UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY PRO SE OFFICE

2026 FEB 24  PM 3: 05

-------------------------------------------------------------------x

ROTH RANBOM,

      Plaintiff,

               Case No. _____

    -against-

               VERIFIED COMPLAINT

REEM BRIDALS LLC, JILLIAN SINEL, and ABHINAV GUPTA,

               JURY TRIAL DEMANDED

    Defendants.

-------------------------------------------------------------------x

# 26 CV 1546

## PRELIMINARY STATEMENT

1. Plaintiff Roth Ranbom ("Plaintiff") brings this action against Reem Bridals LLC ("Reem Bridals" or the "Company"), Jillian Sinel ("Sinel"), and Abhinav Gupta ("Gupta") (collectively, "Defendants") for violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"), the New York Labor Law ("NYLL"), the New York State Human Rights Law ("NYSHRL"), and for tortious interference with prospective business relations and blacklisting in violation of NYLL § 704.

2. This case arises from a pattern of wage theft, retaliation, and post-employment sabotage perpetrated by Defendants against Plaintiff, a commissioned salesperson in the luxury bridal industry. Defendants hired Plaintiff under a written offer letter promising base salary plus commissions, then systematically deprived Plaintiff of earned commissions, unilaterally imposed a draw system without a compliant written agreement, terminated Plaintiff eighteen days after Plaintiff filed a complaint with the New York State Department of Labor ("NYSDOL"), and subsequently interfered with Plaintiff's prospective employment at a competitor through the

transmission of false and misleading information motivated by retaliatory animus.

3. This Complaint is filed on February 24, 2026. Plaintiff's termination occurred on or about February 23, 2023, making February 23, 2026 the applicable statute of limitations deadline for certain claims asserted herein. The United States District Court for the Southern District of New York was closed on February 23, 2026 due to weather emergency, extending the filing deadline to the next business day pursuant to Federal Rule of Civil Procedure 6(a)(3)(A).

## THE PARTIES

4. Plaintiff Roth Ranbom is a natural person residing in Queens County, New York.

5. Defendant Reem Bridals LLC is a Delaware limited liability company that operates a luxury bridal retail establishment at 501 Fifth Avenue, 2nd Floor, New York, New York 10017. Upon information and belief, Reem Bridals LLC has conducted continuous business operations within New York State and within this judicial district, and at all relevant times constituted an enterprise engaged in commerce within the meaning of the FLSA.

6. Defendant Jillian Sinel is, upon information and belief, the President and sole managing member of Reem Bridals LLC, residing in New York. At all relevant times, Sinel exercised direct operational control over the Company, including the authority to hire and fire employees, set wages and commission structures, determine work schedules, and supervise the conditions of employment. Sinel is an "employer" within the meaning of NYLL § 190(3) and FLSA § 203(d), and is personally liable for the violations alleged herein.

7. Defendant Abhinav Gupta is, upon information and belief, the Chief Financial Officer ("CFO") of Reem Bridals LLC. On or about May 24, 2023, Gupta signed official New York State Department of Labor separation documents under the title "CFO," certifying statements regarding Plaintiff's employment and separation that were demonstrably false. At all relevant

2

times, Gupta exercised operational control over the Company's payroll systems, financial reporting, and government filings, including the authority to access and modify payroll system configurations, the display of leave accrual balances on wage statements, and the preparation and submission of documents to state agencies. Gupta received direct email communications from Plaintiff during the employment period at abhinavg@reemacra.com and was copied on correspondence from Defendant Sinel regarding Plaintiff's leave balances and attendance. Gupta is an "employer" within the meaning of NYLL § 190(3) and FLSA § 203(d), and is personally liable for the violations alleged herein.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 216(b) (FLSA private right of action). Plaintiff asserts claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq., which arise under federal law.

9. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as Plaintiff's federal FLSA claims and derive from a common nucleus of operative fact—namely, Defendants' systematic wage violations, retaliatory termination, and post-employment interference.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Reem Bridals LLC operates its principal place of business in this District, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Plaintiff's employment, the wage violations, the protected complaints, the termination, and the tortious interference with prospective employment.

11. Personal jurisdiction over Defendants is proper because Defendant Reem Bridals LLC maintains its principal place of business in this District, conducts continuous and systematic business here, and employed Plaintiff in this District. Defendant Sinel resides in and/or regularly transacts business in this District and exercised operational control over Plaintiff's employment in this District.

## FACTUAL ALLEGATIONS

### A.    Employment and the Offer Letter

12. On or about September 15, 2022, Reem Bridals LLC extended a written offer of employment to Plaintiff for the position of "Retail and Couture Sales Facilitator" at the Company's New York location (the "Offer Letter"). Plaintiff accepted and signed the Offer Letter on September 21, 2022, and commenced employment on September 27, 2022.

13. Under the Offer Letter, Plaintiff's compensation consisted of: (a) a base salary of $75,000 annually; (b) a 3% commission on all of Plaintiff's sales; and (c) an additional 1% commission on all monthly sales if Plaintiff met the monthly sales goal, which was to include both retail and couture products.

14. Plaintiff's principal activity during the employment was selling luxury bridal goods—couture gowns and retail bridal products—and Plaintiff's earnings were based in part on commissions. Plaintiff was therefore a "commission salesman" (commission salesperson) within the meaning of NYLL § 190(6).

15. The Offer Letter did not specify the terms governing the payment of commissions upon termination of employment, the frequency and terms of settlement or reconciliation of commissions, or the method by which commission disputes would be resolved, as required by NYLL § 191(1)(c).

4

16. Defendants never provided Plaintiff with a wage notice complying with NYLL § 195(1), which requires, at hire, a written notice containing the employee's rate of pay, basis thereof (including if paid by commission), allowances claimed, regular pay day, the employer's name, address, telephone number, and other required information.

**B.   FLSA Enterprise Coverage**

17. At all times relevant to this action, Defendants constituted an enterprise engaged in commerce or in the production of goods for commerce within the meaning of FLSA § 203(r) and § 203(s).

18. Upon information and belief, Reem Bridals LLC had and has an annual gross volume of sales made or business done of not less than $500,000, exclusive of excise taxes at the retail level that are separately stated.

19. Upon information and belief, Reem Bridals LLC regularly and recurrently engages in interstate commerce, including but not limited to: (a) purchasing luxury bridal gowns and related merchandise manufactured outside the State of New York and importing such goods into New York for retail sale; (b) maintaining business relationships with designers, manufacturers, and suppliers located outside New York State; (c) processing credit card and other electronic payment transactions that move in interstate commerce; (d) maintaining a website and electronic communications infrastructure that operates in interstate commerce; and (e) serving clientele who travel from outside New York State to purchase bridal goods at the Company's New York location.

20. Plaintiff was employed by an enterprise engaged in commerce within the meaning of the FLSA and is entitled to the protections of the FLSA, including protection from retaliation under 29 U.S.C. § 215(a)(3).

5

C.    **Infrastructure Failure and Operational Dysfunction**

21. During the interview and onboarding process, Plaintiff requested a functioning work phone in order to communicate with clients and process sales. Unlike other employees who used personal phones for work purposes, Plaintiff's arrangement for a company-provided work phone was unique to Plaintiff's employment.

22. On or about September 27, 2022, Defendants provided Plaintiff with a company phone that was obsolete, had a cracked screen, and was incompatible with modern cellular network infrastructure. Company IT personnel confirmed the device was nonfunctional and unsuitable for business use. Despite this confirmation, Defendants did not timely provide a working replacement.

23. Plaintiff remained without functional company communication equipment for several weeks, impairing Plaintiff's ability to communicate with clients, follow up on appointments, coordinate alterations, and generate sales commissions during the critical initial period of employment.

24. During onboarding, Defendants requested that Plaintiff upload Plaintiff's pre-existing client contacts—relationships independently developed prior to employment—to company systems. Because the company-issued phone was nonfunctional and Defendants' infrastructure failures required reliance on personal devices, compliance with this request would have required Plaintiff to transfer independently developed client relationships into company control.

25. Plaintiff declined to upload personal client contacts. In luxury sales, client relationships constitute a critical professional asset and source of goodwill independent of any single employer.

26. On or about October 4, 2022, Defendant Sinel acknowledged in writing that a part-

6

time employee had represented herself as "Director of the atelier," a designation Sinel stated was "news to me," and indicated she would investigate. Despite this acknowledgment, Defendants failed to clarify reporting structure or correct the misrepresentation. The employee continued to exercise de facto authority over Plaintiff, creating operational confusion and undermining Plaintiff's ability to perform duties.

**D.    Commission Violations and Unilateral Changes**

27. From the outset of employment, Defendants failed to enter into a signed, written commission agreement with Plaintiff that set out the agreed terms of employment as required by NYLL § 191(1)(c). The Offer Letter was the sole written document addressing commissions, and it was deficient because it did not specify when commissions were "earned," did not address payment upon termination, and did not set forth draw reconciliation terms.

28. Commissions are "wages" within the meaning of NYLL § 190(1). Under established New York law, when commissions are "earned" depends first on the parties' written agreement, then on the parties' past dealings, and only then on the default rule that a commission is earned when the salesperson has performed all acts required to generate the sale. In the absence of a valid written agreement specifying when commissions are earned, the default rule applies: commissions vest upon sale. In luxury bridal retail, commissions are customarily earned upon execution of the order and receipt of client deposit, as the salesperson's sales function is complete at that point.

**E.    Scheduling Control Structure and Commission Access Restriction**

29. Plaintiff was assigned to the sales floor primarily on Mondays and Thursdays. Other sales staff, including part-time employee Ms. Gabrielle Kauper ("Kauper"), were assigned to work Tuesday, Wednesday, and Friday. Bridal consultations and revenue-generating

7

appointments were predominantly scheduled on days when Plaintiff was not assigned primary sales floor access.

30. Alterations and fittings were routinely scheduled exclusively on Mondays and Thursdays—Plaintiff's assigned workdays. These appointments did not generate new sales commissions and limited Plaintiff's ability to obtain revenue-generating consultations. Kauper did not perform her own alteration appointments; instead, Plaintiff was required to perform alteration work on dresses sold by other employees, including Kauper, without receiving any commission on the original sale or additional compensation for the alteration labor.

31. Plaintiff received bridal clients primarily when scheduling conflicts created overflow or when other sales staff were unavailable, rather than through direct assignment of new consultations. This structural limitation systematically reduced Plaintiff's access to commission-earning opportunities.

32. On multiple occasions, appointments initially associated with Plaintiff were reassigned or rescheduled to days controlled by other staff, further reducing Plaintiff's access to commission-earning opportunities.

33. Upon information and belief, prospective clients were advised by Defendants' staff that appointments were available only on certain days of the week. Specifically, in or around December 2022, receptionist Jennifer Schelich sent an email to a prospective client stating: "Remember that we are open Tuesdays, Wednesdays, and Fridays." This statement was false, as the showroom was open on Mondays and Thursdays when Plaintiff was working and available to serve clients. This misrepresentation corresponded to the schedule of other staff (Tuesday, Wednesday, Friday) rather than Plaintiff's assigned days (Monday, Thursday), and had the effect of diverting prospective clients away from Plaintiff.

8

34. Because commission income depended on access to bridal consultations, the scheduling structure described above materially reduced Plaintiff's ability to earn commissions compared to similarly situated staff. The combined effect of limiting Plaintiff to low-traffic days, concentrating non-commission alteration work on Plaintiff's days, and misrepresenting showroom availability to clients created a system that systematically suppressed Plaintiff's commission income while maintaining the appearance of commission-based compensation.

35. Other sales staff, including part-time employee Kauper, were permitted full sales floor access and received priority assignment of bridal consultations on the high-traffic days (Tuesday, Wednesday, Friday). Kauper worked part-time (three days per week) yet received substantially more commission-earning opportunities than Plaintiff, who worked full-time.

36. Defendants controlled access to commission-generating bridal consultations through scheduling practices that limited Plaintiff to low-traffic sales days, assigned revenue-producing appointments to other staff, and provided Plaintiff access to commission-earning opportunities primarily through overflow or reassignment. This structure systematically reduced Plaintiff's commission income while other employees received preferential access to the same income opportunities.

37. After Plaintiff raised concerns regarding the compensation disparities and scheduling practices described above—including the systematic restriction of client access—Defendants' conduct escalated. Rather than addressing Plaintiff's legitimate complaints, Defendants fabricated performance issues, threatened termination, and ultimately discharged Plaintiff eighteen days after Plaintiff filed a complaint with the New York State Department of Labor.

**F.    Comparator Evidence: Kauper**

38. Throughout Plaintiff's employment, Defendants employed a part-time sales associate

9

named Kauper who performed substantially similar work to Plaintiff—consulting with bridal clients, facilitating sales, and earning commissions on bridal goods. The receptionist responsible for scheduling appointments, Jennifer Schelich, was Kauper's best friend, creating a conflict of interest that contributed to the systematic client diversion described above.

39. Despite working only three days per week (Tuesday, Wednesday, Friday), Kauper received preferential compensation treatment. Specifically, Defendants provided Kauper with monthly commission draw advances of approximately $2,000 per month ($24,000 annually) in addition to her regular salary and commissions.

40. In contrast, Defendants provided Plaintiff—a full-time employee working five days per week—with no commission draw advances during the first four months of employment (September 2022 through January 2023), despite Plaintiff's repeated inquiries regarding overdue commission payments.

41. In or around mid-to-late January 2023, after Plaintiff confronted Defendant Sinel regarding the disparity in treatment and the withholding of commissions, Sinel offered Plaintiff a one-time payment of $1,000—half the monthly amount Kauper received on a recurring basis.

42. Plaintiff received this single $1,000 payment in early February 2023. Defendants terminated Plaintiff's employment on or about February 23, 2023, less than three weeks after making this payment and without providing any additional draw advances. The timing and amount of this payment suggest it was a one-time appeasement rather than the commencement of an ongoing draw structure comparable to Kauper's.

43. Upon information and belief, Kauper continued to receive her $2,000 monthly draw advances throughout this period and was not subjected to the delayed payment, disputed commission calculations, or threats of pay structure changes that Defendants imposed on

Plaintiff.

44. The disparity in compensation structure and draw access cannot be explained by differences in job duties, sales performance, or tenure. Both Plaintiff and Kauper were commission-based sales staff performing substantially similar work selling bridal goods to clients. Any differences in sales volume were directly attributable to Defendants' scheduling practices, which systematically favored Kauper by assigning her to high-traffic days and providing her with preferential access to commission-earning appointments.

45. The difference in treatment was based on impermissible factors and not on legitimate, nondiscriminatory business reasons. The provision of substantial monthly draw advances to a part-time employee while denying equivalent treatment to a full-time employee performing the same work constitutes differential compensation based on factors unrelated to job performance or business necessity.

G.    **Irregular Commission Payments and Calculation Disputes**

46. Throughout Plaintiff's employment from October 2022 through January 2023, Defendants paid Plaintiff commissions on an irregular and opaque basis. Defendants provided wage statements that did not itemize commission rates, the method of commission calculation, or the reconciliation of draws against commissions, in violation of NYLL § 195(3).

47. On or about January 27, 2023, Defendants made a commission payment to Plaintiff in the amount of $4,725.00. This payment was made only after Plaintiff's repeated inquiries and complaints regarding overdue commissions. Prior to this payment, Plaintiff had received minimal or no commission payments despite generating substantial sales during the fall 2022 season.

48. The January 27, 2023 payment did not represent full payment of commissions earned

11

to that date. Plaintiff's own tracking of sales and commission calculations indicated that substantially more was owed.

49. On or about January 23, 2023, Defendant Sinel sent Plaintiff an email purporting to "clarify" the commission payment structure. In this email, Sinel unilaterally announced that commissions would now be paid only upon "shipment" of goods to clients rather than upon sale. This represented a material, unilateral modification of the compensation terms set forth in the Offer Letter, which contained no "shipment" contingency.

50. Sinel's email did not constitute a valid commission agreement under NYLL § 191(1)(c) because it was not a signed agreement setting out the terms of employment at the time of hire. It was a post-hoc, unilateral imposition of terms unfavorable to Plaintiff, issued in response to Plaintiff's complaints about unpaid wages.

51. Moreover, the "payment upon shipment" policy announced in Sinel's email was not applied uniformly to all employees. Upon information and belief, Kauper continued to receive her monthly draw advances regardless of shipment status, while Plaintiff's commissions were withheld pending shipment—a process that could take months given the custom nature of luxury bridal goods.

52. The January 23, 2023 email also threatened to convert Plaintiff's existing commission structure to a "draw versus commission" reconciliation model retroactively, potentially requiring Plaintiff to "pay back" draw amounts if sales did not meet thresholds. This threat was made despite the fact that Plaintiff had not agreed to any draw system and had not received regular draw advances comparable to those provided to Kauper.

53. In that same email, Sinel made accusations regarding Plaintiff's attendance and work hours, claiming that Plaintiff did not "clock in and out" and questioning whether Plaintiff was

12

present for full workdays. These accusations were pretextual and false. Defendants did not maintain a functioning timekeeping system that reliably tracked employee hours, and Plaintiff's work schedule and presence were comparable to other sales staff.

54. On or about February 10, 2023—five days after Plaintiff filed a complaint with the NYSDOL—Defendants made an additional commission payment to Plaintiff in the amount of $1,000.00. This payment was reactive, made in response to Plaintiff's legal complaint rather than in accordance with any regular payment schedule.

55. Even after the February 10, 2023 payment, Plaintiff's commission account remained substantially in arrears. Defendants owed Plaintiff additional commissions on sales made during the fall and winter season that had not been paid.

### H.    Financial Distress and Medical Impact

56. The systematic withholding of earned commissions caused Plaintiff severe financial distress. During the period from October 2022 through January 2023, Plaintiff experienced difficulty meeting basic living expenses due to the shortfall between expected compensation (salary plus timely commission payments) and actual compensation received (salary only, with commissions withheld for months).

57. On or about one occasion in January 2023, Plaintiff was unable to afford the $2.75 fare for public transportation on the New York City subway system due to lack of available funds caused by Defendants' wage theft. Plaintiff disclosed this financial hardship to Defendant Sinel.

58. The financial stress caused by Defendants' wage violations exacerbated Plaintiff's pre-existing anxiety condition. Plaintiff informed Defendant Sinel that the unpaid wages and financial uncertainty were causing significant anxiety and mental distress.

59. Rather than addressing the wage violations that were causing Plaintiff's distress, Defendant Sinel responded in a manner that interfered with Plaintiff's ability to obtain medical treatment. Specifically, Sinel told Plaintiff not to contact Plaintiff's family for support and discouraged Plaintiff from taking prescribed medication for anxiety.

60. During this same period, Plaintiff discovered that the health insurance plan provided by Defendants did not include coverage for Plaintiff's primary care physician, creating an additional barrier to obtaining medical treatment for the anxiety condition that Defendants' wage violations had exacerbated.

61. Defendants' conduct—causing financial distress through wage theft, then actively discouraging medical treatment for the resulting mental health impact—constituted willful interference with Plaintiff's efforts to manage a disability and violated the Americans with Disabilities Act's prohibition on interference with the exercise of ADA rights.

62. After termination, Plaintiff was left without health insurance and without the financial means to afford medical treatment for anxiety. This condition persisted for an extended period, causing ongoing harm to Plaintiff's health and well-being.

I.    **Protected Complaints**

63. In or around January 2023, Plaintiff sent written communications to Defendant Sinel raising concerns about the withholding of commissions, the disparity in compensation treatment between Plaintiff and Kauper, and the systematic restrictions on Plaintiff's access to commission-earning appointments.

64. In these communications, Plaintiff used terms such as "discrimination," "retaliation," and "missing paychecks," making clear that Plaintiff was asserting violations of employment law and wage payment requirements.

14

65. Plaintiff requested that these communications be retained in Plaintiff's personnel file, establishing a formal record of the complaints.

66. On or about February 5, 2023, Plaintiff filed a formal complaint with the New York State Department of Labor ("NYSDOL") regarding Defendants' wage violations, including the withholding of earned commissions and the failure to pay wages in accordance with the Offer Letter and applicable law.

67. Plaintiff's complaints—both the internal complaints to Sinel in January 2023 and the NYSDOL complaint in February 2023—constituted protected activity under FLSA § 215(a)(3), NYLL § 215, and other applicable employment laws.

J.    **Retaliatory Termination**

68. Plaintiff contracted COVID-19 or COVID-like symptoms after coming into direct contact with a coworker whom Defendants permitted to work in the showroom during market week despite that coworker having tested positive by PCR test. On February 20, 2023, Plaintiff notified both Defendant Sinel and Defendant Gupta in writing that "an employee that tested positive [was] allowed to work last week in direct contact with me." On or about February 22, 2023, Plaintiff again raised this issue, asking Defendants: "Where was this level of vigilance with the colleague I came in contact with who had a positive PCR and allowed to work?" Defendants never responded to either notification, never investigated the workplace exposure, and instead escalated their demands for medical documentation from Plaintiff while ignoring the Company's own role in causing the illness.

69. On or about February 22, 2023—seventeen days after Plaintiff filed the NYSDOL complaint—Defendant Sinel sent Plaintiff an email threatening to terminate Plaintiff's employment unless Plaintiff provided medical documentation by the following day.

70. This email claimed that Plaintiff had been absent from work and had not provided required documentation of illness. The email stated that if Plaintiff did not provide proof of a positive COVID-19 test or a doctor's note by February 23, 2023, Defendants would "assume that [Plaintiff had] voluntarily resigned."

71. The demand for immediate medical documentation was pretextual and designed to create an impossible condition. Plaintiff could not afford to visit a doctor to obtain a note because Defendants had withheld Plaintiff's wages and Plaintiff lacked health insurance coverage for Plaintiff's primary care physician. Defendants were aware of Plaintiff's financial constraints and lack of adequate health coverage, having been directly informed of these issues in January 2023.

72. On or about February 23, 2023—eighteen days after Plaintiff filed the NYSDOL complaint—Defendants terminated Plaintiff's employment.

73. The stated reason for termination—failure to provide medical documentation within 24 hours—was pretextual. The true reason for termination was retaliation for Plaintiff's protected complaints regarding wage violations, including the January 2023 internal complaints and the February 5, 2023 NYSDOL complaint.

74. The temporal proximity between the NYSDOL complaint (on or about February 5) and the termination (February 23) is direct evidence of retaliatory motive. Eighteen days is an exceptionally short period that supports an inference of causation.

75. The pretextual nature of the stated reason is further evidenced by: (a) the sudden imposition of documentation requirements that had not been enforced previously; (b) the impossibility of compliance given Plaintiff's financial situation, which Defendants had caused and were aware of; (c) the absence of any prior discipline or warnings regarding attendance; (d)

16

the timing immediately following the NYSDOL complaint; and (e) the escalation of Defendants' hostility toward Plaintiff following Plaintiff's January 2023 complaints about wage violations and scheduling discrimination.

76. Prior to Plaintiff's complaints in January 2023, Defendants had not raised any issues regarding Plaintiff's attendance or performance. The sudden emergence of these allegations immediately after Plaintiff asserted wage claims demonstrates that they were fabricated to provide a pretext for retaliation.

K.   **Unpaid Wages Upon Termination**

77. Upon termination, Defendants failed to pay Plaintiff all wages due, including earned but unpaid commissions.

78. Under New York law, wages earned but unpaid at the time of termination must be paid no later than the regular payday for the pay period during which the termination occurred. NYLL § 191(3). Commissions earned prior to termination are "wages" and must be paid in accordance with the terms of the commission agreement or, in the absence of such agreement, in accordance with the default rule that commissions vest upon completion of the sale.

79. Defendants failed to provide Plaintiff with a final wage statement itemizing all compensation due, in violation of NYLL § 195(3).

80. Defendants have not provided Plaintiff with a full accounting of commissions earned during the employment period, commissions paid, and commissions remaining unpaid.

81. Based on Plaintiff's records of sales made during the employment period and the commission rates set forth in the Offer Letter, Defendants owe Plaintiff substantial unpaid commissions. The exact amount is not presently ascertainable by Plaintiff because Defendants have withheld records and have not provided transparent accounting, but upon information and

17

belief, the amount exceeds $6,000.

**L.    Post-Termination Interference: The Amsale Opportunity**

82. Following termination, Plaintiff sought to mitigate damages by pursuing employment opportunities in the luxury bridal industry, where Plaintiff had years of experience and established professional relationships.

83. In or about April 2023, Plaintiff interviewed for a position as a bridal consultant with Amsale, a prestigious luxury bridal house and direct competitor of Reem Bridals. Amsale is recognized as one of the premier bridal brands in the industry.

84. Plaintiff's interview process with Amsale proceeded favorably through multiple rounds. During the third interview, Neil Brown, an Amsale representative who maintained a preexisting personal relationship with Defendant Sinel, specifically asked Plaintiff whether Plaintiff knew Jillian Sinel and what Plaintiff thought of her. Plaintiff responded truthfully that Reem Bridals did not pay in accordance with the employment contract and that Plaintiff was considering legal action. Despite this disclosure, Amsale expressed strong interest in hiring Plaintiff based on Plaintiff's qualifications, industry experience, and professional presentation.

85. The Amsale hiring process was facilitated by Marina Santo, a recruiter at Fourth Floor, a recruiting firm specializing in luxury retail and bridal industry placements. Ms. Santo served as an intermediary between Plaintiff and Amsale during the interview and negotiation process.

86. Upon information and belief, Neil Brown contacted Defendant Sinel directly regarding Plaintiff's candidacy, leveraging his preexisting personal relationship with Sinel rather than conducting a standard reference check through the recruiter. Upon information and belief, Sinel provided false, misleading, or materially incomplete information about Plaintiff to Brown

18

and/or Amsale, motivated by retaliatory animus stemming from Plaintiff's wage complaints and NYSDOL filing.

87. The information conveyed by Defendant Sinel to Amsale through Neil Brown was false, misleading, or materially incomplete, and was motivated by retaliatory animus against Plaintiff for exercising protected rights under federal and state labor law.

88. Following the reference check, Amsale abruptly withdrew its interest in hiring Plaintiff. The offer that had been anticipated did not materialize.

89. On or about June 9, 2023, Ms. Santo sent Plaintiff a letter via email confirming that Defendants had interfered with the Amsale opportunity. In this letter, Ms. Santo stated that she had been informed by Amsale that "the feedback from your previous employer was not favorable" and that this negative reference was the reason Amsale would not be moving forward with Plaintiff's candidacy.

90. Ms. Santo's letter further stated that the language used by Amsale in communicating the negative reference was "almost verbatim" to language that had appeared in Plaintiff's termination communications from Reem Bridals, suggesting that Defendants had transmitted the same pretextual accusations (regarding attendance and performance) that Defendants had fabricated to justify Plaintiff's retaliatory termination.

91. The provision of a negative reference to a prospective employer, containing false or misleading information and motivated by retaliatory animus, constitutes tortious interference with prospective business relations.

92. The luxury bridal industry in New York is a small, closely networked professional community. A negative reference from a former employer carries substantial weight and can effectively bar a candidate from employment opportunities. Defendants' interference caused

Plaintiff to lose the Amsale opportunity and damaged Plaintiff's professional reputation within the industry.

93. Defendants' conduct also violated NYLL § 704, which prohibits employers from preventing or attempting to prevent a discharged employee from obtaining employment "by any means whatsoever." The transmission of false or retaliatory information to a prospective employer for the purpose of blocking that employment opportunity falls squarely within the conduct prohibited by § 704.

M.    **Ongoing Damages**

94. As a result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer substantial damages, including: (a) unpaid wages in the form of withheld commissions; (b) lost earnings from the retaliatory termination; (c) lost earnings and benefits from the Amsale position that Defendants' interference prevented Plaintiff from obtaining; (d) emotional distress, anxiety, and mental anguish caused by the wage theft, the termination, and the post-employment sabotage; (e) damage to professional reputation in the luxury bridal industry; and (f) ongoing inability to afford medical treatment for anxiety.

95. Plaintiff has made reasonable efforts to mitigate damages by seeking alternative employment, but the competitive nature of the luxury bridal industry, the damage to Plaintiff's reputation caused by Defendants' interference, and the economic conditions in the industry have made it difficult to secure comparable employment.

N.    **Leave Accrual Fraud and Wage Statement Concealment**

96. The termination letter dated February 23, 2023 (bearing law firm document tracking number ACTIVE 685579570v3), drafted by Defendants' outside counsel, justified Plaintiff's separation by stating that Plaintiff's absences during the week of February 20–23, 2023 were

"unexcused" because Plaintiff "did not have any available sick time or paid time off to cover [his] absences."

97. On or about February 17, 2023, Defendant Sinel emailed Plaintiff, copying Defendant Gupta at abhinavg@reemacra.com, and stated: "As stated yesterday, you do not have any more sick time to apply to this absence, so we can apply one of your remaining two PTO days."

98. On or about February 22, 2023, at 10:18 PM, Defendant Sinel emailed Plaintiff and stated: "You do [not] have any available sick time or PTO for your absences Monday, yesterday and today, and thus, they are unexcused." This email further stated that if Plaintiff did not provide a positive COVID test or doctor's note "by tomorrow," "the Company will assume that you have voluntarily resigned from you [sic] position and will proceed with ending your employment."

99. These representations were false. Defendants' own payroll system—the MM229 platform operated under the account "Reem Bridals LLC"—displayed the following accrual balances as of February 20, 2023, at 10:13 AM Eastern: (a) PTO: 32.00 hours available (equivalent to four full 8-hour workdays); and (b) Sick/Safe Leave: 3.86 hours available. A screenshot of the system captured by Plaintiff on that date and time confirms these balances.

100. Defendant Sinel's claim on February 17 that Plaintiff had only "two remaining PTO days" was contradicted by the system's display of 32 hours (four days). Her claim on February 22 that Plaintiff had "no available sick time or PTO" was contradicted by the system's display of 32 hours PTO and 3.86 hours of sick leave available that same week.

101. The entire termination framework—that Plaintiff's absences were "unexcused" because he lacked available leave—was built on a demonstrably false factual premise. Plaintiff had more than sufficient PTO to cover every day of absence from February 15 through February 23, 2023.

102. Furthermore, Defendant Sinel's February 22 email demanding a "positive COVID test" or doctor's note was unnecessary when sufficient PTO existed to cover the absences without medical documentation. The demand for invasive medical information served no

legitimate business purpose and functioned as an additional mechanism to scrutinize Plaintiff's medical condition and manufacture cause for termination.

103. Defendant Sinel's February 17 email also stated: "I note that your call out was 20 mins before the start of the work day (9:30 a.m.) and 17 mins before the start of the work day yesterday, violating the Company's Attendance and Tardiness policy." This escalation of attendance scrutiny—measuring call-out times to the minute—commenced only after Plaintiff's DOL complaint and is consistent with the pattern of heightened surveillance and pretextual documentation that characterizes retaliatory termination.

**O.    Systematic Concealment of Accrual Balances on Wage Statements**

104. Throughout Plaintiff's employment, pay stubs issued by Reem Bridals LLC consistently displayed accrual balances for PTO and Sick/Safe Leave. This pattern held from the first pay stub (pay date October 7, 2022) through the pay stub dated January 27, 2023 (pay period January 9–22, 2023), which showed PTO: 3 days available and Sick/Safe Leave: 0.48 days available.

105. The pay stub dated February 10, 2023 (Voucher #9999006073), covering pay period January 23 through February 5, 2023, was the first and only pay stub to omit accrual balances entirely. In place of the accrual section, the following message appeared: "We apologize your time off is not appearing on your checks this pay period. We have identified an issue that needs correction. We expect that your corrected accruals will appear on the next pay stub."

106. This pay period—January 23 through February 5, 2023—is the exact period during which Plaintiff filed his complaint with the New York State Department of Labor on or about February 5, 2023. The accrual "error" appeared for the first time on the first pay stub issued after Plaintiff engaged in protected activity.

107. Despite the promise that "corrected accruals will appear on the next pay stub," the subsequent and final pay stub—dated February 24, 2023 (Voucher #9999006136), covering pay period February 6–19, 2023—also omitted accrual balances entirely. No error message or explanation was provided. The accrual section was silently removed.

22

108. For the only two pay periods coinciding with Plaintiff's protected activity and Defendants' retaliatory termination sequence, Defendants failed to provide accurate wage statements showing leave accrual balances. The first omission came with an admission of "error." The second omission came with no explanation. Meanwhile, Defendants' own system continued to track the actual balances—32.00 hours PTO and 3.86 hours sick leave—which Defendants affirmatively concealed from Plaintiff while simultaneously claiming those balances were zero.

**P.    False Government Filings and the Three-Way Date Contradiction**

109. On or about May 24, 2023, Defendant Gupta, as "CFO" of Reem Bridals LLC, signed and submitted official New York State Department of Labor separation documents regarding Plaintiff's employment. In these filings, Gupta certified under penalty of law that Plaintiff's "last day worked" was "02/14/23" and characterized the reason for separation as "Voluntarily Quit" with the notation that Plaintiff was "claiming that he was sick."

110. Gupta's certified statement that Plaintiff's last day worked was February 14, 2023 is demonstrably false. On February 15, 2023, at 12:59 PM, Plaintiff sent an email to both Gupta (abhinavg@reemacra.com) and Sinel (jillians@reemacra.com) stating: "I forgot to clock in this morning but was present for the shift. Sorry for the inconvenience. I need to excuse myself for the rest of the day I do not feel well enough to work." This email proves that Plaintiff was physically present at work on February 15, 2023. Gupta received this email directly and nonetheless certified to a state agency, three months later, that Plaintiff's last day of work was February 14.

111. The termination letter dated February 23, 2023, drafted by Defendants' outside counsel, states: "You have been absent from work since Wednesday, February 15, 2023." This language establishes February 15 as the first day of absence—necessarily meaning Plaintiff was present at work on that date before becoming absent, consistent with Plaintiff's email. The termination letter further establishes the operative separation date as February 23, 2023.

112. Three mutually contradictory separation dates now exist in the record: (a) February 14, 2023, as certified by Gupta to the NYS DOL; (b) February 15, 2023, as the first date of absence acknowledged in the termination letter; and (c) February 23, 2023, as the operative

23

termination date in the termination letter. No version of events is consistent with Gupta's certified claim of February 14.

113. Gupta's false certification to the NYS DOL had material consequences for Plaintiff's unemployment insurance claim. By backdating Plaintiff's separation to February 14 and characterizing it as "Voluntarily Quit," Gupta's filing was designed to deny Plaintiff unemployment benefits to which he was entitled. The characterization "claiming that he was sick" further undermined Plaintiff's credibility with the state agency by casting doubt on the legitimacy of Plaintiff's medical leave.

114. If Plaintiff's employment ended on February 14, 2023 as Gupta certified, then all of Defendants' subsequent communications to Plaintiff regarding attendance policies, leave balances, and the February 22 ultimatum were sent to a non-employee about a non-existent employment relationship. The February 23 termination letter would be terminating someone who had already separated. This logical impossibility demonstrates that at least one of Defendants' official positions is false.

**Q.     The Constructive Resignation Trap and Additional Contradictions**

115. Defendant Sinel's February 22, 2023 email contains further statements that undermine Defendants' position. Sinel wrote: "No one reported to work last week and disclosed they tested positive for COVID. In fact, had a colleague come in and disclosed they tested positive for COVID, management would have instructed them to go home in line with Company policy." Plaintiff had reported exposure to a coworker with COVID-like symptoms as the basis for his own illness. Sinel's categorical denial, combined with the demand for a "positive COVID test" rather than a negative one, reflects a pattern of disbelieving Plaintiff's reported medical condition—the same skepticism Defendant Gupta later expressed to the NYS DOL when he wrote that Plaintiff was "claiming that he was sick."

116. Sinel also wrote: "No one has disclosed to employees the reason for your absence (your claimed illness)—so your concerns regarding privacy are unfounded." The parenthetical "your claimed illness" is itself a characterization of the nature of Plaintiff's absence that undermines the denial. Moreover, Plaintiff had raised privacy concerns regarding his medical status being discussed in the workplace. Sinel's defensive denial suggests the concern had merit.

24

117. The February 22 email explicitly laid out the mechanism by which Defendants intended to recharacterize their termination as a "voluntary resignation": "If you do not advise of a positive COVID test or provide a doctor's note attesting to your need for your absence by tomorrow, the Company will assume that you have voluntarily resigned from you [sic] position." This language was crafted to create a paper trail supporting the fiction that Plaintiff quit, when in fact Defendants were constructing an involuntary termination with a manufactured deadline and a false factual premise (that Plaintiff lacked available leave).

118. The "voluntary resignation" characterization is conclusively undermined by the accrual evidence. Defendants cannot simultaneously claim that Plaintiff quit because he exhausted his leave when their own system shows 32 hours of PTO remained available. The termination was involuntary and pretextual.

## FIRST CAUSE OF ACTION
### Unpaid Commissions – Breach of Contract and Violation of NYLL §§ 190-199
### (Against All Defendants)

119. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

120. The Offer Letter constituted a binding employment contract under which Defendants agreed to pay Plaintiff base salary plus commissions at specified rates (3% on Plaintiff's sales, plus an additional 1% if monthly goals were met).

121. Plaintiff performed all conditions precedent to Defendants' obligation to pay commissions, including generating sales of bridal goods during the employment period.

122. Defendants materially breached the employment contract by failing to pay commissions in a timely manner, by unilaterally imposing a "shipment" contingency not present in the Offer Letter, by failing to provide transparent accounting of commissions earned and paid, and by failing to pay all earned commissions upon termination.

123. Commissions are "wages" under NYLL § 190(1). Defendants' failure to pay earned commissions constitutes a violation of NYLL wage payment provisions, including NYLL § 191

25

(frequency of pay) and § 198 (recovery of wages).

124. Plaintiff is entitled to recover all unpaid commissions as damages for breach of contract and as unpaid wages under NYLL.

125. Plaintiff is further entitled to liquidated damages equal to 100% of the unpaid wages pursuant to NYLL § 198(1-a), prejudgment interest at the rate of 9% per annum from the date each commission payment became due, and reasonable attorneys' fees and costs pursuant to NYLL § 198(1-a) and § 663(5).

## SECOND CAUSE OF ACTION
### Failure to Provide Wage Notice – NYLL § 195(1)
### (Against All Defendants)

126. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

127. NYLL § 195(1) requires employers to provide employees, at the time of hiring, with a written notice containing the employee's rate of pay and basis thereof (including if paid by commission), allowances claimed, the regular pay day, the employer's name and contact information, and other required information.

128. Defendants failed to provide Plaintiff with a compliant wage notice at the time of hiring.

129. This failure constitutes a violation of NYLL § 195(1).

130. Plaintiff is entitled to statutory damages of $50 for each work day that the violation continued, up to a total of $5,000, pursuant to NYLL § 198(1-b), plus reasonable attorneys' fees and costs.

## THIRD CAUSE OF ACTION
### Failure to Provide Accurate Wage Statements – NYLL § 195(3)
### (Against All Defendants)

26

131. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

132. NYLL § 195(3) requires employers to provide employees with a wage statement with each payment of wages that lists, among other things, the dates of work covered by the payment, the rate of pay, and if the employee is paid on a commission basis, the details necessary to calculate the commissions.

133. Throughout Plaintiff's employment, Defendants provided wage statements that did not itemize commission rates, did not explain the method of commission calculation, and did not provide the information necessary for Plaintiff to verify the accuracy of commission payments.

134. This failure constitutes a violation of NYLL § 195(3).

135. In addition to the commission-related wage statement deficiencies alleged above, Defendants also violated NYLL § 195(3) by issuing wage statements on February 10, 2023 and February 24, 2023 that omitted leave accrual balances entirely. Defendants' own payroll system continued to track these balances (showing 32 hours PTO and 3.86 hours sick leave on February 20, 2023), but Defendants suppressed this information from the wage statements during the precise period they were misrepresenting Plaintiff's leave balances in correspondence to justify termination.

136. The February 10, 2023 wage statement acknowledged the accrual omission as an "issue that needs correction" and promised correction on the next pay stub. The February 24, 2023 wage statement silently omitted accruals without explanation or correction. Both omissions occurred during the only two pay periods spanning from Plaintiff's DOL complaint (February 5, 2023) through his termination (February 23, 2023). The timing is not coincidental.

137. Plaintiff is entitled to statutory damages of $250 for each work day that the violation continued, up to a total of $5,000, pursuant to NYLL § 198(1-d), plus reasonable attorneys' fees and costs.

27

## FOURTH CAUSE OF ACTION
### Failure to Provide Notice of Pay Rate Change – NYLL § 195(2)
### (Against All Defendants)

138. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

139. NYLL § 195(2) requires that "[a]ny changes in the information required [in the wage notice] must be provided to the employee in writing at least seven calendar days prior to the time of such changes, unless such changes are reflected on the wage statement."

140. On or about January 23, 2023, Defendant Sinel purported to change the terms of Plaintiff's commission compensation by announcing that commissions would henceforth be paid only upon "shipment" rather than upon sale. This constituted a material change in the basis of Plaintiff's pay.

141. Defendants did not provide Plaintiff with written notice of this change seven calendar days in advance, nor was the change reflected in any wage statement provided to Plaintiff.

142. This failure constitutes a violation of NYLL § 195(2).

143. Plaintiff is entitled to appropriate damages, attorneys' fees, and costs.

## FIFTH CAUSE OF ACTION
### Retaliation in Violation of New York Labor Law § 215
### (Against All Defendants)

144. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

145. NYLL § 215(1)(a) provides that "[n]o employer…shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee…because such employee has…made a complaint to his or her employer…or to the commissioner or his or her

28

authorized representative that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter…"

146. Plaintiff engaged in protected activity by: (a) complaining to Defendant Sinel in January 2023 regarding unpaid commissions, discriminatory scheduling practices, and disparities in compensation; and (b) filing a complaint with the New York State Department of Labor on or about February 5, 2023 regarding wage violations.

147. Plaintiff's complaints were made in good faith and based on a reasonable belief that Defendants were violating NYLL wage payment provisions and other employment laws.

148. Defendants retaliated against Plaintiff for engaging in protected activity by terminating Plaintiff's employment on or about February 23, 2023, eighteen days after the NYSDOL complaint was filed.

149. The temporal proximity between the protected activity and the adverse employment action, combined with the pretextual nature of the stated reason for termination and the escalation of hostility following Plaintiff's complaints, establishes that Defendants' retaliatory animus was a motivating factor in the decision to terminate Plaintiff.

150. As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered damages including lost wages, lost benefits, emotional distress, damage to professional reputation, and other consequential harm.

151. Plaintiff is entitled to compensatory damages, liquidated damages as provided by NYLL § 215(2)(a), injunctive relief, and reasonable attorneys' fees and costs.

## SIXTH CAUSE OF ACTION
### Retaliation in Violation of the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3)
### (Against All Defendants)

152. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully

29

set forth herein.

153. Section 215(a)(3) of the FLSA makes it unlawful for any person "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act..."

154. Plaintiff engaged in activity protected by the FLSA by filing a complaint with the NYSDOL regarding wage violations, including violations of wage payment requirements applicable to commission salespersons.

155. Defendants retaliated against Plaintiff in violation of 29 U.S.C. § 215(a)(3) by terminating Plaintiff's employment in response to Plaintiff's protected complaints.

156. As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered and continues to suffer lost wages, lost benefits, and other damages.

157. Plaintiff is entitled to reinstatement or, in the alternative, front pay; back pay with liquidated damages; compensatory damages; and reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b) and § 260.

## SEVENTH CAUSE OF ACTION
### Discrimination in Violation of the New York State Human Rights Law
### (Against All Defendants)

158. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

159. NYSHRL § 296 prohibits discrimination in employment on the basis of protected characteristics and also prohibits retaliation against employees who oppose unlawful discriminatory practices or participate in proceedings related to such practices.

160. Defendants subjected Plaintiff to differential treatment in compensation and working conditions, including systematic restriction of access to commission-earning opportunities

through discriminatory scheduling practices, withholding of commission payments, and denial of draw advances comparable to those provided to other employees.

161. Defendants' termination of Plaintiff's employment was motivated by retaliatory animus in response to Plaintiff's opposition to discriminatory and unlawful employment practices.

162. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer lost wages, lost benefits, emotional distress, and other damages.

163. Plaintiff is entitled to compensatory damages, back pay, front pay, punitive damages, and reasonable attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION
### Tortious Interference with Prospective Business Relations
### (Against All Defendants)

164. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

165. Following termination, Plaintiff had a prospective business relationship with Amsale for employment as a bridal consultant. There was a reasonable probability that Plaintiff would have entered into this employment relationship but for Defendants' interference.

166. Defendants, with knowledge of the prospective relationship between Plaintiff and Amsale, intentionally interfered with that relationship by providing false, misleading, or materially incomplete information to Amsale and/or the recruiting firm Fourth Floor.

167. Defendants' interference was motivated by retaliatory animus stemming from Plaintiff's wage complaints and NYSDOL filing, and was carried out through improper means, including the transmission of false information and pretextual accusations.

168. As a direct and proximate result of Defendants' tortious interference, the prospective

31

employment relationship with Amsale did not materialize, and Plaintiff suffered damages including lost earnings, lost benefits, lost career advancement opportunities, and damage to professional reputation in the luxury bridal industry.

169. Plaintiff is entitled to compensatory damages, including lost earnings and benefits from the Amsale position, and consequential damages for harm to Plaintiff's professional reputation in the closely networked luxury bridal industry.

### NINTH CAUSE OF ACTION
### Blacklisting – New York Labor Law § 704
### (Against All Defendants)

170. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

171. NYLL § 704 prohibits any person from preventing or attempting to prevent a discharged employee from obtaining employment by any means whatsoever.

172. Defendants' transmission of false and misleading information to Amsale and/or Fourth Floor was intended to, and did, prevent Plaintiff from obtaining employment in the luxury bridal industry, in violation of NYLL § 704.

173. Plaintiff is entitled to all damages recoverable under law for Defendants' blacklisting conduct.

### TENTH CAUSE OF ACTION
### Fraud and Misrepresentation Regarding Leave Accrual Balances
### (Against All Defendants)

174. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

175. Defendant Sinel made affirmative misrepresentations of material fact regarding Plaintiff's leave accrual balances in emails dated February 17, 2023 and February 22, 2023.

These misrepresentations were made with knowledge of their falsity, as Defendants' own payroll system displayed balances of 32.00 hours PTO and 3.86 hours sick leave during the same period.

176. These misrepresentations were made with the intent to induce reliance and create a paper trail supporting the predetermined conclusion that Plaintiff's absences were "unexcused" and constituted "voluntary resignation." The misrepresentations were integral to and inseparable from the termination decision.

177. Defendant Gupta made a false certification to the New York State Department of Labor on or about May 24, 2023, stating that Plaintiff's last day worked was February 14, 2023, when Gupta had personally received an email from Plaintiff on February 15, 2023 confirming Plaintiff's physical presence at work that day. Gupta further characterized the separation as "Voluntarily Quit" when the separation was involuntary.

178. Defendants concealed Plaintiff's actual accrual balances by suppressing accrual information from two consecutive wage statements (February 10 and February 24, 2023) during the precise window between Plaintiff's DOL complaint and his termination. This concealment was necessary to sustain the false narrative that Plaintiff lacked available leave.

179. Plaintiff reasonably relied on Defendants' representations regarding his leave balances and was damaged thereby, including but not limited to: loss of employment based on a false factual premise; loss of the ability to apply accrued PTO to cover absences; interference with unemployment insurance benefits through false government filings; reputational harm from the false characterization of his separation as voluntary; and emotional distress.

180. Plaintiff is entitled to compensatory damages, consequential damages, and such other relief as the Court deems just and proper.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants, jointly and severally, as follows:

a. On Count I (Unpaid Commissions): An award of all unpaid commissions; liquidated damages equal to 100% of unpaid wages pursuant to NYLL § 198(1-a); prejudgment interest at

9% per annum from the date each commission became due; and reasonable attorneys' fees and costs;

b. On Count II (Wage Notice Violation): Statutory damages of $50 per work day of violation, not to exceed $5,000, pursuant to NYLL § 198(1-b); plus attorneys' fees and costs;

c. On Count III (Wage Statement Violation): Statutory damages of $250 per work day of violation, not to exceed $5,000, pursuant to NYLL § 198(1-d); plus attorneys' fees and costs;

d. On Count IV (Pay Change Notice Violation): Appropriate damages, attorneys' fees, and costs for Defendants' failure to comply with NYLL § 195(2);

e. On Count V (NYLL Retaliation): Lost compensation; emotional distress damages; liquidated damages as provided by NYLL § 215; injunctive relief restraining Defendants from further retaliation; and attorneys' fees and costs;

f. On Count VI (FLSA Retaliation): Lost wages; reinstatement or front pay; liquidated damages; and attorneys' fees and costs pursuant to 29 U.S.C. § 216(b) and § 260;

g. On Count VII (NYSHRL): Compensatory damages; punitive damages; back pay; front pay; and attorneys' fees and costs;

h. On Count VIII (Tortious Interference): Compensatory damages for lost earnings, benefits, and career advancement from the Amsale position; damages for harm to Plaintiff's professional reputation; and consequential damages;

i. On Count IX (Blacklisting): All damages recoverable under NYLL § 704;

j. On Count X (Fraud and Misrepresentation): Compensatory damages for losses caused by Defendants' false representations regarding leave balances and false government filings; consequential damages; and such other relief as the Court deems just and proper;

k. Pre- and post-judgment interest on all applicable claims;

l. A declaratory judgment that Defendants' commission practices and retaliatory conduct

34

violated applicable law;

m. An injunction prohibiting Defendants from making any further disparaging communications about Plaintiff to prospective employers or industry contacts;

n. An order requiring Defendants to provide a neutral employment reference to any prospective employer upon request;

o. Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands trial by jury on all issues so triable.

Dated: New York, New York
     February 24, 2026

Respectfully submitted,

Roth Ranbom, Pro Se
1178 Broadway, 3rd Floor
PMB #561
New York, New York 10001
424-438-4958
R261291@proton.me

35

## VERIFICATION

STATE OF NEW YORK   )
                  ) ss.:
COUNTY OF NEW YORK   )

Roth Ranbom, being duly sworn, deposes and states: I am the Plaintiff in the above-entitled

action. I have read the foregoing Verified Complaint and know the contents thereof. The same is

true to my knowledge, except as to those matters therein stated to be alleged upon information

and belief, and as to those matters, I believe them to be true.


_____  02/24/2026
Roth Ranbom
State of Florida County of Osceola
Roth Ranbom appeared and signed electronically and presented his NY Drivers License as identification.
Sworn to before me this  24  day
of February, 2026.

_____  02/24/2026
Notary Public    Cecilia Gomez

CECILIA GOMEZ
COMMISSION #HH 704957
EXPIRES ON
JULY 30, 2029

This notarial act was an online notarization

36