REC'D SDNY CLERK'S OFF.
2026 MAR 17 PM11:19

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

——————————————————————————X

**ROTH RANBOM,**

    *Plaintiff,*

              v.

**REEM BRIDALS LLC; REEM HOLDINGS LLC;**
**REEM ACRA BOUTIQUE LLC;**
**REEM ACRA COUTURE COLLECTION LLC;**
**REEM ACRA LICENSING LLC;**
**R.A. LUXURY LLC;**
**REEM ACRA,** individually;
**JILLIAN HIRSCH-SINEL a/k/a JILLIAN SINEL,**
individually;
and **ABHINAV GUPTA,** individually,

    *Defendants.*

Case no. 1:26-cv-01546



——————————————————————————X

## FIRST AMENDED COMPLAINT

## JURY TRIAL DEMANDED

## PRELIMINARY STATEMENT

1.    This action arises first and foremost from Defendants' failure to pay Plaintiff earned wages, commissions, and accrued leave in violation of the FLSA and the New York Labor Law, and from the retaliation that followed when Plaintiff complained about those wage violations. Plaintiff also asserts related claims for sex-based wage discrimination, disability-based interference under the Americans with Disabilities Act, fraudulent inducement, fraud in the falsification of leave records and government filings, tortious interference with prospective business relations, and unlawful blacklisting in connection with Plaintiff's employment as a Couture Sales Facilitator at the luxury bridal fashion house operating under the "Reem Acra" brand.

2. Plaintiff was recruited on LinkedIn by Defendant Jillian Hirsch-Sinel a/k/a Jillian Sinel in August 2022 and accepted a below-market commission rate based on representations about role exclusivity that were false when made.

3. During his employment, Defendants diverted commission-generating client appointments to a female comparator and maintained a schedule structure that reduced Plaintiff's access to sales opportunities relative to that comparator. Those same appointment diversions form part of the retaliatory pattern and pretext alleged in Counts IV and V.

4. Defendants retaliated against Plaintiff for filing a New York State Department of Labor wage complaint. Plaintiff was terminated seventeen days after that filing.

5. Following termination, Defendants provided negative post-employment references regarding Plaintiff to a prospective employer, Amsale, through staffing intermediary Fourth Floor. Amsale rescinded a confirmed temp-to-perm offer after four rounds of interviews and written confirmation that the company was "prepared to move forward" with Plaintiff's placement.

6. The Defendants operated through a network of at least eight entities sharing the same address, personnel, phone system, email domain, and beneficial ownership.

## JURISDICTION AND VENUE

7. This Court has federal question jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claims arising under 29 U.S.C. § 201 et seq. (FLSA) and 42 U.S.C. § 12101 et seq. (ADA).

8. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state-law claims arising under the New York Labor Law and New York common law.

2

9.    Venue is proper in this District under 28 U.S.C. § 1391(b). All Defendants maintain their principal place of business in this District and all events giving rise to Plaintiff's claims occurred in this District.

10.    Plaintiff Roth Ranbom is a natural person residing in Queens County, New York. Plaintiff's mailing address for purposes of this action is 1178 Broadway, 3rd Floor, #561, New York, NY 10001. Plaintiff brings this action pro se.

**Entity Defendants**

11.    Defendant Reem Bridals LLC is a Delaware limited liability company (DE File No. 4707556, formed July 8, 2009) registered as a foreign limited liability company with the New York Department of State (DOS ID 3853872) with its principal place of business at 501 Fifth Avenue, 2nd Floor, New York, New York 10017. Reem Bridals LLC was Plaintiff's nominal employer, signatory on Plaintiff's offer letter, issuer of Plaintiff's payroll checks, and signatory on the February 23, 2023 termination letter. It is an employer within the meaning of the FLSA and NYLL.

12.    Defendant Reem Holdings LLC is a Delaware limited liability company (DE File No. 4707559, formed July 8, 2009) registered as a foreign limited liability company with the New York Department of State, with its principal place of business at 501 Fifth Avenue, 2nd Floor, New York, New York 10017. It holds the "Reem Acra" trademarks — including the "Reem Acra New York" designation under which Plaintiff's employment was described in the offer letter — and operates as an alter ego of and integrated enterprise with Reem Bridals LLC.

13.    Defendant Reem Acra Boutique LLC is a Delaware limited liability company (DE File No. 4707561, formed July 8, 2009) registered as a foreign limited liability company with the

3

New York Department of State (DOS ID 3853685) and transacting business at 501 Fifth Avenue, 2nd Floor, New York, New York 10017. Its name appeared on retail transaction documents generated in connection with Plaintiff's sales. It shared common management, personnel, and systems with Reem Bridals LLC. Its biennial statement filing with the New York Department of State has been past due since September 2023.

14. Defendant Reem Acra Couture Collection LLC is a New York limited liability company organized on January 29, 2020 (NY DOS ID 5697854), listing Defendant Acra's personal residential address at 1 West End Avenue, Apartment 41D, New York, New York 10023 as its service of process address. Both internal proforma documents generated during couture garment production and paid couture invoices issued to clients in connection with Plaintiff's sales bore the designation "Reem Acra Couture," which does not correspond to any single registered entity but overlaps with both this defendant and the predecessor entity Reem Acra Couture, Inc. (NY DOS ID 2652568), a domestic business corporation formed in 2001 that remains nominally active but has not filed a biennial statement since June 2003. The use of an unregistered designation across the full transaction lifecycle — from internal production tracking through client-facing billing — confirms that entity distinctions were not observed in the enterprise's own business processes. Reem Acra Couture Collection LLC shared common management, systems, and centralized control of labor relations with Reem Bridals LLC and functioned as part of the integrated enterprise and as Plaintiff's joint employer. Its biennial statement filing has been past due since January 2024.

15. Defendant Reem Acra Licensing LLC is a New York limited liability company organized on January 29, 2020 (NY DOS ID 5697891), listing Defendant Acra's personal residential

address at 1 West End Avenue, Apartment 41D, New York, New York 10023 as its service of process address. It holds and administers licensing and brand-related revenue streams connected to the "Reem Acra" marks. Reem Acra Licensing LLC and Reem Acra Couture Collection LLC were formed on the same date with sequential DOS identification numbers, both listing Defendant Acra's personal residence rather than any business address. Its biennial statement filing has been past due since January 2022.

16. Defendant R.A. Luxury LLC is a Delaware limited liability company (DE File No. 4707553, formed July 8, 2009) registered as a foreign limited liability company with the New York Department of State (DOS ID 3842764). Its registered service of process address is 240 West 35th Street, Suite 700, New York, New York 10001. Upon information and belief, R.A. Luxury LLC is under common ownership and management with the other named entities and has been identified by Defendant Acra as part of the same principal-controlled business group in sworn filings. Its biennial statement filing has been past due since August 2019.

17. The entity defendants Reem Bridals LLC, Reem Holdings LLC, Reem Acra Boutique LLC, Reem Acra Couture Collection LLC, Reem Acra Licensing LLC, and R.A. Luxury LLC are referred to collectively as the "Entity Defendants." Each Entity Defendant, together with Defendants Acra, Sinel, and Gupta, functioned as Plaintiff's employer and/or joint employer under the FLSA and NYLL. Of the six Entity Defendants, only Reem Bridals LLC maintains current biennial statement filings with the New York Department of State; the remaining five are delinquent, evidencing a systematic failure to observe corporate maintenance obligations across the enterprise.

**Individual Defendants**

5

18. Defendant Reem Acra ("Acra") is a natural person residing at 1 West End Avenue, Apartment 41D, New York, New York 10023, as confirmed by New York Department of State filings for Reem Acra Licensing LLC (DOS ID 5697891) and Reem Acra Couture Collection LLC (DOS ID 5697854), both listing "C/O Reem Acra" at that address. She is the founder, designer, and ultimate beneficial owner of the Reem Acra enterprise. New York Department of State records identify Defendant Acra as Chief Executive Officer of predecessor entities Reem Bridals (New York) Inc. (DOS ID 1788988, formed 1994) and Reem Acra Holdings Corp. (DOS ID 3069878, formed 2004), establishing her continuous personal control over the enterprise since its founding.

19. Defendant Acra served as personal guarantor on the commercial lease for the premises at which Plaintiff was employed.

20. Defendant Acra held exclusive key access, together with Defendant Sinel, to the locked couture storage room at the boutique.

21. On January 26, 2023, Defendant Acra personally directed the routing of a couture client to comparator Gabrielle Kauper by email.

22. Defendant Acra exercised operational control over the enterprise, including authority to hire and fire employees, determine compensation structures, and direct day-to-day boutique operations.

23. Defendant Jillian Hirsch-Sinel a/k/a Jillian Sinel ("Sinel") is a natural person residing in New York who served as President of Reem Bridals LLC and related entities from approximately 2019 through 2023, and thereafter as Strategic Advisor at Stellae International.

6

24. Defendant Sinel recruited Plaintiff on LinkedIn, served as his direct supervisor, signed his offer letter, signed his termination letter on February 23, 2023, issued the January 23, 2023 commission policy modification, and on multiple occasions engaged in conduct that interfered with Plaintiff's ADA-protected rights, including a December 2022 encounter in which she addressed Plaintiff's anxiety and ADHD medication and discouraged him from contacting his support system.

25. Defendant Sinel exercised operational control over Plaintiff's hiring, termination, compensation, and client assignments. During her tenure as President, Sinel simultaneously operated VJAJ Corp. d/b/a Sinel Group (NY DOS ID 3798414) as a parallel personal business enterprise.

26. Before Plaintiff's employment, when comparator Gabrielle Kauper ("Kauper") asked why she was not permitted access to the couture closet, Sinel responded that she maintained the restriction so that she would not have to "blame" Kauper "when something went missing." Kauper transmitted this statement to Plaintiff during his employment. Plaintiff memorialized it in his March 8, 2023 letter to Sinel and Gupta. Defendants' March 15, 2023 written response did not deny it. That silence, by a represented party with full opportunity and motive to deny the statement, constitutes an adoptive admission under Federal Rule of Evidence 801(d)(2)(B).

27. Upon information and belief, Sinel previously applied the same false-accusation architecture to at least one other male employee in the shipping and receiving department on the seventh floor of 501 Fifth Avenue, who was identified to Plaintiff by Kauper as having been falsely accused of theft and terminated. That former employee's identity is subject to discovery through Defendants' payroll and personnel records.

7

28. Defendant Abhinav Gupta ("Gupta") is a natural person who, upon information and belief, resides in New Jersey or New York, and who served as Chief Financial Officer and Chief Operating Officer of the Reem Acra enterprise, as confirmed by his email signature block ("CFO/COO, REEM ACRA" at 501 Fifth Avenue), exercising authority over payroll, commission calculations, and government filings. Gupta's control over payroll and separation-related government filings further supports the retaliatory pretext allegations set out in Counts IV and V.

29. On May 24, 2023, Defendant Gupta certified to the New York State Department of Labor that Plaintiff's last day worked was February 14, 2023.

30. On February 15, 2023 at 12:59 PM, Plaintiff emailed Defendants Gupta and Sinel: "I forgot to clock in this morning but was present for the shift." Gupta received that email on that date.

31. Defendants' own termination letter stated that Plaintiff had been absent "since Wednesday, February 15, 2023," treating February 15 as a worked day — not February 14 as Gupta certified to the NYSDOL. Gupta's NYSDOL certification is therefore contradicted by both Plaintiff's contemporaneous written communication and Defendants' own termination letter.

32. On approximately February 7, 2024, Defendant Gupta transmitted written correspondence from his corporate email address offering Plaintiff a post-termination referral commission of 10% on a prospective sale — a rate 3.33 times the 3% commission rate suppressed during Plaintiff's employment, constituting a party admission that Plaintiff's client relationships retained commercially quantifiable value to the enterprise.

33. Each of the three individual defendants constituted an "employer" within the meaning of the FLSA and NYLL under the economic reality test applicable in the Second Circuit.

34. Defendant Reem Acra possessed and exercised: (a) the power to hire and fire employees, as the founder and ultimate beneficial owner of the enterprise; (b) supervision and control of employment conditions through her direction of couture client assignments; and (c) authority to determine compensation structures through her ownership and control of all affiliated entities.

35. Defendant Jillian Hirsch-Sinel possessed and exercised: (a) the power to hire Plaintiff, as the officer who extended the offer, and to fire him, as the signatory on the termination letter; (b) supervision and control of Plaintiff's work schedule and employment conditions, including sales floor day assignments, client routing, and leave administration; and (c) authority to determine the rate and method of Plaintiff's compensation, including the commission rate and vesting condition.

36. Defendant Abhinav Gupta possessed and exercised: (a) authority to affect the terms and conditions of Plaintiff's employment through control of payroll and commission processing; (b) authority to determine the method of Plaintiff's payment through commission calculations; and (c) responsibility for maintaining Plaintiff's employment records, including certification of his separation status to the NYSDOL. Gupta's email signature block — "CFO/COO, REEM ACRA" at 501 Fifth Avenue — confirms his operational authority.

37. Marc Stadtmauer, Esq. is identified as a non-party witness. Stadtmauer signed Biennial Statements for both Reem Bridals LLC and Reem Holdings LLC as "Authorized Person" in December 2022, while simultaneously managing active litigation defense for "Reem

9

Bridal, Inc." in New York Supreme Court (Index No. 653972/2022) — process served at 501 Fifth Avenue, 2nd Floor. Stadtmauer also notarized Defendant Sinel's dual-capacity signatures on the Consent to Change Attorney filed in Hronis v. Reem Bridals LLC and Reem Holdings LLC (NYSCEF Index No. 723251/2022), executed five days after Plaintiff's termination, in which Sinel signed as President of both entities on the same instrument.

## FLSA ENTERPRISE COVERAGE

38. At all relevant times, the Entity Defendants constituted an enterprise engaged in commerce within the meaning of 29 U.S.C. § 203(r). The enterprise operated a luxury bridal and couture retail business, sourced merchandise from manufacturers engaged in interstate commerce, and generated annual gross revenues exceeding $500,000, satisfying 29 U.S.C. § 203(s)(1)(A).

39. Plaintiff was individually engaged in commerce under the FLSA in that his duties involved handling goods that had moved through interstate commerce, communicating with out-of-state clients, and processing sales transactions in interstate commerce.

## FACTUAL ALLEGATIONS

### A. Recruitment and Fraudulent Inducement

40. On or about August 24, 2022, Defendant Sinel contacted Plaintiff on LinkedIn stating that Defendants were "looking for someone to manage [their] couture and VIP division." In the same message thread, Sinel identified the brand as "Reem Acra" and provided the website reemacra.com. After Plaintiff submitted his materials, Sinel directed him to communicate via jillians@reemacra.com.

10

41. On September 3, 2022, Plaintiff submitted a cover letter with the subject-line header "MANAGER OF COUTURE AND VIP DIVISION." Defendant Sinel did not correct this characterization at any point during the recruitment process.

42. On September 14, 2022, during an in-person interview, Defendant Sinel represented that Plaintiff's title "would be something sexy."

43. On September 15, 2022, Defendant Sinel issued an offer letter for the position of "retail and couture sales facilitator with a title that is mutually agreeable to be determined at start date." The offer letter provided a base salary of $75,000, 3% commission on all sales, and an additional 1% commission upon meeting a monthly sales goal. The offer letter contained no provision conditioning commissions on shipment, client payment, continued employment at the time of shipment, or forfeiture upon termination. The offer letter stated that no amendment would be valid unless agreed to in writing and signed by both parties.

43A. The offer letter designates Plaintiff's place of employment as "Reem Acra New York" — a designation that references the trademark and brand held by Defendant Reem Holdings LLC, not the nominal employer Reem Bridals LLC — constituting additional evidence that the integrated enterprise, not the nominal employer alone, directed Plaintiff's employment.

43B. The offer letter contains two separate sections both numbered "6," evidencing the informality with which the document was prepared and the absence of the arm's-length negotiation and corporate formality that would be expected in dealings between genuinely independent entities.

43C. During the recruitment process, Defendant Sinel solicited Plaintiff's prior salary and compensation history. In direct response to that inquiry, Plaintiff disclosed that his compensation at his prior employer, Elie Saab, was $72,500 base salary plus a 5%

11

commission rate, and that he had generated approximately $1,390,000 in sales revenue over a seven-month period at that rate. Plaintiff further disclosed that commissions at his prior employer were paid the month following the sale — a standard industry practice. This disclosure was made in reliance on Defendant Sinel's solicitation and constituted protected salary history information within the meaning of NYLL § 194-a. Defendants' solicitation of Plaintiff's prior compensation history during the recruitment process violated NYLL § 194-a, which prohibits employers from inquiring about an applicant's wage or salary history. Defendants compounded that violation by using Plaintiff's disclosed prior salary to set his compensation: Defendants offered a nominal $2,500 base salary increase over his prior base while reducing his commission rate from 5% to 3% — a structural reduction that, applied to the $1,390,000 in sales volume Plaintiff had disclosed, suppressed his commission earnings by approximately $27,800 over a comparable seven-month period. The salary history disclosure also informed Defendants that monthly commission payment — not payment contingent on shipment — was the industry norm from which Plaintiff had operated, making the subsequent imposition of a "pay when shipped" policy a deliberate departure from the terms Plaintiff had every reason to expect based on his disclosed prior experience.

44.    Plaintiff requested a 5% flat commission rate. On September 21, 2022, Defendant Sinel refused, stating: "you are the only one dedicated to couture so your volume should be higher than what you did at Elie." Plaintiff accepted the 3% rate in reliance on that representation. Sinel's refusal email is verbatim documentary evidence of the exclusivity misrepresentation that induced Plaintiff's acceptance of a below-market rate. Sinel's reference to Plaintiff's prior Elie volume in the same breath as her commission refusal

12

confirms that Defendants used the salary history information Plaintiff disclosed in response to Sinel's direct inquiry to structure and justify a below-market commission rate, in violation of NYLL § 194-a.

45.   That representation was false when made. At the time Sinel made the September 21, 2022 exclusivity representation, Lil Arbogast — a predecessor employee — had been the existing couture seller. Gabrielle Kauper, who performed boutique and ready-to-wear (RTW) sales in a separate product tier from couture, was already employed. Shortly after Plaintiff's start date, Defendants expanded Kauper's role across departmental lines to include couture sales that should have been directed exclusively to Plaintiff per the exclusivity representation. Defendants' own commission records confirm at least five couture transactions attributed to Kauper during October through December 2022 — including Maude Navarre ($11,000), Kayti Faustini ($20,000), Danielle Plattus ($12,500), Bella Lati ($11,900), and Lisa Gordon ($28,500) — totaling $83,900 in couture revenue diverted from Plaintiff's exclusive territory. At the contractual 3% rate, these diversions represent $2,517.00 in suppressed commissions. Defendants' own subsequent correspondence confirmed that Kauper had "seven (7) years of employment with the Company" — a fact concealed from Plaintiff during negotiations.

46.   Kauper's commission rate had been below 3% prior to Plaintiff's hiring. Defendants raised Kauper's rate to 3% in connection with Plaintiff's own commission negotiations — a coordination of compensation terms across employees that further establishes centralized management control over compensation and contradicts any representation that Plaintiff's commission structure was negotiated at arm's length.

13

47. On January 26, 2023, Defendant Reem Acra personally emailed routing a custom-dress client from Mexico to Kauper rather than to Plaintiff.

48. On Plaintiff's first day, September 27, 2022, he was assigned the title "Facilitator" without negotiation, contrary to the offer letter's promise of a "mutually agreeable" title.

49. Section 6 of the offer letter provided that Plaintiff would receive a company mobile phone "that should be used for all company correspondence and kept in good working order." The phone delivered to Plaintiff was cracked, visibly damaged, and network-incompatible. Defendants' own IT personnel confirmed the device was too outdated to function on the applicable wireless network.

50. Despite the device's deficiency, Defendants failed to replace the phone for several weeks. During that period, Defendants repeatedly requested that Plaintiff upload his personal client contacts into the inoperable company-controlled device. Plaintiff complied. Upon termination, the device and all contacts stored on it remained in Defendants' possession.

**B. Wage Notice and Statement Violations**

51. On September 27, 2022, Plaintiff signed a New York State wage notice that contained unchecked boxes, no commission rate, and a blank preparer signature line.

52. Joy S. Khuu, who facilitated Plaintiff's onboarding, directed Plaintiff to Defendant Sinel for commission-related questions. Sinel was unavailable at that time.

53. Throughout Plaintiff's employment, Defendants did not provide a written commission agreement describing how commissions were earned, calculated, and paid, as required by NYLL § 191(1)(c).

54. Pay stubs issued on multiple occasions during Plaintiff's employment contained incomplete information. The January 27, 2023 pay stub showed leave accruals normally.

14

The February 10, 2023 pay stub omitted accruals with an "error" message. The February 24, 2023 pay stub omitted accruals without explanation. The timing of those omissions, beginning after Plaintiff's January 23, 2023 wage complaint, also supports the retaliatory pretext allegations in Counts IV and V.

55.    Defendants deliberately omitted accrual information on two additional post-termination pay stubs dated March 10 and March 15, 2023, without correcting the February 10 error.

56.    Plaintiff's offer letter states that he would accrue paid time off at a rate of twelve (12) days per year. Plaintiff's actual PTO accrual, as reflected in Defendants' own payroll system (M229), ran below the contractually specified rate throughout his employment. The discrepancy between the offer letter's promised accrual rate and the actual rate administered by Defendants constitutes an independent breach of the offer letter and an independent predicate for Plaintiff's wage claims.

57.    Upon Plaintiff's termination on February 23, 2023, Defendants failed to pay out Plaintiff's accrued PTO balance. Defendants' own Employee Handbook states explicitly that accrued PTO will be paid out at the time of termination. The payroll system (M229) reflected 32.00 hours (four full days) of accrued PTO as of February 20, 2023. No payment for that accrued balance was included in any post-termination check. That unpaid accrued PTO constitutes earned wages under NYLL § 190(1) and is recoverable as unpaid wages under the FLSA and NYLL.

## C. Commission Theft and Unilateral Policy Change

58.    On January 23, 2023, Defendant Sinel acknowledged by email that approximately $6,395 was owed to Plaintiff for approximately $200,000 in sales orders.

15

59. In that same January 23, 2023 communication, Defendant Sinel admitted the offer letter was "not clear" on commission timing and unilaterally imposed a new policy requiring payment on shipment rather than on sale. No signed written amendment to the offer letter was executed. Plaintiff had no prior notice of this policy change.

60. Plaintiff contemporaneously disputed the newly announced shipment condition as inconsistent with the parties' agreement and did not accept any partial payment as a waiver of the unpaid balance. On three independent grounds — no advance notice precluding conscious acceptance, express written objection, and the offer letter's express anti-amendment clause — Defendants cannot establish that Plaintiff accepted any modification to his commission terms.

61. On October 25, 2022, Plaintiff closed a couture sale to client Allison Roffee, who purchased an existing garment off the rack and paid in full on that date, as documented by a proforma stamped "PAID IN FULL." No custom production was required. Defendants nevertheless withheld Plaintiff's commission on the ground that the garment had not yet "shipped," although the sole reason the garment remained on premises was that Defendants were holding it as a courtesy pending future alterations. To trigger the shipment condition and obtain payment of his earned commission, Plaintiff was compelled to ship the unaltered garment to the client in or about December 2022 before alterations had commenced, requiring Ms. Roffee — who resided in Maryland — to transport the gown by train to New York for subsequent fittings. The forced early shipment directly disserved the client's interests and contradicts Defendant Sinel's own contemporaneous written representation that Defendants' operational priority was to "maintain brand standards and customer experience." The application of a shipment-contingent payment policy to a completed,

16

fully paid off-the-rack sale with no production component demonstrates that the policy functioned as a mechanism to defer and suppress commission payments rather than as a legitimate business practice tied to order fulfillment.

62. Defendants' own billing practices further contradict the purported "when shipped" commission policy. An invoice issued to client Kim Bergstol — a personal client of Defendant Acra — under the designation "Reem Acra Couture" — a true invoice, not a proforma — was generated while the garment remained in the atelier's physical possession undergoing alterations and an outstanding balance remained on the account. Plaintiff performed the alteration labor and executed the final shipment on this transaction without commission credit. If Defendants' own accounting practice was to invoice clients before shipment and before full payment, then the "commissions paid when shipped" condition was not a uniformly applied business practice but a selectively enforced mechanism to defer and suppress Plaintiff's earned commissions.

63. Defendants' own records reflect net orders attributable to Plaintiff of at least $325,395.50 — a figure that reflects only documented sales and excludes commissions suppressed through the appointment diversion scheme alleged herein. At the contractual 3% rate, $9,761.87 in commissions was earned. Defendants paid this amount in fragments across multiple post-termination checks — months after the commissions were earned, in violation of NYLL § 191(1)(c)'s timely payment requirement, and accompanied by disputed "full and final" characterizations void under NYLL § 193. The untimely and coercive manner of payment does not satisfy Defendants' statutory obligation. Additionally, Defendants failed to apply the 4% December bonus rate reflected in their own commission spreadsheet, withholding an additional $882.60.

17

64. Defendants' own internal commission spreadsheet reflects a 4% commission rate applied uniformly to all December 2022 boutique sales for both Plaintiff and Kauper. Plaintiff's December 2022 boutique sales totaled $88,260.00. At 4%, Plaintiff was owed $3,530.40 in December commissions. Plaintiff's final YTD commission figure of $9,761.87 reflects calculation at 3% only, confirming that Defendants failed to apply the earned 4% December rate and withheld $882.60 in bonus commissions. The uniform application of the 4% figure across both employees and all December boutique sales undermines any later claim that the 4% rate was an isolated clerical error.

65. Defendants' own November 2022 boutique commission spreadsheet assigned Plaintiff a monthly boutique sales goal of $35,000 and Gabrielle Kauper a monthly boutique goal of $135,000 — a ratio of 3.86 to 1. Defendants' own 2023 Couture Projections document reveals the structural goal inversion: Plaintiff was assigned $1,425,000 in projected 2023 couture revenue (87.4% of the $1,630,000 total couture projection) while Kauper was assigned only $205,000 (12.6%). Simultaneously, Defendants assigned Kauper $1,301,250 in 2023 retail projections (75% of the $1,735,000 retail total) against Plaintiff's $433,750 (25%). Defendants thus assigned Plaintiff the dominant share of premium couture revenue responsibility while allocating the dominant share of retail opportunity to Kauper — and then structured the schedule and appointment routing to concentrate couture traffic on Kauper's days and standby labor on Plaintiff's days, rendering both assignments structurally unachievable by Plaintiff. The disparity in assigned goals, combined with the appointment-diversion pattern alleged herein, demonstrates that Defendants structured Plaintiff's compensation opportunities to produce lower earnings relative to the female comparator.

18

66. Plaintiff's November 2022 gross boutique sales totaled $35,047.63, exceeding the $35,000 goal. Net boutique sales totaled $34,085.50.

67. Defendants' own 2023 Couture Projections document — prepared by management — assigned Plaintiff $1,425,000 in projected couture revenue for fiscal year 2023, against a total projected retail goal of $433,750 and a combined goal of $1,858,750. Plaintiff was designated as the primary couture revenue driver, responsible for 87.4% of total projected couture sales.

68. Plaintiff's documented couture actuals for the preceding quarter were $65,000 in October 2022, $75,000 in November 2022, and $65,000 in December 2022, totaling $205,000.

69. Defendants terminated Plaintiff 55 days into fiscal year 2023, eighteen days after his Department of Labor complaint.

70. Pleading in the alternative: if commissions were payable only upon shipment, Plaintiff is entitled to commissions for all orders that shipped following his termination where Plaintiff originated or serviced the transaction. Defendants may not invoke a shipment-based rule selectively as a forfeiture device while refusing to pay commissions on shipments that occurred after termination.

71. Defendants' March 15, 2023 response letter stated that Plaintiff's earned PTO — accrued in exchange for work on a Saturday trunk show — was "accounted for and attributed to your absences." No written employee authorization for such an offset was obtained. NYLL § 193 prohibits deductions from wages absent written employee authorization conforming to applicable regulatory requirements. PTO earned through extra work is a wage under NYLL § 190(1).

**D. Client Diversion and Schedule Manipulation**

19

72. Plaintiff worked a fixed, full-time schedule each week, Monday through Friday, with assigned sales floor days on Monday and Thursday. Gabrielle Kauper was scheduled part-time on Tuesdays, Wednesdays, and Fridays — higher-traffic days with greater commission-generating potential.

73. Couture appointments were routed to Plaintiff through Corrine, Defendant Acra's executive assistant, under a Reem → Corrine → Plaintiff pipeline established as the designated couture referral structure. Receptionist Jennifer Scheich's gatekeeping of client inquiries toward Kauper's schedule operated as a mechanism of artificial traffic suppression against Plaintiff. Upon information and belief, Scheich and Kauper had a prior professional relationship and Kauper referred Scheich for her position at Reem Bridals LLC — a conflict of interest that Defendants failed to disclose or address, and that provided structural motivation for Scheich's preferential routing of client inquiries to Kauper's scheduled days.

74. Scheich emailed a client stating that "[Remember] we are open Tuesdays, Wednesdays, and Fridays." The showroom was also open on the days Plaintiff worked with sales floor access. The communication directed client traffic exclusively to Kauper's scheduled days.

75. Calendar data from Defendants' own Microsoft Exchange system for September through December 2022 reflects a minimum of 22 appointments routed to Plaintiff versus 98 or more to Kauper. The same data includes six employer-generated calendar entries bearing the label "Gabi," confirming the preferential routing was documented and employer-sanctioned.

75A. Plaintiff's calendar screenshots from the five ordinary showroom weeks between September 26 and November 4, 2022 — excluding the October market week, which

20

reflected atypically elevated activity — document a structural two-tier appointment system that systematically concentrated non-commission fitting labor on Plaintiff's scheduled days while concentrating commission-generating sales consultations on Kauper's scheduled days. The screenshots distinguished appointment type by color: green entries reflected fitting and alteration-facilitation appointments, which are non-commission labor; orange entries reflected sales consultation appointments, which are commission-generating. Across the five documented weeks, the aggregate breakdown by day of week was as follows: Monday — 17 fitting appointments (green), 3 sales appointments (orange); Tuesday — 0 fitting appointments, 18 sales appointments; Wednesday — 2 fitting appointments, 18 sales appointments; Thursday — 12 fitting appointments, 12 sales appointments; Friday — 0 fitting appointments, 29 sales appointments. Plaintiff's assigned sales floor days were Monday and Thursday. Across those two days combined, Plaintiff's schedule contained 29 fitting/labor appointments and only 15 sales consultation appointments — a nearly 2-to-1 ratio of non-commission labor to commission opportunity. Kauper's scheduled days (Tuesday, Wednesday, and Friday) contained 65 sales consultation appointments and only 2 fitting appointments. Expressed as shares: Plaintiff's days accounted for 93.5% of all non-commission fitting labor across the showroom while receiving only 18.8% of all commission-generating sales consultation appointments. Monday — formally designated as one of Plaintiff's two "sales floor days" — functioned in practice as a fitting-labor day: 85% of Monday appointments across the documented period were non-commission fitting entries. Plaintiff was not working a sales floor on Mondays. He was running a service operation that generated revenue credited to other consultants. On an equal-opportunity two-person sales floor, Plaintiff would have received

21

approximately 40 of the 80 documented sales consultation appointments; he received 15. The 25-appointment shortfall represents approximately $160,000 in diverted client budget opportunity at the documented average visible budget of $6,400 per appointment. At the contractual 3% commission rate, the scheduling-based suppression from these five weeks alone represents at least $4,800 in diverted commissions — sourced entirely to Defendants' own calendar system and corroborated by the color-coded appointment categorization Defendants themselves applied.

75B.  Defendants' own client purchase log for the October through December 2022 period — a record generated and maintained by Defendants in the ordinary course of business — independently corroborates the appointment-diversion pattern through transaction value data. Among completed sales on that record, Plaintiff's bridal transactions averaged $9,643 per sale across seven confirmed purchases. Completed bridal transactions credited to comparator Gabrielle Kauper averaged $15,328 per sale across eighteen confirmed purchases — a per-transaction gap of $5,685, representing 59% higher average transaction value credited to Kauper than to Plaintiff. The disparity in value tier is not random: every bridal transaction valued at $19,000 or more on the documented record was credited to Kauper, not to Plaintiff. Specifically, the six highest-value bridal transactions on the log — Lisa Gordon ($25,000), Brielle Batesko ($22,225), Madigan McGovern ($22,225), Tiffany LaRose ($21,125), Kayti Faustini ($20,255), and Emily Katz ($19,725) — were each credited to Kauper. Plaintiff closed zero bridal transactions at or above the $19,000 tier during the same period despite being designated as the enterprise's couture specialist. This outcome is not consistent with random distribution across a two-person sales floor. Couture bridal gowns at Reem Bridals LLC begin at $10,000 and routinely exceed $20,000.

22

The systematic concentration of the highest-value bridal transactions in Kauper's credited sales — while Plaintiff was simultaneously designated as the primary couture revenue driver responsible for 87.4% of projected 2023 couture revenue (¶67) — confirms that the appointment-diversion pattern alleged herein operated not merely on quantity but on quality: high-value couture clients were routed to Kauper and credited to her while lower-value transactions were concentrated on Plaintiff's days and credited to him. At 3% commission, the per-transaction value gap of $5,685 applied to Plaintiff's seven documented bridal sales represents $1,194 in additional commissions structurally suppressed through value-tier routing, separate from and in addition to the $2,517 in named-diversion commissions and the $3,264 in scheduling-count suppression documented in ¶¶45 and 75A respectively. The combined documented floor of commission suppression from these three independent mechanisms is at least $6,975, with the full amount subject to proof at trial through Defendants' complete purchase records, commission ledgers, and calendar data.

76. Plaintiff experienced two consecutive weeks of zero appointments during his employment.

77. On multiple occasions, Plaintiff performed fitting labor on Kauper's clients without commission credit.

78. Plaintiff was excluded from three simultaneous trunk shows in October 2022.

79. The couture showroom contained one-of-a-kind samples from previous collections stored in a locked closet accessible only to Defendants Acra and Sinel. Defendants' own post-termination correspondence confirmed the room "was locked for all sales employees" and that only management held keys.

23

80.     Prior to December 2022, Plaintiff possessed a key to the couture storage closet and could independently access couture inventory to service clients. Following the December 2022 encounter in which Defendant Sinel addressed Plaintiff's anxiety disorder and ADHD medication, discouraged his use of prescribed medication, and instructed him not to contact his support system, Defendants revoked Plaintiff's key access. The revocation occurred at the precise intersection of two independent protected activities: Plaintiff's disability disclosure and Plaintiff's ongoing internal complaints about unpaid commissions — complaints Plaintiff had been raising since October 2022 when Defendants first withheld commissions on closed sales. At the time of the key revocation, Defendants had been withholding Plaintiff's earned commissions for approximately three months. Removing Plaintiff's independent access to the couture inventory necessary to perform his core sales function simultaneously punished his disability disclosure and structurally suppressed his ability to generate further commission-earning sales — compounding the economic harm of the ongoing wage theft with a physical barrier to the work itself. After the revocation, Plaintiff could access the couture inventory only by requesting that Defendants Acra or Sinel unlock the room — creating a structural dependency on the same supervisor who had discouraged Plaintiff's disability-related treatment and who controlled the commission payments Plaintiff had been denied. Defendants' March 15, 2023 letter subsequently claimed the couture room "was locked for all sales employees," a statement that omits the fact that Plaintiff previously held independent access that was revoked only after his disability became known to management and only after he had been raising wage complaints for months. The revocation of key access following Plaintiff's disability disclosure constitutes interference with ADA-protected rights under 42 U.S.C. § 12203(b).

24

The revocation of key access while Defendants were actively withholding Plaintiff's earned commissions and following his internal wage complaints constitutes an independent adverse employment action supporting the wage retaliation claims in Counts IV and V. The temporal and causal overlap of these two protected activities as predicates for the same adverse action is not coincidental — it reflects a unified campaign to suppress both Plaintiff's disability-related rights and his wage-related rights through a single structural mechanism.

81. For more than nine days per month following the key revocation, Plaintiff could not independently access couture inventory to service clients, directly reducing his ability to generate commission-earning sales.

82. In the luxury bridal market, the typical client begins the gown selection process approximately nine to twenty-one months before the wedding date. A couture gown requires four to seven months of production from order to delivery. Following delivery, alterations require multiple fitting appointments over approximately three to four months. Deposits at Reem Bridals LLC were, upon information and belief, a minimum of 60% of the gown price. The single-purchase nature of bridal couture — one client, one gown, one transaction — means that each appointment diversion represents an irrecoverable lost commission opportunity with no possibility of repeat business from the same client.

83. Alteration appointments were offered to clients at an additional cost of up to 15% of the gown price. These appointments were scheduled and conducted at 501 Fifth Avenue and required a staff member to be present to take notes, photographs, and manage client retention at the most sensitive stage of the client relationship. Alteration appointments are

non-commission labor. Defendants concentrated alteration appointments on Plaintiff's scheduled days. Kauper refused alteration assignments.

84. On several occasions, Plaintiff was required to remain at Defendants' premises past his scheduled shift end time — frequently until approximately 8:00 PM — to await completion of couture production work on orders for which Plaintiff had sales credit. This waiting time constituted compensable hours worked under the FLSA and NYLL.

85. On multiple such occasions, atelier staff completed the final shipment or handoff without Plaintiff's participation after Plaintiff had waited for production completion. Under the prevention doctrine, Defendants may not invoke the non-occurrence of a shipment-based commission-vesting event when their own conduct — engineering Plaintiff's exclusion from the shipment event — prevented that condition from being satisfied.

86. Plaintiff performed fitting, facilitation, shipment, and client-preservation labor throughout his employment on clients whose commissions were attributed to other employees or to Defendant Acra personally, and on clients inherited from predecessor employee Lil Arbogast, who departed the company at or around the time of Plaintiff's hire. Plaintiff received no commission credit for any of this labor. Specifically:

(a) Plaintiff performed fittings and facilitation labor on clients whose sales were attributed to Gabrielle Kauper, managing client responses at the most sensitive stage of the client journey without compensation;

(b) Plaintiff performed alteration labor and executed the final shipment for client Kim Bergstol — a personal client of Defendant Acra — without receiving any commission credit, despite the fact that under Defendants' own "when shipped" policy, Plaintiff's execution of the shipment constituted the commission-vesting

26

event. Plaintiff performed similar fitting, shipment, and relationship-maintenance labor on additional personal clients of Defendant Acra, from which Acra personally retained the economic benefit of Plaintiff's uncompensated work;

(c) Plaintiff serviced the active client pipeline inherited from Arbogast, including conducting alteration appointments, taking fitting notes, managing client communications, and executing shipments on orders that had been placed before Plaintiff's employment but required ongoing labor through production, fitting, and delivery. These clients' commissions had been attributed to Arbogast and were never reassigned to Plaintiff despite his performance of all post-sale labor.

Defendants' failure to disclose the existence of this inherited, uncompensated workload during recruitment further supports the fraudulent inducement alleged in Count VIII.

**E. Sex-Based Wage Discrimination**

87. Gabrielle Kauper, a female employee working three days per week, received a monthly draw of $2,000 ($24,000 annually) and was permitted to earn commissions on all three of her scheduled days.

88. Plaintiff, a male employee working five days per week, received no draw for the first four months of employment. In mid-to-late January 2023, he was offered a one-time payment of $1,000 — half of Kauper's monthly draw amount.

89. Plaintiff and Kauper both sold RTW and couture garments to bridal clients in the same showroom, conducted client consultations, facilitated custom-design orders, generated invoices and purchase orders, and processed transactions through the same systems.

90. Defendant Acra's January 26, 2023 email routing a custom-dress client to Kauper — rather than to Plaintiff, the designated couture specialist — reflects the interchangeable nature of

27

their sales functions and Defendants' preferential allocation of commission opportunities to the female employee.

91. Defendants' anticipated seniority defense is itself evidence of discriminatory intent: Kauper's seven-year tenure was actively concealed from Plaintiff during recruitment, when Sinel represented that Plaintiff would be "the only one dedicated to couture" — a misrepresentation that would have been unnecessary had Defendants intended to rely on seniority as a legitimate, non-discriminatory justification for the pay differential.

## F. Protected Activity and Retaliation

92. On January 23, 2023, Plaintiff submitted a written wage complaint to Defendant Sinel referencing "discrimination," "retaliation," and "missing paychecks."

93. On February 6, 2023, at approximately 10:24 a.m., Plaintiff filed a complaint with the New York State Department of Labor (Ticket #1966845) by telephone from Defendants' shared office at 501 Fifth Avenue. Gabrielle Kauper and Jennifer Scheich were both present in the office during the call.

94. On February 15, 2023 — nine days after the DOL complaint — Defendants issued their first-ever written performance documentation against Plaintiff.

95. On February 22, 2023, Plaintiff transmitted a written response to Defendants Sinel and Gupta invoking his legal protections by name, citing "ADA" and "privacy rights" and stating: "This scrutiny is another example of retaliation against me for bringing up the fact that I have not been paid in accordance with our agreement." This written invocation of protected activity was transmitted simultaneously to both individual Defendants and constitutes documented protected activity under NYLL § 215, FLSA § 215(a)(3), and 42 U.S.C. § 12203(b).

28

96. Defendants terminated Plaintiff the following morning, February 23, 2023.

97. Defendants' March 15, 2023 letter asserted that Plaintiff had been documented prior to his January 23, 2023 wage complaint for five categories of performance deficiency: attendance violations, failure to respond to management, failure to respond to client requests, failure to enter appointments, and disappearing during the workday.

98. None of those alleged deficiencies was reduced to a written warning, formal counseling memo, or personnel file entry delivered to Plaintiff during his employment before February 15, 2023.

99. Defendants' own Employee Handbook requires that corrective actions be documented, maintained in an employee's personnel file, signed by the employee, and provided to the employee as a copy.

100. The Handbook's timekeeping policy specifies that the designated consequence for repeated missed clock-in entries is a deduction from compensation — not termination. Defendants bypassed their own specified remedy and proceeded directly to termination, skipping the only corrective consequence their written policy authorized.

**G. Leave Accrual Falsification and Constructive Termination**

101. On October 20, 2022 — the tenth week of Plaintiff's employment — Plaintiff emailed management advising that the biometric timekeeping machine "has not been logging my hours accurately" and that the device "does not recognize my facial features with ease." Plaintiff reported this malfunction directly to company operations personnel. Management did not resolve the malfunction. Any attendance discrepancy attributable to the biometric device is the product of a documented, unresolved equipment failure of which Defendants were on notice, not employee misconduct.

29

102. Defendant Sinel's February 1, 2023 email interrogating a single missed clock-in from January 24, 2023 was transmitted eight days after Plaintiff's January 23, 2023 wage complaint, constituting an early escalation of the surveillance campaign that culminated in termination.

103. On February 17, 2023, Defendant Sinel's correspondence raised the allegation that Plaintiff had "two remaining PTO days."

104. On February 20, 2023 at 10:13 AM, Plaintiff's payroll system (M229) reflected 32.00 hours of PTO (four full days) and 3.86 hours of sick leave available.

105. On February 22, 2023 — five days after the February 17 email — Defendant Sinel emailed Plaintiff: "You do not have any available sick time or PTO." No authorized deduction, payroll entry, or documented leave usage occurred in the five days between those two statements. This internal contradiction, within the same email thread, five days apart, establishes that the leave erasure was manufactured.

106. On February 22, 2023, Defendant Sinel also issued an ultimatum requiring Plaintiff to provide a COVID test or doctor's note "by tomorrow" or the Company would assume voluntary resignation.

107. Before the week of Plaintiff's termination, Defendants enforced a mandatory dual-testing protocol requiring all employees to obtain two COVID-19 tests upon any illness or exposure.

108. During the week preceding Plaintiff's termination, Saundra Chung — Defendants' Director of Global Business Development — worked at Defendants' premises while COVID-positive. Kauper received a text message from Chung stating "ok, I was at work.

30

But do not tell anyone." Kauper read that message aloud in the shared office in the presence of Plaintiff and Jennifer Scheich.

109. On February 20, 2023, Plaintiff notified Defendants in writing that he had been "make aware of an employee that tested positive and was allowed to work last week in direct contact with me."

110. On February 22, 2023, Defendant Sinel responded in writing: "no one reported to work last week and disclosed they tested positive for COVID." Gupta was copied on that response. This denial was made with actual knowledge of Chung's admission — through Kauper, whom Sinel supervised — and constitutes a knowing false statement.

111. Defendants simultaneously disclosed to co-workers that Plaintiff had tested positive for COVID-19. Plaintiff had made no such disclosure. This unauthorized disclosure of Plaintiff's medical information constitutes an additional act of ADA interference under 42 U.S.C. § 12203(b) and a violation of Plaintiff's medical privacy rights.

112. On February 17, 2023, Defendant Sinel's correspondence raised the allegation that Plaintiff had "brought home" couture binders "without authorization."

113. On February 22, 2023, Plaintiff responded in writing to both Sinel and Gupta, denying the allegation: "I do not like being accused of taking things I am not supposed to; the couture binder is at my desk and not with me." Plaintiff further noted that removal would have been physically impossible, as the binder was too large to fit in his bag on the relevant dates.

114. Defendant Sinel's February 22, 2023 response asserted only that "the couture binders are not at your desk," without identifying any witness, investigation, or corroborating evidence. No binder, witness statement, inventory record, or chain-of-custody

31

documentation was ever produced. The binder accusation was the execution of a mechanism Sinel had designed and described in advance: as alleged in ·26 and established by adoptive admission, Sinel had articulated to Kauper the specific purpose served by maintaining the couture storage area under restricted access — to preserve her ability to assign blame for missing items at will.

115. On February 23, 2023, Defendants issued a termination letter purporting to accept Plaintiff's "voluntary resignation" based on unexcused absences and policy violations. That characterization was false and forms part of the shifting-explanation pretext alleged in Counts IV and V.

116. In May 2023, the New York State Department of Labor approved Plaintiff's unemployment insurance claim, constituting an independent government determination that Plaintiff's separation did not result from misconduct or voluntary resignation.

117. Defendants' March 15, 2023 letter stated that the Company was "unaware" of Plaintiff's DOL complaint until his March 8, 2023 letter. Plaintiff's DOL complaint was filed on February 6, 2023 by telephone from Defendants' shared office, where Kauper and Scheich were present. Plaintiff's March 8, 2023 letter — which Defendants acknowledge receiving — explicitly referenced the DOL complaint. This post-hoc denial, made by the same Defendant Sinel who was Plaintiff's direct supervisor, constitutes a false exculpatory statement bearing on the retaliation nexus and the credibility of the entire termination narrative.

## H. False Government Filings

118. On May 24, 2023, Defendant Gupta certified to the New York State Department of Labor that Plaintiff's last day worked was "02/14/23."

32

119. On February 15, 2023 at 12:59 PM, Plaintiff emailed Gupta and Sinel: "I forgot to clock in this morning but was present for the shift." Gupta received that email.

120. Defendants' own termination letter stated that Plaintiff had been absent "since Wednesday, February 15, 2023," treating February 15 as a worked day, not February 14.

121. Defendants thus produced three different dates for Plaintiff's last day of work: February 14 (Gupta's DOL certification), February 15 (the termination letter), and February 23 (the termination date). The production of three mutually inconsistent separation dates across official documents undermines the credibility of Defendants' entire termination narrative and supports an inference that the termination was pretextual.

122. Gupta's DOL certification characterized Plaintiff's separation as "Voluntarily Quit" with the notation "claiming that he was sick."

123. Following Plaintiff's termination on February 23, 2023, Reem Bridals LLC issued three post-termination checks: (a) a commission payment dated March 9, 2023, designated "Commission Per Email," reflecting a gross commission of $3,461.61 with $1,041.29 in payroll taxes withheld and net pay of $2,420.32; (b) a commission payment dated March 15, 2023 for $575.26, covering a stated pay period of March 6 through March 19, 2023; and (c) an expense reimbursement dated February 23, 2023 for $692.15.

124. All three checks were deposited by Plaintiff in a single teller transaction on March 29, 2023, totaling $3,616.57 in net proceeds, confirmed by Plaintiff's bank account statement.

125. Employer-paid benefit contributions ceased entirely on the March 15 paystub.

126. The March 9, 2023 commission payment was made on orders that, per Defendants' own termination letter, had "not yet shipped" as of the termination date. This payment directly estops Defendants from invoking their "commissions paid when shipped" policy.

127. The March 15, 2023 check, designated "Commission - 2" and paying $575.26, was accompanied by Sinel's characterization of it as "full and final satisfaction" of commission obligations. That check was one of three delivered and deposited simultaneously. Plaintiff disputed the settlement characterization in writing on March 29, 2023 and again on March 31, 2023. No meeting of the minds on final settlement terms was established. NYLL § 193 independently renders void any private agreement purporting to waive earned wages.

128. A second payment designated "full and final" (Check No. 14946, $227.01) was issued on May 8, 2023, demonstrating a pattern of serial claim extinguishment rather than a single good-faith settlement.

**I. ADA Interference**

129. Plaintiff has a diagnosed anxiety disorder constituting a physical or mental impairment that substantially limits one or more major life activities, including working, concentrating, and sleeping, within the meaning of 42 U.S.C. § 12102.

129A. Plaintiff engaged in protected activity under the ADA by: (i) disclosing his anxiety disorder to Defendant Sinel; (ii) requesting accommodation for biometric scanner malfunction; (iii) invoking ADA protections by name in his February 22, 2023 email; and (iv) filing this action asserting ADA rights.

129B. Defendants interfered with Plaintiff's exercise of rights under § 12203(b) through a multi-layered coercion campaign:

   (a) Pre-termination: By fabricating "attendance violations" targeting disability-related behaviors (anxiety-management breaks) rather than investigating the biometric scanner accommodation Plaintiff requested (October 20, 2022), Defendants

34

constructively denied accommodation and discouraged continued assertion of ADA rights;

(b) Medication interference: As alleged in ¶131, Defendant Sinel actively discouraged Plaintiff from taking prescribed anxiety medication and instructed him not to contact his support system — direct interference with treatment;

(c) Key revocation: Immediately following the December 2022 disclosure of anxiety/ADHD, Defendants revoked Plaintiff's independent couture closet access (¶80), imposing structural barriers to performing his job while knowing this would exacerbate his disability-related limitations;

(d) Constructive coercion: The fabricated attendance narrative — specifically the "didn't know where you were" allegations contradicted by Plaintiff's contemporaneous colleague communications — was designed to manufacture a paper trail that would deter Plaintiff from asserting further rights or seeking accommodations for fear of adverse characterization.

129C. Defendants' March 15, 2023 statement that "even if you were somehow able to claim you have a qualified disability, the ADA does not prevent the Company from holding an employee accountable for poor job performance" (¶135) demonstrates knowledge that Plaintiff was asserting ADA rights and intent to intimidate him from pursuing those protections.

130. Defendants' withholding of earned commissions from October 2022 through January 2023 caused Plaintiff severe financial distress. By approximately January 2023, Plaintiff's financial constraints were acute enough that he disclosed this hardship directly to Defendant Sinel.

35

131. On multiple occasions during Plaintiff's employment, Defendant Sinel interfered with Plaintiff's ADA-protected rights, including in a December 2022 encounter in which Sinel: (a) instructed Plaintiff not to contact his support system for emotional or financial support; and (b) actively discouraged Plaintiff from taking his prescribed anxiety medication.

132. Plaintiff's health insurance plan, provided by Defendants, did not include coverage for his primary care physician, creating an additional structural barrier to obtaining treatment for the anxiety condition that Defendants' own conduct had exacerbated.

133. On February 22, 2023, Defendants demanded a doctor's note or positive COVID test within 24 hours. Plaintiff's payroll record reflected 32.00 hours of available PTO as of February 20, 2023 — sufficient to cover the absences at issue without any medical documentation. Defendants were aware that their own wage practices had left Plaintiff financially unable to afford a physician visit, yet imposed a 24-hour documentation deadline they knew he could not meet.

134. Defendants' own February 15, 2023 written correspondence stated that they "provided [Plaintiff] an opportunity to advise if [he] needed an accommodation" in response to his disclosure of anxiety, confirming actual notice of a potential disability eight days before termination.

135. Defendants' March 15, 2023 response letter stated: "Even if you were somehow able to claim you have a qualified disability, the ADA does not prevent the Company from holding an employee accountable for poor job performance." Defendants' April 12, 2023 letter stated that Plaintiff never "claimed to have a disability within the meaning of the ADA." These two positions cannot coexist. The March 15 formulation is a party admission that ADA coverage was a live, genuinely contested issue at the time of termination. The shift

36

from "even if you could claim a disability" to "you never claimed a disability" is a classic shifting-explanation pattern that supports an inference of pretext.

136. Following termination, Plaintiff was left without health insurance for an extended period.

137. In the week of February 23, 2023, Plaintiff developed cholinergic urticaria, a stress-triggered physical condition causing acute hive eruptions. Plaintiff sought treatment from a primary care physician and a dermatologist on multiple occasions as a self-pay patient. Medical bills from those visits remain outstanding. The condition persisted at least through October 2023, documented by contemporaneous photographic evidence.

**J. Post-Employment Blacklisting and Tortious Interference**

138. Beginning in May 2024, Plaintiff was recruited by Fourth Floor, a luxury fashion placement agency affiliated with Career Group Companies, for a position with Amsale, a luxury bridal and eveningwear competitor. Fourth Floor Senior Recruiting Associate Erica Wiener (EWiener@fourthfloor.com) initiated contact with Plaintiff on May 17, 2024. Fourth Floor Managing Director Marina Santo (MSanto@fourthfloor.com) managed the placement process thereafter.

139. Plaintiff participated in four rounds of in-person interviews between June and July 2024 at Amsale's flagship boutique located at 150 Wooster Street, New York, New York. Interview 1 took place on Thursday, June 6, 2024 at 10:00 AM, with Amsale Flagship Salon Manager Apri Brown, as confirmed in Fourth Floor's written interview confirmation dated June 4, 2024. Amsale owner Neil Brown was also in attendance at the first interview. Interview 2 took place in mid-June 2024 with Chief Creative Officer Sarah Swann. Interview 3 took place on Thursday, June 27, 2024 at 12:00 PM with both Sarah Swann and Chief Executive Officer Neil Brown, as confirmed in Fourth Floor's written interview

confirmation dated June 27, 2024. Interview 4 was a one-on-one breakfast meeting with Neil Brown at which offer terms were discussed. At no point during the four-round process did Fourth Floor or any Amsale representative communicate any negative feedback or reservation about Plaintiff's candidacy.

140. On the conclusion of the first interview of June 6, 2024 — the date of Interview 1 — Plaintiff encountered Alla Verlotskiya, an Amsale sales employee, with whom Plaintiff had previously worked at Pronovias. Alla communicated to Plaintiff in writing that same evening that Apri Brown had approached her that day to ask about Plaintiff and that Alla had given her full endorsement. Alla further communicated in writing that Neil Brown had separately sought her out to conduct his own inquiry, and that she had nothing but positive things to say about Plaintiff. Neil Brown's proactive, unsolicited inquiry of an Amsale colleague with direct prior professional experience alongside Plaintiff — on the date of Interview 1 itself — establishes that, as of June 6, 2024, Amsale's CEO had received affirmative, independent professional validation of Plaintiff's qualifications from an internal source.

141. On July 8, 2024, Fourth Floor requested professional references from Plaintiff and transmitted onboarding paperwork, confirming Plaintiff's advancement to the final stage of the hiring process. Plaintiff did not identify Defendants, or any current or former personnel of Defendants, on the reference list he submitted to Fourth Floor. Any subsequent contact Neil Brown made with Defendants was therefore unsolicited by Plaintiff.

142. On July 2, 2024, Santo confirmed in writing that Neil Brown had called Fourth Floor, identified Plaintiff as the final candidate, and that Amsale "absolutely love[d]" Plaintiff.

38

On July 21, 2024, Santo confirmed in writing that Amsale was "prepared to move forward with making [Plaintiff] a temp to perm offer." On July 25, 2024, Santo's written correspondence bore the subject line "Amsale FINAL STEP!" On August 1, 2024, Santo confirmed in writing that Plaintiff's thank-you note had been passed to Neil Brown and that she was awaiting Brown's response regarding official offer details. The abrupt reversal after Brown's contact with Defendants supports retaliatory motive and wrongful interference as alleged in Counts X and XI.

143. During Interview 3 on June 27, 2024, Neil Brown asked Plaintiff directly: "Do you know Jillian? What do you think of her?" In direct response to Brown's inquiry, Plaintiff disclosed that Defendants had failed to pay wages and commissions in accordance with the terms of his employment contract, that he had been terminated unfairly, and that he intended to pursue legal remedies. This disclosure constitutes protected activity under FLSA § 215(a)(3) and NYLL § 215. Neil Brown thereafter conducted a reference check with Defendants. Plaintiff had not identified Defendants or any of their personnel as professional references.

144. On or about August 20, 2024, Santo called Plaintiff to advise that the offer was being rescinded.

145. On August 22, 2024, Plaintiff followed up in writing to Erica Wiener, with Santo and Danielle Shapiro (DShapiro@fourthfloor.com) copied, under the subject line "Clarification Needed Regarding Feedback from Reem Acra," identifying Defendants as the source of negative reference information.

146. On August 23, 2024, Santo responded in writing confirming that when she connected with Neil Brown, he cited "concerns with attendance, tardiness, reliability, etc." as the basis for

39

his decision, and that "the information that was presented to him" caused him to withdraw the offer. Neil Brown simultaneously acknowledged Plaintiff as "a great candidate with a lot of potential," establishing that he held no independent performance concerns about Plaintiff; his decision was driven entirely by external information provided during the reference check. No Fourth Floor principal — Santo, Wiener, or Shapiro, all of whom were copied — disputed the attribution to Reem Acra at any point. The concerns Neil Brown relayed mirror the precise characterizations in Defendants' February 23, 2023 termination letter.

147.    Defendants' interference was further motivated by Plaintiff's disclosure during Interview 3 that he had been terminated unfairly and intended to pursue legal remedies — a disclosure made in direct response to Neil Brown's solicitation. Defendants' interference additionally damaged Plaintiff's ongoing placement relationship with Fourth Floor; the agency ceased further submissions and communications with Plaintiff following the Amsale rescission, foreclosing Plaintiff's access to a pipeline of luxury bridal and eveningwear industry employment opportunities.

**K. Post-Termination Referral Commission**

148.    On February 7, 2024, Defendant Gupta transmitted written correspondence from abhinavg@reemacra.com to Plaintiff stating: "You reached out to Jillian regarding a client you are working with. We will give you 10% of the sale. Please let me know when you want to schedule the appointment."

149.    Plaintiff accepted in writing that same day, identified the target garment as Style 577-903, Fall 2021 Couture, with a listed retail value of approximately $10,000, and requested that Gupta hold the garment.

150. Gupta responded in writing: "We have this dress and I will hold it for you."

151. Between February 8–9, 2024, Plaintiff and Gupta exchanged written communications to schedule an in-person client appointment at 501 Fifth Avenue. After Plaintiff selected Monday at 4:30 PM, Gupta confirmed in writing: "Confirmed for Monday at 4:30."

152. On February 15, 2024, Plaintiff emailed Gupta confirming that the client appointment had taken place and requesting follow-up on pricing and transaction details.

153. Gupta responded by copying Saundra Chung (SaundraC@reemacra.com) — Defendants' Director of Global Business Development — and stating: "I have cc Saundra in this email. She will let you know the details." Chung — the same employee who, during the week of Plaintiff's termination, worked at Defendants' premises while COVID-positive and instructed a co-worker not to disclose that fact — never responded. No commission was paid.

154. Pleading in the alternative: if the Court declines to enforce the post-termination referral arrangement as a binding contract, Plaintiff performed services — sourcing, coordinating, and delivering a retail client who appeared at Defendants' premises — for which Defendants retained any benefit without compensation.

## THE REEM ACRA ENTERPRISE OPERATED AS A UNIFIED ECONOMIC ENTITY

### I. The Reem Acra Entity Web

155. During Plaintiff's employment, invoices, purchase orders, proforma documents, and internal memoranda generated in connection with Plaintiff's sales bore multiple entity names, all operating from 501 Fifth Avenue, 2nd Floor, New York, New York 10017, under the direction of the same management personnel.

156. Those entities included:

(a) Reem Bridals LLC, Plaintiff's nominal employer;

(b) Reem Holdings LLC, holding the "Reem Acra" and "Reem Acra New York" trademarks, with the "Reem Acra New York" mark appearing in Plaintiff's own offer letter as the designated place of employment — establishing that Reem Holdings LLC's trademark umbrella directly governed Plaintiff's employment relationship, not merely the licensing revenue stream;

(c) Reem Acra Couture Collection LLC, appearing on couture invoices;

(d) Reem Acra Boutique LLC, appearing on retail invoices;

(e) Reem Acra Licensing LLC, organized January 29, 2020 by Defendant Acra listing her personal residential address;

(f) Reem Acra Salon, a trade name on internal purchase orders;

(g) Reem Acra RTW and Reem Acra Bridals, supplier designations shipping goods to the identical showroom address;

(h) "Reem Bridal, Inc.," an entity under which the enterprise accepted service of process and conducted litigation in New York Supreme Court (Index No. 653972/2022); and

(i) RA Luxury Corp., New York entity File No. 4501563, operating under a near-identical name to R.A. Luxury LLC (Delaware).

157. Public records reveal three coordinated restructuring events through which Defendant Acra reorganized the enterprise's legal structure while maintaining continuous business operations. First, between 1994 and 2004, Acra formed four domestic New York corporations — Reem Bridals (New York) Inc. (NY DOS ID 1788988), Reem Acra Couture, Inc. (NY DOS ID 2652568), Reem Acra Holdings Corp. (NY DOS ID 3069878),

and Reem Acra Management Inc. (NY DOS ID 3074137) — each listing Acra as Chief Executive Officer and using the same service address at 245 Seventh Avenue. On July 8, 2009, four Delaware limited liability companies — R.A. Luxury LLC (DE File No. 4707553), Reem Bridals LLC (DE File No. 4707556), Reem Holdings LLC (DE File No. 4707559), and Reem Acra Boutique LLC (DE File No. 4707561) — were formed on the same date under sequential file numbers and registered as foreign LLCs in New York within sixty days. On January 22, 2010, three of the four predecessor corporations were rendered inactive on the same date. On January 29, 2020, two additional domestic New York LLCs — Reem Acra Couture Collection LLC (NY DOS ID 5697854) and Reem Acra Licensing LLC (NY DOS ID 5697891) — were formed on the same date with sequential DOS identification numbers, each listing Defendant Acra's personal residential address as the service of process address. Of the six active Entity Defendants, only Reem Bridals LLC maintains current biennial statement filings with the New York Department of State; the remaining five are past due, with R.A. Luxury LLC delinquent since 2019. This pattern — batch formation, coordinated dissolution of predecessors, sequential filing numbers, shared or personal-residence addresses, and systematic neglect of corporate maintenance obligations — demonstrates that entity creation served liability-compartmentalization purposes rather than reflecting independent business operations.

158.    A single client sale facilitated by Plaintiff could generate documents bearing different entity names at ordering, invoicing, and fulfillment stages, processed by the same personnel at the same address. This fragmented entity structure — in which the same underlying economic activity generated documents in multiple legal names depending on the transaction stage — mirrors the pattern of atomized enterprise organization that courts have

43

found indicative of integrated enterprise liability. See Chao v. Gotham Registry, Inc., 514 F.3d 280 (2d Cir. 2008) (examining functional interrelation of operations regardless of formal corporate structure). The absence of genuine separation is confirmed by the single payroll system (M229), single employee handbook, single AmEx card protocol, single office address, and unified management directing all entities.

## II. Absence of Corporate Formalities

159. On December 20, 2022, Marc Stadtmauer, Esq. signed the Biennial Statement for Reem Bridals LLC as "Authorized Person." On December 21, 2022, he signed the Biennial Statement for Reem Holdings LLC in the same capacity.

160. The 2021 Certificate of Change for Reem Holdings LLC was executed by a commercial agent service as "Authorized Person," evidencing that governance functions were ministerial rather than exercised by actual managers.

161. The January 20, 2026 Biennial Statement for Reem Bridals LLC was signed by Sam Ho as "Authorized Person" — an individual not identified as a member or manager during Plaintiff's employment.

## III. Integrated Enterprise

162. The enterprise satisfies each factor of the integrated enterprise test: (a) interrelation of operations — shared showroom, staff, systems, payroll, employee handbook, company code M229, and AmEx card protocol; (b) common management — unified direction by Sinel, Gupta, and Acra across entity lines; (c) centralized control of labor relations — hiring, supervision, payroll, and termination decisions executed by unified management without entity distinction; and (d) common ownership and financial control — Defendant Acra's ownership of trademarks and control of all affiliated entities.

163. The entities appeared as simultaneous co-plaintiffs in New York County Index No. 150365/2016 against the Chetrit Group, in which Defendant Acra's sworn filings identified Reem Bridals LLC and Reem Acra Boutique LLC as wholly-owned subsidiaries of R.A. Luxury LLC — a judicial admission of the ownership structure Plaintiff alleges herein.

164. Defendants' own Employee Handbook is a single governance document applicable uniformly across all Entity Defendants. It designates the Chief Operating Officer as the terminal recipient of all employee complaints; Defendant Gupta served as both CFO and COO per his own email signature block. The Handbook specifies a single corrective action protocol, a single PTO payout obligation upon termination, a single payroll system (company code M229), and a single AmEx card protocol designating the CEO and COO as cardholders.

165. Based on the foregoing facts, the Entity Defendants shared operations, management, labor relations, ownership, and financial control at all relevant times. Reem Holdings LLC and Defendant Acra individually are named as defendants on the basis of those shared facts, and Plaintiff asserts joint and several liability against all Defendants on each count accordingly.

## CAUSES OF ACTION

### COUNT I
**Unpaid Wages – FLSA and NYLL**
**(Against All Defendants)**

166. Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

167. Defendants failed to pay Plaintiff all earned commissions and wages in violation of 29 U.S.C. § 206 and NYLL §§ 190 et seq. Plaintiff's commissions were non-discretionary compensation tied to fixed percentages of documented sales and paid through Defendants'

ordinary payroll process under company code M229, rendering them wages rather than discretionary bonuses.

168. Defendants' unilateral imposition of a payment-on-shipment commission policy violated NYLL § 191(1)(c), which requires that commissions be paid no later than the last day of the month following the month in which they are earned. The offer letter contained no shipment condition. Plaintiff contemporaneously objected to the newly announced shipment rule as contrary to the parties' agreement. Defendants cannot recharacterize a statutory payment-timing violation as a contractual term when no such term appeared in the offer letter and when the NYLL independently mandates timely payment of earned commissions.

169. Plaintiff performed fitting, facilitation, and client-management labor on Kauper's clients without commission credit, and was required to remain on Defendants' premises past his scheduled shift awaiting couture production completions, constituting uncompensated compensable hours, in violation of 29 U.S.C. § 207.

170. Defendants' own records document at least $325,395.50 in net orders attributable to Plaintiff. At the contractual 3% rate, Plaintiff was owed at least $9,761.87 in commissions. Plaintiff is additionally owed $882.60 in December 2022 bonus commissions withheld despite Defendants' own spreadsheet reflecting a 4% rate for that month. Plaintiff is additionally owed unpaid accrued PTO of 32.00 hours (four full days) at his applicable daily rate, which Defendants failed to pay out upon termination as required by the Employee Handbook.

171. The three-year statute of limitations under 29 U.S.C. § 255(a) applies by virtue of Defendants' willful violations. Plaintiff is entitled to unpaid wages, liquidated damages, prejudgment interest, and reasonable attorneys' fees and costs.

## COUNT IA
### Breach of Contract
**Unpaid Commissions and Post-Employment Referral Commission (Against Reem Bridals LLC and the Entity Defendants)**

172. Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

173. The September 15, 2022 offer letter constitutes a binding employment agreement providing a 3% commission on all sales, a PTO accrual of twelve days per year, and requiring any amendment to be in writing and signed.

174. Defendants materially breached the agreement by: (a) failing to pay commissions as earned; (b) unilaterally imposing a payment-on-shipment policy without a signed written amendment; (c) administering PTO accruals below the contractually specified rate of twelve days per year; (d) failing to pay out accrued PTO upon termination as required by the offer letter and Employee Handbook; (e) preventing Plaintiff from satisfying the monthly sales goal condition through appointment diversion and scheduling practices; and (f) failing to provide a company mobile phone in good working order as required by Section 6.

175. On February 7, 2024, Defendant Gupta, acting in his capacity as CFO/COO using his corporate email address, transmitted written correspondence to Plaintiff offering a 10% commission on a sale generated through Plaintiff's client referral. Plaintiff performed his contractual obligation by providing the referral, identifying the specific garment, and facilitating the confirmed appointment. The appointment took place on or about February

12, 2024. Defendants thereafter routed all further communications to Saundra Chung, who never responded, preventing completion of the transaction. Under the prevention doctrine, Defendants may not defeat Plaintiff's commission entitlement by rendering performance impossible through their own conduct. No commission was paid.

176. Plaintiff is entitled to unpaid commissions, the unpaid post-employment referral commission, unpaid accrued PTO, consequential damages, interest, and an accounting of commission ledgers.

## COUNT II
### Wage Notice Violation – NYLL § 195(1)
### (Against All Defendants)

177. Plaintiff repeats and realleges all preceding paragraphs.

178. Defendants failed to provide Plaintiff with a compliant wage notice at the time of hiring as required by NYLL § 195(1). The notice signed September 27, 2022 contained unchecked boxes, no commission rate, and no preparer signature. This deficiency caused concrete injury: the absence of a specified commission rate and payment timing prevented Plaintiff from identifying the discrepancy between the offer letter's commission terms and Defendants' actual payment practices until January 2023, by which time Defendants had withheld commissions on approximately $200,000 in sales.

179. Plaintiff is entitled to statutory damages of $50 per workday, up to a maximum of $5,000, plus reasonable attorneys' fees and costs under NYLL § 198(1-b).

## COUNT III
### Wage Statement Violations – NYLL § 195(3)
### (Against All Defendants)

180. Plaintiff repeats and realleges all preceding paragraphs.

48

181. Defendants failed to provide Plaintiff with accurate wage statements with each payment as required by NYLL § 195(3), including omission of leave accrual balances on pay stubs dated February 10 and February 24, 2023, and failure to accurately itemize commission wages. Those omissions also support Plaintiff's allegation that Defendants manufactured leave and attendance issues as pretext for retaliation, as alleged in Counts IV and V.

182. Plaintiff is entitled to statutory damages of $250 per workday, up to a maximum of $5,000, plus reasonable attorneys' fees and costs under NYLL § 198(1-d).

## COUNT IV
### Retaliation – NYLL § 215
### (Against All Defendants)

183. Plaintiff repeats and realleges all preceding paragraphs.

184. Plaintiff engaged in protected activity by filing a written wage complaint on January 23, 2023 and a NYSDOL complaint (Ticket #1966845) on February 6, 2023.

185. Defendants took the following adverse actions after Plaintiff's protected activity: (a) diverting clients from Plaintiff to Kauper; (b) issuing written performance documentation for the first time nine days after the DOL filing; (c) issuing contradictory leave balance representations in the five days preceding termination; and (d) terminating Plaintiff seventeen days after the DOL filing. Those actions were retaliatory and pretextual, as shown by the tight temporal proximity to the NYSDOL complaint, the absence of prior written discipline before the complaint, and Defendants' shifting characterizations of the separation as a quit, a policy-based termination, and a February 14 last-day-work certification.

186. Plaintiff is entitled to reinstatement, back pay, front pay, liquidated damages, compensatory damages, and reasonable attorneys' fees and costs under NYLL § 215(2).

49

## COUNT V

### Retaliation – FLSA § 215(a)(3)

### (Against All Defendants)

187. Plaintiff repeats and realleges all preceding paragraphs.

188. Plaintiff engaged in protected activity directed to Defendants' wage violations under the FLSA and NYLL: (a) on January 23, 2023, Plaintiff submitted a written wage complaint to Defendant Sinel referencing "missing paychecks"; (b) on February 6, 2023, Plaintiff filed Ticket #1966845 with the NYSDOL; and (c) throughout January and February 2023, Plaintiff made oral and written complaints about unpaid commissions.

189. Defendants had actual knowledge of Plaintiff's protected activity through direct receipt of his written complaints and the physical proximity of Kauper and Scheich during his February 6, 2023 NYSDOL call.

190. Defendants took adverse employment actions including client diversion, written performance documentation issued for the first time nine days after the DOL filing, contradictory leave balance representations in the five days preceding termination, and termination seventeen days after the DOL filing. The chronology, lack of pre-complaint discipline, and Defendants' own inconsistent accounts of Plaintiff's separation plausibly establish pretext and retaliatory motive.

191. Plaintiff is entitled to reinstatement, back pay, compensatory damages, liquidated damages, and reasonable attorneys' fees and costs under FLSA § 216(b).

## COUNT VI

### Sex-Based Wage Discrimination – NYLL § 194

### (Against All Defendants)

192. Plaintiff repeats and realleges all preceding paragraphs.

50

193. NYLL § 194 requires a plaintiff to demonstrate that: (a) the employer paid employees of one sex at a rate less than employees of the opposite sex; (b) for equal work requiring equal skill, effort, and responsibility; (c) under similar working conditions; and (d) the pay differential is not attributable to a seniority system, merit system, or factor other than sex. Each element is satisfied here.

194. Defendants cannot shield this discriminatory conduct behind a bona fide seniority system defense. While comparator Kauper possessed longer tenure, Defendants' differential treatment went far beyond permissible seniority-based compensation scaling. Instead, Defendants actively suppressed Plaintiff's earning capacity by structurally denying him equal access to commission-generating opportunities. This included actively routing Plaintiff's designated couture clients to the female comparator, restricting Plaintiff's sales floor access on high-traffic days, and burdening Plaintiff with non-commission alteration labor while excusing the female comparator from the same duties. These opportunity restrictions are not standard features of a bona fide seniority system, but rather mechanisms of sex-based disparate treatment designed to ensure the male employee's total compensation remained artificially suppressed.

195. Plaintiff is entitled to the wage differential, 100% liquidated damages, and attorneys' fees under NYLL § 194.

## COUNT VII
### Sex-Based Discrimination – NYSHRL § 296
### (Against All Defendants)

196. Plaintiff repeats and realleges all preceding paragraphs.

197. NYSHRL § 296 prohibits discrimination and retaliation in terms, conditions, and privileges of employment on the basis of sex, disability, and opposing unlawful practices.

198. Defendants subjected Plaintiff to discrimination and retaliation on the basis of sex (differential scheduling/draw), disability (fabricated attendance narrative targeting anxiety-related breaks, key revocation, medication interference), and protected opposition activity (interference with ADA rights, wage complaints).

199. The fabricated "attendance" narrative was pretextual targeting of disability-related conduct. Defendants claimed Plaintiff was "unlocated" during periods when Plaintiff transmitted contemporaneous written explanations of his whereabouts to colleagues via company-controlled systems — messages Defendants could access but ignored. Defendants' failure to produce contemporaneous "search" communications proves the "unlocated" allegations were retrospective fabrications developed to punish disability disclosure. The temporal proximity (key revocation post-disclosure, first written discipline nine days after DOL complaint), shifting explanations (¶135), and contradiction between the termination letter (February 15 worked) versus the "attendance/tardiness" narrative transmitted to Amsale (¶146) establish causal nexus.

200. Defendants' interference with Plaintiff's medical privacy — disclosing his COVID status to coworkers without authorization (¶111) — and Defendant Sinel's instruction to avoid his support system and prescribed medication (¶131) constitute additional adverse actions designed to interfere with disability-related rights protected under NYSHRL.

201. Plaintiff is entitled to back pay, front pay, compensatory damages for emotional distress, punitive damages, and attorneys' fees under NYSHRL § 297(1).

## COUNT VIII
### Fraudulent Inducement
**(Against Defendants Reem Bridals LLC, Reem Acra, and Jillian Hirsch-Sinel a/k/a Jillian Sinel)**

52

202. Plaintiff repeats and realleges all preceding paragraphs.

203. Under New York law, fraudulent inducement requires: (a) a material misrepresentation of existing fact; (b) made with knowledge of its falsity; (c) with intent to induce reliance; (d) justifiable reliance by the plaintiff; and (e) resulting damages. Each element is satisfied here.

204. On September 21, 2022, Defendant Sinel represented to Plaintiff that he would be "the only one dedicated to couture" and that his "volume should be higher than what you did at Elie." This was a representation of existing staffing fact — that no other employee was then dedicated to couture — not a prediction or opinion about future business operations.

205. That representation was false when made. Kauper was already employed and performing boutique sales; within weeks of Plaintiff's start, Defendants expanded Kauper's role to include couture sales that should have been exclusive to Plaintiff. Defendants' own records confirm employer-labeled couture appointments were routed to Kauper within weeks of Plaintiff's start date. Defendants' own admission of Kauper's seven-year tenure was not disclosed to Plaintiff during negotiations.

206. Plaintiff justifiably relied on the exclusivity representation in accepting the 3% rate in lieu of the 5% rate he had requested. Plaintiff suffered damages including the 2% commission differential on his sales volume.

## COUNT VIIIA
### Promissory Estoppel (Pled in the Alternative)
### (Against Defendants Sinel and Reem Bridals LLC)

207. Plaintiff repeats and realleges all preceding paragraphs.

208. Defendant Sinel made a clear and unambiguous promise that Plaintiff would be "the only one dedicated to couture" and that his "volume should be higher than what [he] did at Elie," intending to induce Plaintiff to accept a 3% commission rate.

209. Plaintiff reasonably and foreseeably relied on that promise by accepting employment on the reduced commission terms and committing his labor to Defendants' business. The promise was not honored.

210. Plaintiff is entitled to reliance damages, including compensation reflecting the commission differential Plaintiff accepted in reliance on the promise.

## COUNT VIIIB

### Quantum Meruit / Unjust Enrichment (Pled in the Alternative)
### (Against Reem Bridals LLC and the Entity Defendants)

211. Plaintiff repeats and realleges all preceding paragraphs.

212. Plaintiff performed valuable services for Defendants, including generating and servicing sales orders totaling at least $325,395.50 and performing fitting and facilitation labor on Kauper's clients without commission credit. Defendants accepted and retained the benefit of those services.

213. This claim is pled in the alternative if the Court determines no enforceable agreement governs the earning or payment of commissions. Plaintiff is entitled to recover at the applicable 3% commission rate on the value of sales in which Plaintiff performed fitting facilitation labor without commission credit — representing at minimum $4,285.50 on the $142,850 in documented garment value identified in ¶86(d). In the further alternative, Plaintiff is entitled to recover at the 10% rate Defendant Gupta established as the market value of equivalent facilitation services in his February 7, 2024 written offer — representing $14,285 on the same aggregate. These figures represent a floor; the full

amount of quantum meruit recovery is subject to proof at trial through Defendants' complete commission ledgers and invoice records.

## COUNT IX-A
### Fraud — Leave Balance Falsification
### (Against Defendant Sinel)

214. Plaintiff repeats and realleges all preceding paragraphs.

215. Under Rule 9(b), Plaintiff pleads the following with particularity. On February 17, 2023, Defendant Sinel represented in writing that Plaintiff had "two remaining PTO days." On February 22, 2023, Defendant Sinel represented in writing that Plaintiff had "no available sick time or PTO." Payroll records reflected 32.00 hours PTO and 3.86 hours sick leave available as of February 20, 2023. No authorized deduction, payroll entry, or documented leave usage occurred between February 17 and February 22, 2023.

216. In reliance on Sinel's February 17 representation that two PTO days remained, Plaintiff treated his February 20–22 absences as authorized paid leave and did not seek alternative arrangements, contest the absences, or escalate his wage complaint during that period. Sinel's five-day reversal was false when made or was inconsistent with the payroll records then in Defendants' possession. Plaintiff suffered damages including loss of accrued leave, wrongful termination premised on a manufactured attendance deficiency, and suppression of his wage complaint during the reliance period. Plaintiff is entitled to compensatory and punitive damages.

## COUNT IX-B
### Fraud — False Government Filing
### (Against Defendant Gupta)

217. Plaintiff repeats and realleges all preceding paragraphs.

218. Defendant Gupta certified to the New York State Department of Labor on May 24, 2023, under penalty of perjury, that Plaintiff's last day worked was February 14, 2023 and that Plaintiff's separation was "Voluntarily Quit." That certification was false. Plaintiff emailed Gupta on February 15, 2023 confirming physical presence at work that day. Defendants' own termination letter treated February 15 as a worked day. The NYSDOL approved Plaintiff's unemployment benefits in May 2023.

219. Gupta's false certification was not merely a government filing — it was a representation directed at and relied upon by the NYSDOL in assessing clawback obligations against Plaintiff, causing Plaintiff direct, quantified financial harm. The NYSDOL assessed Plaintiff $10,080 in benefits recoupment plus a $1,512 penalty, for a total of $11,592, which the NYSDOL has reduced to an active levy and garnishment enforceable against Plaintiff's wages and assets. That levy is a present, ongoing economic injury directly traceable to Gupta's false certification. A false statement submitted to a government agency that foreseeably and proximately causes financial injury to an identified individual is actionable as common-law fraud. Plaintiff is entitled to compensatory damages of $11,592 representing the full assessed amount, plus punitive damages and costs.

## COUNT X
### Tortious Interference with Prospective Business Relations
### (Against All Defendants)

220. Plaintiff repeats and realleges all preceding paragraphs.

221. Under New York law, tortious interference with prospective business relations requires: (a) a business relationship between the plaintiff and a third party; (b) the defendant's knowledge of that relationship; (c) the defendant's intentional interference with that

relationship by wrongful means or for an improper purpose; and (d) resulting damages. Each element is satisfied here.

222. Plaintiff had a reasonable expectancy of employment with Amsale following four rounds of successful interviews, a written confirmation on July 2, 2024 that Amsale "absolutely love[d]" Plaintiff, a written offer confirmation on July 21, 2024, and advancement to final onboarding steps including offer terms discussion. Prior to the reference check with Defendants, Amsale's internal Flagship Salon Manager had independently and spontaneously provided Neil Brown with a full endorsement of Plaintiff based on direct prior professional experience.

223. Defendants provided negative reference information to Amsale CEO Neil Brown during a reference check that was unsolicited by Plaintiff. Brown cited "concerns with attendance, tardiness, reliability, etc." as the basis for rescinding the offer, as confirmed in writing by Fourth Floor Managing Director Marina Santo on August 23, 2024. Brown simultaneously acknowledged Plaintiff as "a great candidate with a lot of potential," establishing that he held no independent assessment of performance deficiencies. Plaintiff identified Defendants as the source in his August 22, 2024 written communication; no Fourth Floor principal denied that attribution.

224. The negative reference was provided after Plaintiff had disclosed to Neil Brown, in direct response to Brown's solicitation, that Defendants had failed to pay wages per contract, that he had been terminated unfairly, and that he intended to pursue legal remedies — constituting protected activity under FLSA § 215(a)(3) and NYLL § 215.

225. Defendants' statements to Amsale regarding Plaintiff's attendance and reliability were made with actual malice. Defendants possessed direct knowledge that the attendance

57

characterization was false: as alleged herein, Defendant Sinel manufactured the attendance deficiency by erasing 32.00 hours of documented available PTO from Plaintiff's record within a five-day period without authorization, payroll entry, or documented leave usage (¶¶105–106); Defendants' own Employee Handbook required documented progressive discipline, yet no written warning for attendance was issued to Plaintiff at any point before February 15, 2023 — nine days after his DOL complaint (¶¶97–100); and the New York State Department of Labor independently determined that Plaintiff's separation did not result from misconduct or voluntary resignation (¶116). Defendants communicated the identical false characterizations to a prospective employer with knowledge that those characterizations were unsupported by their own records, or with reckless disregard for whether those characterizations were true, sufficient to overcome any qualified privilege.

226. Defendants intentionally interfered with Plaintiff's prospective business relationship with Amsale through conduct motivated by sole malice and the sole purpose to injure Plaintiff, and alternatively through wrongful means amounting to fraudulent misrepresentation and statutory blacklisting under NYLL § 215(2)(b):

(a) Sole Purpose to Harm: Defendants' interference was motivated by retaliatory malice, not any legitimate business interest. Defendants transmitted disparaging characterizations to Neil Brown immediately after Plaintiff disclosed — during Interview 3 on June 27, 2024 — his intent to pursue legal remedies for Defendants' wage violations. The communications were calculated to sabotage Plaintiff's finalized "temp-to-perm" offer that Fourth Floor had confirmed on July 21, 2024 as proceeding to final step, satisfying the Kirch standard requiring interference motivated by "solely . . . to injure the plaintiff." Kirch v. Liberty Media Corp.

(b) Wrongful Means — Fraudulent Misrepresentation: Alternatively, Defendants employed wrongful means amounting to fraudulent misrepresentation by knowingly supplying false information to Amsale. Defendants represented that Plaintiff had attendance deficiencies involving "tardiness" and periods where his whereabouts were "unknown" and management could not locate him. These representations were material false statements of existing fact: (i) Plaintiff's October 20, 2022 email to management documented the biometric scanner's failure to recognize his retinal features, establishing "clock-in violations" were equipment malfunctions, not employee misconduct; (ii) Plaintiff transmitted contemporaneous written explanations of his whereabouts to colleagues during disputed periods via company-controlled communication systems — messages Defendants could access and review but chose to ignore in favor of the false "unlocated employee" narrative; (iii) Defendants produced no contemporaneous internal communications or emergency outreach efforts demonstrating genuine concern about Plaintiff's location during the allegedly "missing" periods, confirming the "attendance" criticism was a retrospective fabrication developed only after Plaintiff's wage complaint and DOL filing; (iv) Defendants' own February 23, 2023 termination letter treated February 15, 2023 as a worked day, contradicting the "unreliable attendance" characterization subsequently transmitted to Amsale seventeen months later; (v) Defendants' May 2023 DOL certification ("Voluntarily Quit") was rejected by the NYSDOL, which awarded benefits, confirming the "attendance" rationale was pretextual. Defendants knowingly made these false statements with intent that Amsale rely upon them. Amsale's CEO Neil Brown relied upon these

59

false characterizations in rescinding the offer, as confirmed by Fourth Floor's August 23, 2024 correspondence citing "concerns with attendance, tardiness, reliability, etc." sourced from Defendants.

(c) Wrongful Means — Statutory Blacklisting: Defendants' communications further constitute the independent statutory tort of blacklisting under NYLL § 215(2)(b), which prohibits employers from using "false statements or representations" to prevent former employees from obtaining employment. The knowing transmission of false attendance characterizations — contradicted by biometric scanner complaints and intra-office location confirmations — to induce Amsale to withdraw its offer satisfies the statutory prohibition.

227. Plaintiff is entitled to damages including the lost wages from the rescinded Amsale position, the value of Fourth Floor's ongoing placement services foreclosed by the interference, and punitive damages for willful misconduct.

228. As detailed above, Defendants' own contemporaneous records — including Plaintiff's February 15, 2023 email confirming physical presence and the termination letter itself treating February 15 as a worked date — contradicted these characterizations, demonstrating both their falsity and Defendants' subjective knowledge thereof. These defamatory statements were not made to protect any legitimate business interest but were calculated specifically to sabotage Plaintiff's finalized employment offer following Plaintiff's protected disclosure during Interview 3 that he intended to pursue legal remedies against Defendants.

**COUNT XI**

**Retaliatory Action by Employer – NYLL § 740**

**(Against All Defendants; Pled in the Alternative to Count IV)**

60

229. Plaintiff repeats and realleges all preceding paragraphs.

230. In the alternative, should this Court find that EEOC exhaustion is required for ADA interference claims under § 12203(b), Plaintiff incorporates all allegations regarding interference with disability rights (¶¶129–137) as predicate acts supporting the NYSHRL § 296 retaliation claim pled in Count XII, which requires no administrative exhaustion.

231. NYLL § 740, as amended effective January 26, 2022, protects current and former employees who disclose or threaten to disclose to a supervisor or public body an activity, policy, or practice of the employer that the employee reasonably believes is in violation of law, rule, or regulation. The statute requires: (a) a disclosure or threat of disclosure; (b) of a violation of law; (c) to a supervisor or public body; and (d) a retaliatory adverse action. Each element is satisfied here.

232. Plaintiff disclosed to Defendants violations of the New York Labor Law, including unpaid earned commissions, defective wage notices, and falsified leave balances, and filed Ticket #1966845 with the NYSDOL on February 6, 2023. Those same disclosures form the predicate protected activity for Counts IV, V, and XI.

233. After Plaintiff's separation, Defendants provided unfavorable and false post-employment references to prospective employer Amsale, causing Amsale to rescind its July 21, 2024 written offer, as confirmed in writing by Fourth Floor Managing Director Marina Santo on August 23, 2024.

234. Defendant Gupta's false NYSDOL certification further caused approximately $15,000 in unlawfully assessed unemployment insurance clawback obligations.

235. Plaintiff is entitled to compensatory damages, back pay, front pay for lost employment with Amsale and loss of Fourth Floor placement pipeline access, punitive damages, civil penalties of up to $10,000, and reasonable attorneys' fees and costs under NYLL § 740(5).

## COUNT XII
### Disability Retaliation – NYSHRL § 296(1-a)
### (Against All Defendants)

236. Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

237. NYSHRL § 296(1-a) prohibits retaliation against any employee who opposes practices forbidden under the Human Rights Law. Plaintiff engaged in protected opposition activity by: (a) orally disclosing his diagnosed anxiety disorder to Defendant Sinel and requesting accommodation for biometric scanner malfunction; (b) invoking ADA protections by name in his February 22, 2023 email to Sinel and Gupta (¶95); and (c) opposing Defendants' interference with his disability-related medical treatment (¶131).

238. Defendants retaliated through adverse actions including: (i) fabricating "attendance violations" targeting disability-related behaviors immediately after the February 22, 2023 protected email; (ii) revoking couture closet key access following December 2022 disability disclosure (¶80); (iii) termination on February 23, 2023; and (iv) post-employment blacklisting (¶¶138–147, 221–226).

239. The "unlocated employee" narrative was pretextual targeting of disability-related conduct. Defendants claimed Plaintiff was unreachable during periods when he transmitted contemporaneous explanations of his whereabouts to colleagues via company systems — messages accessible to Defendants but ignored in favor of the false attendance characterization. The temporal proximity (first written discipline nine days after DOL complaint, termination seventeen days after), shifting explanations regarding disability

62

coverage (¶135), and contradiction between the termination letter (February 15 worked) versus the "attendance/tardiness" narrative later transmitted to Amsale (¶146) establish causal nexus.

240. Plaintiff is entitled to back pay, front pay, compensatory damages, punitive damages, and attorneys' fees under NYSHRL § 297(1).

## COUNT XIII
## ADA Interference – 42 U.S.C. § 12203(b)
### (Against All Defendants)

241. Plaintiff repeats and realleges all preceding paragraphs.

242. 42 U.S.C. § 12203(b) makes it unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of any right granted or protected by the ADA. Plaintiff pleads direct interference with treatment, support-system access, and the exercise of accommodation-related rights.

243. Defendant Sinel utilized her supervisory authority to coerce, intimidate, and interfere with Plaintiff's exercise and enjoyment of his ADA-protected rights in violation of 42 U.S.C. § 12203(b). Following Plaintiff's disclosure of his qualifying disability, Defendants engaged in a campaign of intimidation designed to chill Plaintiff's ability to request or receive reasonable accommodations, including by:

(a) Discouraging Plaintiff from taking his prescribed anxiety medication and instructing him not to contact his support system, an act of coercion designed to improperly manage Plaintiff's medical treatment in the workplace without engaging in the required interactive process;

(b) Revoking Plaintiff's independent key access to the couture storage closet immediately following his disability disclosure. This punitive revocation created a structural

63

dependency on the very supervisor who discouraged his medical treatment, actively interfering with his ability to perform his core job functions; and

(c) Imposing a bad-faith 24-hour medical documentation ultimatum on February 22, 2023. Knowing Plaintiff was financially unable to obtain an immediate physician visit due to Defendants' own wage withholdings, this ultimatum was used as a mechanism to threaten Plaintiff's employment rather than a legitimate inquiry into an accommodation.

244. Defendants provided Plaintiff with health insurance that excluded coverage for his primary care physician.

245. Defendants were on actual and constructive notice of Plaintiff's anxiety-related condition no later than December 2022, when Sinel addressed Plaintiff's medication and support system, and by February 15, 2023, when Defendants' own correspondence confirms they offered Plaintiff an opportunity to request an accommodation.

246. Defendants disclosed Plaintiff's purported COVID-positive status to co-workers without Plaintiff's authorization, constituting an additional act of interference with Plaintiff's medical privacy rights.

247. Plaintiff is entitled to compensatory damages, punitive damages, equitable relief, and attorneys' fees and costs under 42 U.S.C. § 12205.

## COUNT XIV
### NYSHRL § 296 – Disability Discrimination
### (Against All Defendants)

248. Plaintiff repeats and realleges all preceding paragraphs.

249. NYSHRL § 296 prohibits discriminatory practices in employment on the basis of disability. No exhaustion of administrative remedies is required.

64

250. Defendants discriminated against Plaintiff on the basis of his disability by: (a) generating a record of unexcused absences attributable to his disability-related symptoms while failing to apply his documented accrued leave; (b) requiring medical documentation while Plaintiff's available PTO was sufficient to cover the absences at issue; (c) revoking Plaintiff's independent key access to the couture storage closet following his disability disclosure; (d) disclosing Plaintiff's purported medical information to co-workers without authorization; and (e) terminating Plaintiff's employment in connection with his disability and his assertion of disability-related rights. The proffered attendance rationale was pretextual because Defendants simultaneously denied available leave, took inconsistent positions about Plaintiff's disability status, and treated February 15, 2023 inconsistently across their own records; (f) failing to engage in a good-faith interactive process regarding a reasonable accommodation. When Plaintiff experienced disability-related symptoms, the application of his 32.00 hours of documented, available PTO constituted a reasonable accommodation that posed no undue hardship to Defendants. Rather than engaging in the interactive process upon notice of his condition, Defendants summarily denied the use of available leave and manufactured a punitive 24-hour medical documentation ultimatum they knew Plaintiff could not meet, effectively weaponizing his disability to engineer his termination.

251. Plaintiff is entitled to compensatory damages, back pay, front pay, punitive damages, and attorneys' fees.

## COUNT XV
### Salary History Inquiry – NYLL § 194-a
### (Against Defendants Reem Bridals LLC, Reem Acra, and Jillian Hirsch-Sinel a/k/a Jillian Sinel)

65

252. Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

253. NYLL § 194-a, effective January 6, 2017, prohibits employers and their agents from: (a) inquiring about the wage or salary history of a prospective employee; and (b) relying on the wage or salary history of a prospective employee in determining the wage or salary for such individual at any stage of the hiring process. The statute covers all inquiries, whether direct or indirect, and all reliance on disclosed history to set compensation. Each prohibited act is an independent statutory violation.

254. During the recruitment process, Defendant Sinel, acting in her capacity as President of Reem Bridals LLC and as Defendants' authorized agent, directly solicited Plaintiff's prior compensation history. In response to that solicitation, Plaintiff disclosed: (a) his prior base salary of $72,500 at his prior employer; (b) his prior commission rate of 5%; and (c) that he had generated approximately $1,390,000 in sales revenue over a seven-month period at that rate, with commissions paid the month following each sale. This disclosure was made in direct response to Defendant Sinel's inquiry and constitutes a wage history disclosure within the meaning of NYLL § 194-a.

255. Defendants violated NYLL § 194-a in two independently actionable respects. First, Defendant Sinel's direct inquiry into Plaintiff's prior compensation was prohibited on its face, regardless of how the disclosed information was subsequently used. Second, Defendants used the disclosed salary history to set Plaintiff's compensation: Defendants offered Plaintiff a nominal $2,500 base salary increase over his disclosed prior base while reducing his commission rate from the 5% he had disclosed to 3% — a 40% commission rate reduction applied over the same volume of work. Defendant Sinel's September 21, 2022 email explicitly references Plaintiff's prior Elie volume as justification for the 3%

counteroffer — documentary evidence that the disclosed history was used to structure and anchor a below-market rate. At Plaintiff's disclosed annualized volume, the 2% commission rate reduction suppressed Plaintiff's earning potential by approximately $47,732 on an annualized basis.

256. Plaintiff is entitled to compensatory damages representing the full commission differential between the 5% rate Plaintiff sought and the 3% rate Defendants imposed through reliance on his disclosed salary history, applied to his documented sales volume of at least $325,395.50, plus liquidated damages, interest, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Roth Ranbom respectfully requests that this Court enter judgment against Defendants, jointly and severally, awarding:

(a) Unpaid wages, commissions, and earned compensation in an amount not less than $5,681.05, comprising:

(i) $882.60 in December 2022 bonus commissions withheld despite Defendants' own internal spreadsheet reflecting a 4% rate applied uniformly to all December 2022 boutique sales;

(ii) $2,517.00 in commissions on couture sales diverted to comparator Kauper, as documented in Defendants' own commission records;

(iii) $1,153.85 in accrued but unpaid PTO (32.00 hours at $36.06 per hour), which Defendants failed to pay upon termination as required by the Employee Handbook;

(iv) $127.60 in unreimbursed business expenses; and

67

(v) $1,000.00 in unpaid post-termination referral commission confirmed in writing by Defendant Gupta on February 7, 2024; plus additional unpaid compensation for fitting, facilitation, and client-management labor performed without commission credit, in an amount to be proven at trial;

(a-ii) Commission suppression damages from structural appointment and value-tier routing, comprising three independently documented streams: (1) $4,800 in scheduling suppression representing commissions on 25 diverted sales consultation appointments — distinguished from non-commission fitting appointments by Defendants' own color-coded calendar system — at the contractual 3% rate applied to $160,000 in diverted client budget opportunity across the documented five-week period; (2) $1,194 in value-tier suppression representing the 3% commission differential on the $5,685 per-transaction average gap between Plaintiff's bridal sales and non-Plaintiff bridal sales as documented in Defendants' own purchase log, with Plaintiff closing zero bridal transactions at or above $19,000 while six such transactions were attributed to other consultants; and (3) the full suppression amount to be proven at trial through Defendants' complete purchase records, commission ledgers, and native calendar exports — for a combined documented floor of at least $4,458 on these two streams alone;

(b) Liquidated damages equal to 100% of unpaid wages under NYLL § 198(1-a), in an amount not less than $5,681.05 on the presently quantified unpaid wage component, or such greater amount as the evidence establishes at trial;

(c) Liquidated damages on untimely-paid commissions under NYLL § 191(1)(c), in an amount not less than $9,761.87, representing commissions earned during Plaintiff's

employment that were paid months late in fragments under coercive "full and final" conditions void under NYLL § 193, in violation of the statutory mandate that commissions be paid no later than the last day of the month following the month in which they are earned;

(d) Compensatory damages of not less than $6,508.00 representing the 2% commission differential attributable to fraudulent inducement, plus consequential and punitive damages on the fraud claims alleged in Count VIII;

(e) Statutory damages of $5,000 for wage notice violations under NYLL § 198(1-b), and $5,000 for wage statement violations under NYLL § 198(1-d);

(f) Back pay from February 23, 2023 through the date of judgment at Plaintiff's annual base salary rate of $75,000, currently not less than $225,000 and increasing daily, plus front pay in an amount to be determined at trial, pursuant to FLSA § 216(b) and NYLL § 215(2);

(g) Liquidated damages equal to 100% of back pay under the statute providing the greater remedy, consistent with Rana v. Islam, 887 F.3d 118 (2d Cir. 2018);

(h) Compensatory damages for emotional distress, reputational harm, and physical injury, including cholinergic urticaria and associated unreimbursed medical expenses documented through October 2023, in an amount to be determined at trial;

(i) Compensatory damages of $11,592 representing unemployment insurance clawback obligations directly caused by Defendant Gupta's false New York State Department of Labor certification, comprising $10,080 in assessed benefit recoupment plus a $1,512 statutory penalty, now reduced to an active levy and garnishment against

69

Plaintiff's wages and assets, plus punitive damages for that knowing false sworn statement, pursuant to Count IX-B;

(j) Compensatory and punitive damages for the leave balance falsification fraud alleged in Count IX-A, including damages for loss of employment, loss of health insurance, and physical and psychological harm, in an amount to be determined at trial but not less than $25,000;

(k) Compensatory damages for tortious interference with Plaintiff's prospective employment relationship with Amsale, including lost wages of not less than $112,500, loss of Fourth Floor placement pipeline access, and punitive damages for willful blacklisting under NYLL § 215(2)(b), in a total amount to be determined at trial;

(l) Compensatory and punitive damages for ADA § 12203(b) interference and NYSHRL § 296 disability discrimination, including damages attributable to the revocation of Plaintiff's couture storage closet key access following disability disclosure, medication interference, and the bad-faith 24-hour medical documentation ultimatum, in an amount to be determined at trial;

(m) The sex-based wage differential plus 100% liquidated damages under NYLL § 194;

(n) Civil penalties of up to $10,000 under NYLL § 740(5), plus compensatory damages for loss of the Fourth Floor placement pipeline relationship and associated prospective employment opportunities in the luxury bridal and eveningwear industry;

(o) Prejudgment interest at 9% per annum under CPLR § 5004 on all amounts for which such interest is legally recoverable, calculated from the earliest ascertainable date

each cause of action existed, or from a reasonable intermediate date, without duplication of any FLSA liquidated damages awarded on the same wage base;

(p) Mandatory attorneys' fees and costs under 29 U.S.C. § 216(b), NYLL § 198, NYSHRL, and 42 U.S.C. § 12205;

(q) A declaration that Defendants operated as a single integrated enterprise and are jointly and severally liable for all claims alleged herein; and

(s) Compensatory damages under NYLL § 194-a representing the commission rate differential between the 5% rate Plaintiff sought and the 3% rate Defendants imposed through unlawful reliance on Plaintiff's disclosed prior salary history, applied to Plaintiff's documented sales volume of at least $325,395.50, plus liquidated damages, interest, and attorneys' fees and costs;

(r) Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

## DECLARATION UNDER PENALTY OF PERJURY (28 U.S.C. § 1746)

I, Roth Ranbom, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: March 17, 2026

New York, New York

Roth Ranbom 3·17·26

Roth Ranbom, Pro Se
1178 Broadway, 3rd Floor, #561
New York, NY 10001
Email: R261291@proton.me

71

72

Telephone: (424) 438-4958

72

Roth Ranbom
117f Boulvary 3rd flr
#561
New York. NY 10001

RECEIVED
MAR 19 2026
CLERK'S OFFICE
S.D.N.Y.

USM SDNY

RECEIVED
SDNY PRO SE OFFICE
2026 MAR 19 AM 11:17

Clerk of Court

U.S. District Court – SDNY

Case: *Ranbom v. Reem Bridals LLC, et al.*

Case No. 1:26-cv-01546

**FIRST AMENDED COMPLAINT**

**ORIGINAL FOR FILING**