**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROTH RANBOM,<br><br>Plaintiff,<br><br>-against-<br><br>REEM BRIDALS LLC; REEM HOLDINGS LLC; REEM ACRA BOUTIQUE LLC; REEM ACRA COUTURE COLLECTION LLC; REEM ACRA LICENSING LLC; R.A. LUXURY LLC; REEM ACRA, individually; JILLIAN HIRSCH-SINEL a/k/a JILLIAN SINEL, individually; and ABHINAV GUPTA, individually,<br><br>Defendants. | **Case No.**<br><br>**1:26-cv-01546-JHR-GS**<br><br>**SECOND AMENDED VERIFIED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Roth Ranbom ("Plaintiff"), appearing pro se, for his Second Amended Complaint against Defendants, alleges as follows:

**PRELIMINARY STATEMENT**

1. This action arises from Defendants' failure to pay earned commissions, from statutory wage-notice and wage-statement violations, from a sex-based pay disparity, and from the retaliation that followed Plaintiff's written wage complaints — a same-week alteration of his compensation terms, escalating scrutiny of his attendance, termination one day after he confirmed in writing that he intended to return to work, and a false sworn certification to a state agency.

2. The core of the case is documented by Defendants' own records. A signed offer letter states a 3% commission with no shipment condition, no draw, and a clause barring amendment except in a writing signed by both parties. Thirteen minutes before Plaintiff signed, Defendants'

President represented in writing that Plaintiff would be "the only one dedicated to couture." Thirty-four minutes after Plaintiff's January 18, 2023 written wage complaint, the President conceded that the offer letter "does not state clearly whether the commission is paid based on when order is taken or when it is shipped so we have set a policy," and admitted Plaintiff was "currently owed $6,395 in commission." Defendants' statutory wage notice asserts exempt status, omits the commission rate and basis, omits the employer's telephone number, and bears no employer signature.

3. Plaintiff pleads only what Defendants' documents and his own contemporaneous records support. Where an allegation rests on inference or on information within Defendants' exclusive control, Plaintiff says so.

## JURISDICTION AND VENUE

4. This Court has federal question jurisdiction under 28 U.S.C. § 1331. Plaintiff asserts claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq., including retaliation under 29 U.S.C. § 215(a)(3), and under the Equal Pay Act, 29 U.S.C. § 206(d), with remedies under 29 U.S.C. § 216(b).

5. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claims under the New York Labor Law, the New York State Human Rights Law, and the New York City Human Rights Law. Those claims arise from the same employment relationship, compensation practices, retaliation sequence, and termination, and form part of the same case or controversy.

6. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District. Plaintiff was employed at Defendants' premises at 501 Fifth Avenue in New York County from September 28, 2022 through February

23, 2023, and the hiring, the compensation practices, the wage complaints, and the separation at issue all occurred there. Plaintiff's offer letter provides that it "shall be enforceable solely in the Federal or state courts located in New York County."

## TIMELINESS

7. This action was commenced on February 24, 2026. Plaintiff's employment was terminated on February 23, 2023. To the extent any limitations period would otherwise have expired on February 23, 2026, Plaintiff alleges that the period was extended to February 24, 2026 under Fed. R. Civ. P. 6(a)(3)(A), because the Clerk's Office for this District was inaccessible on February 23, 2026. In a Notice to the Bar issued over the names of Chief Judge Laura Taylor Swain and Clerk of Court Tammi Hellwig, the Court announced that "[t]he Manhattan, White Plains, and Poughkeepsie courthouses will be closed on Monday, February 23, 2026 due to inclement weather." In a further Notice to the Bar issued over the same names, the Court announced that "[o]n Tuesday, 2/24/26, the court will be open at all locations" and that "[t]he Court's public counters will open for in-person service beginning at 10:00 a.m." February 24, 2026 was therefore the first accessible day within the meaning of Rule 6(a)(3)(A). Plaintiff was not at that time a registered electronic filer in this District and had no access to the Court's electronic case filing system; the Court's public counters were his means of filing. Plaintiff filed the complaint in person at the Court's Pro Se Intake Unit on February 24, 2026, the day those counters reopened. Both notices are annexed as Exhibit EE.

7A. Plaintiff pleads the extension stated at ¶ 7 as to his claims under the Fair Labor Standards Act and the Equal Pay Act. As to his claims under the New York State Human Rights Law and the New York City Human Rights Law, Plaintiff alleges in the alternative that the closure of the courthouse on February 23, 2026 made filing on that date impossible and that the

periods applicable to those claims are subject to tolling for that day. Plaintiff further alleges that the following claims do not depend on ¶ 7: Counts I through V, IX and XII, which are governed by the six-year periods of NYLL §§ 198(3) and 663(3); Count VI, the primary timely act under which occurred in August 2024 (¶¶ 130A, 135A); and Count VIII, as to which Defendants made payments on March 10 and March 15, 2023 under the compensation terms at issue (¶¶ 145A, 145A-2).

8. Plaintiff alleges that his NYLL Article 6 claims are subject to the six-year period provided by NYLL § 198(3). Plaintiff alleges that his FLSA claims are subject to 29 U.S.C. § 255(a) and are timely as to willful violations, including the separately pleaded August 2024 conduct. Plaintiff alleges that his NYSHRL and NYCHRL claims are timely to the extent stated in the respective counts, and in all events as to the August 2024 conduct.

**PARTIES**

8A. This action was commenced on February 24, 2026 against Defendants Reem Bridals LLC, Jillian Sinel, and Abhinav Gupta. Plaintiff first named Defendants Reem Holdings LLC, Reem Acra Boutique LLC, Reem Acra Couture Collection LLC, Reem Acra Licensing LLC, R.A. Luxury LLC, and Reem Acra (the "Later-Named Defendants") in the amended complaint filed March 17, 2026 — twenty-one days after commencement, and within the period Fed. R. Civ. P. 4(m) allows for service of the original complaint. Every claim Plaintiff asserts against the Later-Named Defendants arises out of the same employment, the same compensation practices, and the same separation set out in the original complaint. Those claims relate back to February 24, 2026 under Fed. R. Civ. P. 15(c)(1)(B).

8A-1. On February 26, 2026 the Court granted Plaintiff leave to proceed in forma pauperis. On April 28, 2026 the Court entered an Order of Service (ECF 11) directing the Clerk

of Court to issue summonses for all nine Defendants — including each of the Later-Named Defendants — and to deliver the amended complaint to the United States Marshals Service for service. The Court stated in that Order that although Rule 4(m) "generally requires that a summons be served within 90 days of the date that the complaint is filed, Plaintiff is proceeding IFP and could not have effected service on the defendants until the Court reviewed the amended complaint and ordered that summonses be issued for the defendants," and that the Court "therefore extends the time to serve the defendants until 90 days after the date that summonses for the defendants issue." The United States Marshals Service effected service on the Entity Defendants and on Reem Acra on June 5, 2026. Plaintiff alleges that service was made within the period Rule 4(m) allows as extended by order of this Court, and that any period measured under Fed. R. Civ. P. 15(c)(1)(C) is measured accordingly.

8A-2. The service addresses the Court directed in that Order are themselves evidence of the relationships alleged at ¶¶ 8B and 19A–19U. The Order lists Reem Bridals LLC, Reem Holdings LLC, and Reem Acra Boutique LLC at a single address — 501 Fifth Avenue, 2nd Floor, New York, New York — the premises at which Plaintiff worked. It lists Reem Acra Couture Collection LLC and Reem Acra Licensing LLC at 1 West End Avenue, Apartment 41D, New York, New York, which is also the address listed for Defendant Reem Acra individually. It lists R.A. Luxury LLC at 240 West 35th Street, New York, New York — the address a New York court identified as Reem Bridals LLC's "principal design and production facility" (¶ 19O). Plaintiff alleges that two Entity Defendants are reachable only at the residence of the individual who certified that she manages others of them (¶¶ 19K, 19O), and that no Entity Defendant maintains an address independent of Reem Bridals LLC's premises, Reem Bridals LLC's production facility, or Reem Acra's residence.

8B. The Later-Named Defendants are united in interest with Reem Bridals LLC and are chargeable, by reason of that relationship, with notice of the institution of this action. Reem Acra is the owner and chief executive of Reem Bridals LLC and certified under penalties of perjury that she was the Manager of Reem Holdings LLC and of R.A. Luxury LLC (¶¶ 16, 19K, 19O). Three of the entities stated in a prior pleading of their own that Reem Bridals LLC and Reem Acra Boutique LLC are each "a wholly-owned subsidiary of R.A. Luxury LLC" (¶ 19N). Four were insured under a single policy and prosecuted a single claim for damage to shared premises (¶ 19O). Four were organized in Delaware on the same day through the same registered agent (¶ 19C). They share premises, the single electronic-mail domain reemacra.com, and common management (¶¶ 10–15, 17–20, 19P). A single sale Plaintiff originated was invoiced by one of these entities, ordered through a second, sold to a third, and commissioned by a fourth (¶ 19Q).

8C. The Later-Named Defendants will suffer no prejudice from the relation back. On July 23, 2026 a single law firm filed a stipulation in this action stating that it "represents Defendants Reem Bridals LLC, Reem Holdings LLC, Reem Acra Boutique LLC, Reem Acra Couture Collection LLC, Reem Acra Licensing LLC, R.A. Luxury LLC, Reem Acra, Jillian Hirsch-Sinel, and Abhinav Gupta (collectively, 'Defendants')"; that the letter "shall constitute the appearance of" that firm "as counsel of record for all Defendants"; that Defendants "consent to Plaintiff's filing of a Second Amended Complaint"; and that Defendants "waive any defenses they may have had under Fed. R. Civ. P. 12(b)(4) or 12(b)(5)." Each Defendant executed an acknowledgment of service, and all Defendants answer to a single response deadline. Plaintiff further alleges that Defendants used the several entity names and the designation "Reem Acra" interchangeably throughout his hiring, pay, and separation (¶¶ 17–18, 26, 51, 73, 79A), and that the documents on which the individual entity names appeared were internal to Defendants while

the writings Plaintiff and Defendants' clients received identified only "Reem Acra" or "Reem Acra New York" (¶¶ 22, 19Q). Plaintiff alleges on that basis that any failure to name each correct entity in the original complaint was a mistake concerning the proper parties' identity and not a deliberate choice to proceed against one entity in place of another.

8D. As to Plaintiff's claims under the New York State Human Rights Law and the New York City Human Rights Law, Plaintiff pleads in the alternative that relation back is available under Fed. R. Civ. P. 15(c)(1)(A), which permits relation back where the law supplying the limitations period allows it. Plaintiff does not concede that Fed. R. Civ. P. 15(c)(1)(C) is unsatisfied, and pleads under both provisions.

8E. Defendant Jillian Hirsch-Sinel was named as a Defendant in the original complaint filed February 24, 2026, in which she is identified as "Jillian Sinel." The amended complaint corrected only the form of her name. No claim against her depends on relation back.

9. Plaintiff Roth Ranbom is a natural person residing in the State of New York. He is male. Plaintiff's address for service and for notice in this action is 1178 Broadway, 3rd Floor, PMB #561, New York, NY 10001. Plaintiff was employed by Defendants from September 28, 2022 through February 23, 2023 at Defendants' premises at 501 Fifth Avenue in New York County.

10. Defendant Reem Bridals LLC is a foreign limited liability company organized under the laws of Delaware and registered with the New York Department of State under identification number 3853872. Its address of record with the Department of State for service of process is 501 Fifth Avenue, 2nd Floor, New York, NY 10017 (¶ 19C). During Plaintiff's employment Reem Bridals maintained a place of business at 501 Fifth Avenue, 2nd Floor, where Plaintiff worked, and Defendants' own hiring documents bear a second address, 240 West 35th Street, 7th Floor,

New York, NY 10001 (¶ 22). A court of this State stated in a decision entered March 6, 2025 that Reem Bridals "has its principal design and production facility at 240 West 35th Street in Manhattan, using the entire seventh floor" (¶ 19O). Reem Bridals was Plaintiff's employer of record: it issued his offer letter, his wage notice, his pay under payroll code "MM229-REEM BRIDA," his 2023 Form W-2 under EIN 27-0509328, and his termination letter. On the New York State Form IA 12.3 Record of Employment that Defendants transmitted to Plaintiff with that termination letter, Reem Bridals LLC states that its payroll records are kept at 501 5th Avenue, New York, NY 10017.

11. Defendant Reem Holdings LLC is a foreign limited liability company registered with the New York Department of State under identification number 3842723. On December 14, 2021 it filed a Certificate of Change under Limited Liability Company Law § 804-A — the provision governing foreign limited liability companies — changing the address for service of process to 501 Fifth Avenue, 2nd Floor, New York, NY 10017 (¶ 19C).

12. Defendant Reem Acra Boutique LLC is a foreign limited liability company organized under the laws of Delaware and registered with the New York Department of State under identification number 3853685, with an address of record at 501 5th Avenue, 2nd Floor, New York, NY 10017. Plaintiff sold merchandise on invoices bearing the Boutique designation.

13. Defendant Reem Acra Couture Collection LLC is a domestic New York limited liability company, Department of State identification number 5697854, whose initial filing was made on January 29, 2020 and whose address of record is 1 West End Avenue, Apartment 41D, New York, NY 10023 — the residential address of Defendant Reem Acra. Plaintiff serviced clients whose order documents issued under the "Reem Acra Couture" designation.

14. Defendant Reem Acra Licensing LLC is a domestic New York limited liability company, Department of State identification number 5697891, organized under Limited Liability Company Law § 203 by Articles of Organization filed with the Department of State on January 29, 2020 under file number 200129010111. The Articles designate the Secretary of State as agent for service of process and give the address for mailing process as "c/o Reem Acra, 1 West End Ave., Apt. 41D, New York, NY 10023" — the residence of Defendant Reem Acra. The Articles are signed "Reem Acra (signature) / Reem Acra, ORGANIZER," and state that the company is to be managed by one or more members.

15. Defendant R.A. Luxury LLC is a foreign limited liability company organized under the laws of Delaware, with a foreign formation date of July 8, 2009, registered with the New York Department of State on August 7, 2009 under identification number 3842764. In a complaint it filed in the Supreme Court of the State of New York, R.A. Luxury LLC stated that Reem Bridals LLC and Reem Acra Boutique LLC are its wholly-owned subsidiaries (¶ 19N). R.A. Luxury LLC is therefore the corporate parent of Plaintiff's employer of record. Its address of record for service of process is 240 West 35th Street, Suite 700, New York, NY 10001 — the same address the United States Patent and Trademark Office lists for Defendant Reem Holdings LLC as owner of the REEM ACRA marks (¶ 19H), and the same building in which Reem Bridals LLC maintained a place of business (¶ 10).

16. Defendant Reem Acra is a natural person and the principal of the Reem Acra enterprise. A Judicial Hearing Officer of the Supreme Court of the State of New York stated, in a decision after inquest entered on the testimony of Reem Acra herself, that "Reem Acra is the owner and chief executive of Reem Bridals, LLC" (¶ 19O). United States Patent and Trademark Office records for the marks under which Plaintiff sold identify her, as "Acra, Reem," as the

original registrant of U.S. Registration No. 2731062 (¶ 19H). On December 7, 2009 she certified to the New York Department of State, under penalties of perjury, that she was the Manager of Defendant Reem Holdings LLC and, in a separate certificate executed the same day, that she was the Manager of Defendant R.A. Luxury LLC (¶ 19K). On January 29, 2020 she personally signed the Articles of Organization of Defendant Reem Acra Licensing LLC as its ORGANIZER and designated her own residence as that entity's address for service of process (¶ 14); Defendant Reem Acra Couture Collection LLC was registered at the same residence on the same day (¶¶ 13, 19C). On January 26, 2023 she directed that she receive follow-up reporting on clients she referred (¶ 47), and she was a recipient of Defendants' internal couture client recap of the same date (¶ 61A). On October 17, 2022 at 8:46 p.m., responding to Plaintiff's request concerning his company-issued telephone, Sinel wrote: "I need to review this with Ms Acra tomorrow but I will make it happen."

17. Defendant Jillian Hirsch-Sinel held herself out as President in Defendants' correspondence with Plaintiff. She subscribed each of the Company's three responsive letters of March 15, April 12, and May 5, 2023 "Jillian Sinel / President / Reem Bridals LLC," and in the electronic mail transmitting the April 12, 2023 letter identified herself as "Jillian Sinel / President / REEM ACRA / 501 5th Avenue, 2nd floor / New York, NY 10017." She subscribed Plaintiff's September 15, 2022 offer letter "Jillian Sinel / Reem Bridals, LLC," without stating a title. She recruited Plaintiff, negotiated and signed his offer letter, set his commission rate and that of his comparator, imposed the January 23, 2023 compensation terms, issued the attendance directives of February 2023, and authored each of the Company's three responsive letters of March 15, April 12, and May 5, 2023. She was an employer within the meaning of NYLL § 190(3) and 29 U.S.C. § 203(d).

18. Defendant Abhinav Gupta held himself out as a financial officer of Defendants. On the New York State Department of Labor Notice of Potential Charges and Notice of Protest concerning Plaintiff's separation, each addressed to "REEM BRIDALS LLC, 501 5TH AVE FL 2," Gupta printed his name, stated his title as "CFO," gave his electronic-mail address as abhinavg@reemacra.com, and signed on May 24, 2023 (¶¶ 96–97). In electronic mail sent from the address abhinavg@reemacra.com on January 31, February 9 and February 15, 2024, he identified himself in a signature block as "Abhi Gupta / CFO/COO / REEM ACRA / 501 Fifth Avenue, 2nd Floor / New York, NY 10017." He executed the May 24, 2023 certification to the New York State Department of Labor described at ¶¶ 95–98. On January 31, 2024 he transmitted Plaintiff's 2023 Form W-2 to him by electronic mail under the subject line "Your W2," writing that "[w]e mailed your W2 to the address we have on file and it came back as undeliverable" and attaching a scanned copy (¶ 86). He was a copied recipient of each of the three letters Sinel authored in response to Plaintiff's wage complaints (¶ 78) and of Plaintiff's written demands of April 1 and April 23, 2023. On February 7, 2024 he promised Plaintiff "10% of the sale" for a client referral (¶ 76). Plaintiff alleges that Gupta possessed and exercised operational control over Defendants' payroll and wage-records practices and was an employer within the meaning of NYLL § 190(3) and 29 U.S.C. § 203(d).

## COMMON ALLEGATIONS

### A. The Reem Acra Enterprise

19. The Entity Defendants operated as a single integrated enterprise and/or joint employers under the FLSA and NYLL. They shared the principal (Reem Acra), the President (Sinel), premises, the "reemacra.com" email domain, and a telephone number, 212-421-3200, on which Defendants' sales and operations personnel each held an extension (¶ 21). Plaintiff was

carried on the payroll of Reem Bridals LLC under payroll code "MM229-REEM BRIDA" (¶ 10), and the commission on a sale invoiced by Reem Acra Boutique LLC was computed on a schedule captioned "REEM BRIDALS LLC" (¶¶ 19Q, 55–56). Plaintiff does not allege personal knowledge of how any Entity Defendant compensated any employee other than himself. The payroll records of each Entity Defendant, the payroll vendor or vendors each used, and the identity of the entity that paid each category of personnel, including atelier, production, and wholesale personnel, are within Defendants' possession and control.

19A. At all relevant times Defendants were an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 203(s)(1). Defendants sold and offered for sale bridal and couture merchandise and had employees handling, selling, or otherwise working on goods and materials that had been moved in or produced for commerce, including garments, fabrics, and trims manufactured outside the State of New York. On January 18, 2023 Defendants' President stated in writing that Plaintiff alone was "currently owed $6,395 in commission for approximately $200,000 in orders that have been taken" — orders taken over approximately sixteen weeks by one of at least two commissioned salespersons at a single showroom. On that basis Plaintiff alleges, upon information and belief, that Defendants' annual gross volume of sales made or business done was not less than $500,000. Defendants' invoice number 5222, one of the twenty-nine transactions on Defendants' commission report (¶¶ 55–56), bills a customer located in Doha, Qatar, states "Out-of-state sale, exempt from sales tax," records payment by wire transfer, and identifies the sales representative as "RR"; the corresponding order confirmation states that "Terms are FOB from New York, NY, USA" and designates carriage by United Parcel Service. Plaintiff separately alleges individual coverage under 29 U.S.C. §§ 206 and 207: his work regularly and recurrently involved merchandise that had moved

in interstate and foreign commerce, communications with clients and vendors located outside New York, and the use of interstate telephone, electronic-mail, and payment systems in the ordinary course of that work.

19B. New York Department of State records identify the following entities and Department of State identification numbers: Reem Bridals LLC (3853872); Reem Holdings LLC (3842723); Reem Acra Boutique LLC (3853685); Reem Acra Licensing LLC (5697891); Reem Acra Couture Collection LLC (5697854); R.A. Luxury LLC (3842764). The same records identify two further entities bearing the Reem Acra name that are not named as Defendants. Reem Acra Couture, Inc. (2652568) is a domestic business corporation whose initial filing was made June 20, 2001 and whose biennial statement has been past due since June 30, 2003. RA Strategic Holdings, Inc. (4240283) filed a Biennial Statement with the Department of State on February 24, 2015 under filing number 150224006333 which names "REEM ACRA" as its Chief Executive Officer, gives 730 Fifth Avenue, Suite 205, New York, NY 10019 as the address of its chief executive officer, of its principal executive office, and for service of process, and bears the electronic signature of an authorized person other than Reem Acra. That address is the same address Reem Holdings LLC and R.A. Luxury LLC gave the Department of State in 2009 (¶ 19C) and the same address three Entity Defendants gave a New York court in 2016 as their principal place of business (¶ 19N). Plaintiff does not allege that either entity employed him.

19C. New York and Delaware public records reflect the following. Four of the Entity Defendants — Reem Bridals LLC, Reem Holdings LLC, Reem Acra Boutique LLC, and R.A. Luxury LLC — are foreign limited liability companies organized under the laws of Delaware, and Department of State records give each of the four the same foreign formation date, July 8, 2009. Delaware records identify Reem Bridals LLC under file number 4707556 with the

registered agent Capitol Corporate Services, Inc., Dover, Delaware — the same Delaware agent recorded for Reem Holdings LLC and R.A. Luxury LLC. The four registered in New York in two same-day pairs: Reem Holdings LLC and R.A. Luxury LLC on August 7, 2009 under identification numbers forty-one apart, and Reem Acra Boutique LLC and Reem Bridals LLC on September 9, 2009. The remaining two — Reem Acra Couture Collection LLC and Reem Acra Licensing LLC — each bear an initial Department of State filing date of January 29, 2020, each is registered at 1 West End Avenue, Apartment 41D, New York, NY 10023, the residence of Defendant Reem Acra, and their identification numbers differ by thirty-seven. The Biennial Statements filed for Reem Bridals LLC on December 20, 2022 and for Reem Holdings LLC and Reem Acra Boutique LLC on December 21, 2022 each state the service-of-process address as 501 Fifth Avenue, 2nd Floor; the first two bear the electronic signature of the same authorized person. Reem Holdings LLC gave 730 Fifth Avenue, Suite 205 as its address as late as 2011 and changed its address for service of process to 501 Fifth Avenue, 2nd Floor by Certificate of Change filed December 14, 2021, approximately ten months before Plaintiff was employed at those premises. In a proceeding before the Trademark Trial and Appeal Board, Reem Holdings LLC admitted that "Opposer's own website, http://www.reemacra.com/," is its own — the domain of the electronic-mail addresses assigned to Plaintiff and to Defendants' personnel (¶ 19). Department of State records further show that the biennial statement of R.A. Luxury LLC — the entity that told a New York court it is the corporate parent of Plaintiff's employer of record (¶ 19N) — has been past due since August 31, 2019, and that of Reem Acra Boutique LLC since September 30, 2023, while that of Reem Bridals LLC, the entity that carried Plaintiff on its payroll, is current. Plaintiff alleges that the common Delaware formation date, the common registered agent, the paired same-day New York registrations, the same-day 2020 filings at

Defendant Reem Acra's residence, the shared service-of-process address, and the maintenance of some entities' filings but not others support an inference that the Entity Defendants were formed, registered, and administered as a single coordinated group.

19H. The trademarks under which Plaintiff sold merchandise are owned by Defendant Reem Holdings LLC and not by Plaintiff's employer of record. United States Patent and Trademark Office records identify Reem Holdings LLC as the owner of record of every REEM-formative mark in the portfolio, including U.S. Registration No. 2731062 for REEM ACRA NEW YORK, registered July 1, 2003 for wedding gowns, bridesmaids' dresses, veils, headpieces and evening wear, and U.S. Registration No. 3191042 for REEM ACRA, whose active classes include wedding gowns and evening wear and retail and online store services featuring those goods. Office records record Reem Holdings LLC's owner address as having moved to 240 West 35th Street, Suite 700 — the address of record of Defendant R.A. Luxury LLC (¶ 15) and the building in which Reem Bridals LLC maintained a place of business (¶ 10). The registrant of record for Registration No. 2731062 was originally "Acra, Reem" — Defendant Reem Acra individually — and the entire interest was assigned into Reem Holdings LLC by instruments executed July 22, 2009, fourteen days after the four Delaware entities identified at ¶ 19C were formed. On June 28, 2023, four months after Plaintiff's employment ended, Reem Holdings LLC filed a Combined Declaration of Use and Application for Renewal under 15 U.S.C. §§ 1058, 1059 as to Registration No. 2731062, declaring that the mark was in use in commerce on the goods identified — wedding gowns, veils, bride's maid dresses, headpieces and evening wear, the merchandise Plaintiff was employed to sell — and supporting the declaration with photographs of a woven "Reem Acra NEW YORK" label sewn into a garment.

19J. Plaintiff alleges the facts at ¶¶ 19B–19H and ¶¶ 19K–19Q in support of his allegations of common ownership, common management, centralized control of labor relations, and interrelated operations (¶¶ 19–20), and not as separate causes of action. Plaintiff alleges employer status as to each Defendant on the operational facts pleaded at ¶¶ 20–23, 38–47, and 52A–52G. Plaintiff further alleges that the brand under which he was directed to sell, the premises at which he worked, the electronic-mail domain through which he was directed, and the payroll on which he was carried were not held by any single one of the Entity Defendants.

19K. On December 7, 2009 Defendant Reem Acra executed a Certificate of Publication under Limited Liability Company Law § 802 for Defendant Reem Holdings LLC. The certificate states, in the blank provided for the signatory's title, "The undersigned is the Manager ... of Reem Holdings LLC," and recites: "I certify the foregoing statements to be true under penalties of perjury." It is signed "/s/ Reem Acra" over the printed name "Reem Acra." The Department of State filed it on December 8, 2009 under filing number 091208000003. On the same date, December 7, 2009, Defendant Reem Acra executed an identical Certificate of Publication for Defendant R.A. Luxury LLC, in which she likewise certified under penalties of perjury that she was that company's Manager. The Department of State filed that certificate on December 8, 2009 under filing number 091208000004 — the next consecutive filing number. Both certificates were submitted for filing by Duane Morris LLP, 1540 Broadway, New York, NY 10036.

19N. On or about January 2016, Defendants R.A. Luxury LLC, Reem Bridals LLC, and Reem Acra Boutique LLC commenced an action as co-plaintiffs in the Supreme Court of the State of New York, County of New York, captioned *R.A. Luxury LLC, Reem Bridals LLC, Reem Acra Boutique LLC v. The Chetrit Group LLC, et al.*, Index No. 150365/2016. In the complaint in that action those three Defendants stated that each of Reem Bridals LLC and Reem Acra

Boutique LLC "is a wholly-owned subsidiary of R.A. Luxury LLC," that each of the three maintains its principal design and production facility at 240 W. 35th Street and its principal place of business at 730 Fifth Avenue, and, describing themselves collectively, that "[t]he Reem Acra brand was launched by Reem Acra in 1997 and since such time, Plaintiffs have become an established, recognized and successful international designer brand, manufacturer, wholesaler and retailer of women's luxury apparel." Plaintiff alleges these statements as admissions by three Entity Defendants that they share common ownership, share premises, and operate as a single brand enterprise.

19O. That action proceeded to an inquest on damages before a Judicial Hearing Officer of the same court. In a Decision After Inquest (Amended) entered March 6, 2025, NYSCEF Document No. 725, the court stated: "Reem Bridals, LLC has its principal design and production facility at 240 West 35th Street in Manhattan, using the entire seventh floor." The same decision states: "Reem Acra is the owner and chief executive of Reem Bridals, LLC." The decision recites that this and related facts were established by the hearing testimony of Reem Acra. The caption of that decision identifies the plaintiff subrogors as "REEM BRIDALS, LLC, REEM HOLDINGS, LLC, REEM ACRA BOUTIQUE LLC, R.A. LUXURY, LLC" — four of the six Entity Defendants — insured under a single policy of Assurance Company of America and pursuing a single loss. Plaintiff alleges that four Entity Defendants were covered by common insurance and prosecuted a common claim for damage to shared premises. Plaintiff does not allege that the decision adjudicated any issue in this action; he alleges the quoted statements as evidence of ownership, of centralized control, and of interrelated operations.

19P. Reem Bridals LLC occupied the premises at which Plaintiff worked under a written lease. In a commercial non-payment petition filed October 26, 2023 in the Civil Court of the City

of New York, County of New York, captioned *501 Fifth Avenue Company LLC v. Reem Bridals LLC*, Index No. LT-320914-23/NY, the landlord alleged at paragraph 2 that "Reem Bridals LLC, is the tenant in possession of the commercial space known as Rooms 200, 712, 704 & 811 in the building known as 501 Fifth Avenue, New York, New York 10017, pursuant to a written lease dated April 1, 2019, which lease has been modified by letter agreements dated December 1, 2020," and that the lease "is due to expire May 31, 2026." Plaintiff's employment fell within that lease term. Room 200 corresponds to the second floor — the address each of Reem Bridals LLC, Reem Holdings LLC, and Reem Acra Boutique LLC gives the Secretary of State for service of process (¶¶ 10–12, 19C).

19Q. A single transaction Plaintiff originated was processed across four differently named Reem designations. Defendants' invoice number 5222, dated December 23, 2022 for purchase order P2485, is issued on the letterhead of "Reem Acra Boutique LLC" at 501 Fifth Avenue, 2nd Floor, and identifies the sales representative as "RR." The corresponding internal order confirmation, order number 16415 dated October 18, 2022, is headed "REEM ACRA RTW" at the same address and records the purchaser as "RASALON — REEM ACRA SALON, 501 Fifth Avenue, 2nd Floor." The same transaction appears on the document captioned "REEM BRIDALS LLC / ROTH RANBOM COMISSION REPORT" as purchase order P2485 credited to "Roth" (¶¶ 55–56), and on Defendants' contemporaneous schedule coded to the boutique division (¶¶ 60B-1, 60B-2). The order confirmation records a sale from "REEM ACRA RTW" to "REEM ACRA SALON" at the same address; the invoice to the end customer issued from Reem Acra Boutique LLC; and the commission on that same order was computed by Reem Bridals LLC. Plaintiff alleges that Defendants did not observe distinctions among these designations in the ordinary conduct of the business in which he sold, and that a single sale he originated passed

among them before reaching the customer. Which entity ultimately received the revenue and the profit from Plaintiff's sales, and the terms of any intercompany arrangement among these designations, are within Defendants' possession and control. Plaintiff does not allege that "REEM ACRA RTW" or "REEM ACRA SALON" is a separate juridical entity, and names neither as a Defendant. Plaintiff further alleges, as to the transactions he handled, that the documents bearing these entity designations were prepared and used internally. The document the client received and signed was headed "Reem Acra New York," identified no limited liability company, was typed by Defendants' sales personnel, and recorded any alterations on its reverse. "Reem Acra New York" is the mark registered as U.S. Registration No. 2731062 to Defendant Reem Holdings LLC (¶ 19H) — an entity that carried no employee on its payroll, is not Plaintiff's employer of record, and issued no invoice to the customer on the transaction described in this paragraph. Plaintiff alleges that a client purchasing from Defendants in the ordinary course therefore received no writing identifying which of the Entity Defendants was the counterparty to the sale.

19S. Defendants' internal order confirmations for transactions Plaintiff originated record a sale from "REEM ACRA BRIDAL" at 501 Fifth Avenue, 2nd Floor, to "RASALON — REEM ACRA SALON" at 501 Fifth Avenue, 2nd Floor. Order confirmation number 16414, dated October 18, 2022 and bearing the customer order reference "KNABLE," records style 6314CR/CR, size 14, with the customizations "X=OPEN TO C CUP" and "X=LONG CREAM SKIRT LINER," at a unit price of $11,500.00 and an extension of $11,500.00. The client order form for that transaction, dated October 14, 2022 on "Reem Acra New York" letterhead and identifying the consultants as "Jen" and Plaintiff, prices the same gown with the same two customizations at $11,500. Order confirmation number 16483, dated November 8, 2022 and

bearing the customer order reference "DIFIORE," records style 6621CR/CR at a unit price of $10,995.00 and style 6709JCRM at a unit price of $2,000.00, extensions totaling $12,995.00. Defendants' commission report states the net order on the corresponding transaction — purchase order P2499, dated November 8, 2022, and identified on that report as "DIFIORE-16483" — as $12,995.00 (¶¶ 55–56).

19T. Plaintiff alleges on the basis of ¶ 19S that Defendants transferred merchandise between these designations at the same price the merchandise was sold for, and that no designation took a wholesale margin on the transfer. Plaintiff alleges that a transfer at the selling price, recorded on terms of "NET 10" and "NET 30" between two designations at the same street address and floor, is not consistent with arm's-length dealing between separate enterprises. The intercompany pricing policy, the transfer records, any intercompany invoices, and the books recording which designation realized the revenue and the profit on these transactions are within Defendants' possession and control.

19T-1. Plaintiff is in possession, from the performance of his inventory duties (¶ 38A), of further invoices issued in the name of Defendant Reem Holdings LLC from 501 Fifth Avenue, 2nd Floor. One such invoice, numbered RH220323 and dated December 22, 2022, is billed to a person identified on the face of the invoice by a first name and the job function "Patternmaker," for two garments priced at $1,995.00 and $2,595.00. A second such invoice states one garment, style 583-400, priced at $895.00, beside the handwritten annotation "Given to RA per email." A third, numbered RH220361 and dated January 4, 2023, is billed to a recipient at a commercial address in the New York garment district for four garments priced at $2,595.00, $20,000.00, $20,000.00 and $15,000.00 — one of which carries no description other than "COURTURE" [sic] — and bears the annotation "confirmed for pickup TUES." Plaintiff alleges that Defendant

Reem Holdings LLC — an entity that carried no employee on its payroll and was not Plaintiff's employer of record (¶¶ 19H, 19Q) — issued invoices in its own name for merchandise transferred to Defendants' own personnel and to Defendant Reem Acra individually. Plaintiff alleges that such transfers are not sales to customers, and that Defendants used invoices in the name of Reem Holdings LLC to record the internal movement of merchandise among Defendants and their principals. Whether any consideration passed on these transfers, and how Defendants recorded them in their books, are within Defendants' possession and control.

19T-2. Defendants' electronic sales system records Defendant Reem Acra as a user acting on individual customer orders. The draft-order record for a transaction dated November 15, 2022 states "#D1276 Updated by Reem Acra Today at 6:58 pm" and records a single line in the amount of $14,715.00 marked "Tax exempt." The corresponding order, numbered #2170, was created at 6:58 p.m. that evening in the same amount and paid in full the same day. Defendants' commission report states the net order on the corresponding purchase order, P0539 dated November 15, 2022, as $14,490.00 — the same figure less the $225.00 freight charge Defendants applied to such orders (¶ 58B). Plaintiff alleges that Defendant Reem Acra personally entered, updated, or priced orders in Defendants' sales system, including an order credited to Plaintiff, and that she likewise set the price on the transaction described at ¶ 58E and was copied on Defendants' internal recap of the client meeting concerning it (¶ 61A). The user accounts, audit logs, and draft-order histories of Defendants' sales system are within Defendants' possession and control.

19U. Each order confirmation described at ¶ 19S records, in the field captioned "SALESPERSON," the entry "NOT APPLICA[BLE]." Plaintiff alleges that Defendants' order system therefore recorded no salesperson on transactions Plaintiff originated and for which

Defendants' own commission report credits him (¶¶ 55–56). Defendants' order system, its salesperson field, and Defendants' records of sales attribution — including the client-attribution list Defendants state they enclosed with their March 15, 2023 letter — are within Defendants' possession and control.

19R. Two further transactions Plaintiff is in possession of bear additional entity designations issued from 501 Fifth Avenue, 2nd Floor. A pro forma invoice numbered P0553 and dated January 25, 2023 is headed "Reem Acra Couture" beneath the masthead "Reem Acra NEW YORK," identifies the sales representative as "RR," and directs payment to a bank account whose beneficiary account name is "Reem Bridals LLC" at the same street address. That same purchase order, P0553, appears on Defendants' commission report as an order credited to Plaintiff (¶ 55). An invoice numbered RH220142 and dated November 14, 2022 is headed "Reem Holdings LLC" at the same street address and is billed to a customer located in Seoul, Republic of Korea, for merchandise the description of which identifies certain items as couture. Plaintiff alleges that Defendant Reem Holdings LLC therefore issued invoices to customers in its own name from the same premises at which Plaintiff worked, while carrying no employee on its payroll, and that Defendant Reem Acra Couture Collection LLC's designation likewise appeared on client-facing documents for orders credited to Plaintiff. The intercompany arrangements governing which of these designations invoiced, collected, and retained the revenue on Plaintiff's sales are within Defendants' possession and control.

20. As to Plaintiff's own employment, control of labor relations rested with Sinel, who in turn reported to Reem Acra. Sinel set Plaintiff's compensation and that of his comparator, granted and denied his systems access, established his attendance-notification protocol, imposed

the January 23, 2023 compensation change, and signed his termination letter. Sinel in turn reported operational decisions concerning Plaintiff to Reem Acra.

21. At onboarding Defendants furnished Plaintiff an internal telephone directory listing extensions at 212-421-3200 for Reem Acra (201), Arbogast (205), Everaert (206), Pritchett (207), Khuu (213), Schelich (214), Sinel (221), and Kauper (224). Defendants' correspondence uses two telephone numbers. Plaintiff's offer letter bears the footer "240 West 35th Street 7th Floor New York, NY 10001 Tel 212.421.3200" and directs Plaintiff to "call me at (212) 421-3200, Ext.141." Jennifer Schelich subscribed her electronic mail "REEM ACRA / 501 5th Avenue, 2nd Floor / New York, NY 10017 / E retailoperations@reemacra.com / W + 212.421.3200 ext 214." Sinel subscribed hers "REEM ACRA / 501 5th Avenue, 2nd floor ... W +1.212.630.9977 ext 221"; Gupta subscribed his "REEM ACRA / 501 Fifth Avenue, 2nd Floor ... W +1212-630-9977 Ext 205"; and Plaintiff's own Company signature block read "REEM ACRA / 501 Fifth Avenue, 2nd Floor ... W +1.212.630.9977 ext. 215." Every one of those signature blocks identifies the subscriber as "REEM ACRA" without any limited liability company designation. Plaintiff does not allege how many telephone systems Defendants maintained or which entity subscribed to either number; those facts are within Defendants' possession and control.

22. The hiring documents used the employing entity and the brand interchangeably. Plaintiff's offer letter issued on Reem Bridals LLC letterhead for a position "at Reem Acra New York," directed acceptance to two "reemacra.com" addresses, and bears two different business addresses in its page footers — 501 Fifth Avenue, 2nd Floor on page one and 240 West 35th Street, 7th Floor on page two. Both footers appear as distinct document sections in the native file. Sinel transmitted that Reem Bridals LLC letter from the address JillianS@reemacra.com,

under the subject line "offer letter," over a signature block reading "Jillian Sinel / President / REEM ACRA / 501 5th Avenue, 2nd floor / New York, NY 10017." The transmittal identifies no limited liability company.

23. Plaintiff's day-to-day work crossed entity lines. He sold "Reem Acra" branded retail and couture products, serviced clients whose paperwork issued under the "Reem Acra Couture" designation, worked from shared premises, and reported to Sinel and Gupta, each of whom signed for "REEM ACRA" without entity qualification (¶¶ 17–18).

**B. Hiring and Compensation Terms**

24. In or about September 2022 Sinel recruited Plaintiff, representing that Defendants sought someone to manage the Atelier/VIP division. Plaintiff's cover letter and pre-hiring correspondence reflect that understanding.

25. Sinel met with Plaintiff twice before any writing issued — once with Vice President of Customer Experience Lil Arbogast, and once alone. During those meetings Sinel asked Plaintiff what he had earned at his prior employer, and Plaintiff answered.

26. By letter dated September 15, 2022, Reem Bridals offered Plaintiff the position of "retail and couture sales facilitator with a title that is mutually agreeable to be determined at start date, at Reem Acra New York," beginning September 27, 2022.

27. Paragraph 4 of the offer letter provides: "You will receive 3% commission on all your sales and an additional 1% commission on all of your monthly sales if you meet your monthly sales goal. The sales goal will include both retail and couture products." The offer letter contains no term deferring the earning or payment of commissions until shipment, no term providing for a draw, no term reconciling commissions against a draw, and no term addressing commissions on termination.

28. Paragraph 8 of the offer letter provides: "This letter agreement shall supersede any prior verbal or written agreements between you and the Company. No amendments to this letter agreement shall be effective unless agreed to in writing by the Company and you." No writing signed by both parties amended Paragraph 4 or Paragraph 8 at any time.

29. Paragraph 2 provides that Plaintiff "will report to Lil Arbogast and Jillian Sinel" and "will work five (5) days a week" in the New York office. Paragraph 3 provides that Plaintiff's "compensation will be paid at a base salary of $75,000 annually, less all required tax withholdings and deductions, in accordance with the Company's then current payroll practices." That qualifying clause appears in the sentence fixing base salary. Paragraph 4, which fixes commission (¶ 27), contains no comparable clause. Paragraph 5 provides a dry-cleaning allowance of up to $200 per month upon receipts.

30. Sinel transmitted the offer letter to Plaintiff's personal electronic-mail address on September 20, 2022 at 10:35:14 a.m., as a Microsoft Word attachment named "Roth Ranbom - Reem Bridals LLC-Employment Offer Letter.docx," writing: "Enclosed please find your offer letter as we discussed." The native file's embedded properties record that it was created on September 15, 2022 at 6:54 p.m. and last modified the same evening at 8:32 p.m., with a single revision. The same properties record the document's title as "May 7, 2012" and a last-printed date of May 7, 2012, and record no author name and no last-modified-by name. The letter by its terms required acceptance "no later than September 19th, 2022," a date that had passed before Defendants transmitted it.

31. On September 21, 2022 at 3:25 p.m. Plaintiff wrote to Sinel: "There is only one part I wish to amend, if possible: May I please have a flat 5% commission on all sales?"

32. At 3:47 p.m. Sinel declined, writing: "I am unable to change the commission structure for one sales person and not the rest of the team — I will actually need to raise the current salesperson to 3% in order to match your current proposed compensation. However please note that there are only two people selling and you are the only one dedicated to couture so your volume should be higher than what you did at Elie."

33. At 4:00 p.m. — twelve minutes and fifty-seven seconds later — Plaintiff returned the offer letter initialed and signed.

34. In that written exchange Sinel tied the 3% rate both to internal parity with the incumbent salesperson and to the representation that Plaintiff alone would be dedicated to couture.

35. Plaintiff alleges the couture-exclusivity representation was inaccurate. Arbogast held and transmitted the Company's couture line sheets and pricing materials (¶ 41); Sinel directed Plaintiff to attend client stylist appointments "with Lil"; Arbogast and Plaintiff jointly consulted on couture pricing; Arbogast maintained clients of her own; and Arbogast administered a physical inventory of couture.

**C. Title**

36. No title was ever agreed. Defendants' onboarding materials left the title blank. Weeks into his employment Plaintiff wrote to Sinel: "I asked gabby her title and she said director of the atelier so I'm still at a loss for what to land on for my title." Plaintiff's comparator represented to Plaintiff that she held the title Director of the Atelier. Plaintiff reported that representation to Sinel by text message on September 30, 2022 at 7:02 p.m. — the Friday of his first week of employment — in the message quoted above. Sinel replied at 7:07 p.m. that evening: "Gaby's title is Director of the atelier - that's news to me - will certainly investigate - stay tuned."

Defendants never confirmed the title to Plaintiff, never corrected the representation, and never assigned Plaintiff any title.

37. A separate document Defendants presented to Plaintiff on September 28, 2022 identified his position as "Business Growth Representative," a designation Plaintiff never held and which appears in no other Company record.

**D. Duties, Pricing, and Systems Access**

38. Plaintiff's primary duty was selling merchandise to clients. He worked from the price lists and line sheets Defendants supplied and from a schedule of customization prices Defendants maintained. Plaintiff did not set, revise, or approve the prices on those materials, and did not determine what Defendants would charge for any garment or service not already priced on them. Within the prices Defendants supplied Plaintiff had latitude in quoting a client, and on at least one occasion quoted a client a figure above the price Defendants' materials stated. For any garment or customization Defendants' materials did not price, Plaintiff obtained the figure from Sinel, from Arbogast, or from production personnel; on February 2, 2023 Plaintiff transmitted a client's specifications to Sinel and Sinel set the price at "$16,000."

39. Plaintiff supervised no employees and had no hiring or firing authority. Defendants directed him in writing, in the ordinary course, to perform non-sales physical tasks. On November 16, 2022 a member of Defendants' staff wrote to the sales group, "We have lots of gowns that returned. Can someone come help hollin take them down please?" On December 2, 2022 the same staff member wrote, "Pls lmk when you are finished with your first appt this morning so we can start rearranging the showroom." On December 9, 2022 she wrote, "I'll be in by 10 to move all the gowns in the showroom. Pls help us if you can," and later that day, "Gabby, Roth please lmk when showroom is empty with clients so we can move the racks." On

December 12, 2022 she directed Plaintiff and another employee to "help me move the gowns," to "just switch out the hangers," to "move the bridal gowns on the floor to the balcony," and to "try to find as many wooden hangers as possible," and wrote, "I will need your help to set up showroom for Vogue later when there is a break." On February 1, 2023 Defendants' shipping coordinator wrote that merchandise bound for Defendants' warehouse required staff to "double bag, change black hangers to plastic, and laminate everything." Plaintiff performed tasks of this kind. They produced no commission, and Defendants' own attainment records do not credit them (¶ 91C). Plaintiff also performed non-sales tasks including measuring showroom furniture, inspecting damaged merchandise, adjusting showroom lighting, sourcing and assembling showroom furnishings, and putting away merchandise belonging to the comparator's clients. Plaintiff further alleges that on his arrival Defendants' couture merchandise was hung on plastic hangers, that a number of those hangers were broken, and that garments with open-mesh necklines were exposed to damage from them, and that Plaintiff replaced the hangers and reorganized the couture room in which Defendants stored garments they priced in the tens of thousands of dollars (¶¶ 38A, 91C-1). Plaintiff performed tasks of this kind during his scheduled hours. They produced no order and no commission.

39A. Plaintiff alleges that the non-sales work described at ¶¶ 39 and 44A–44C consumed hours of his scheduled workweek, and that the work of developing clients and of learning Defendants' merchandise — the work by which a commissioned consultant generates orders — was displaced into hours outside his schedule. Plaintiff performed that work after the close of his scheduled day, at Defendants' premises, on the occasions and at the times set out at ¶¶ 52D(a)–(i) and established by the contemporaneous records described at ¶¶ 52D-1 through 52D-4. Plaintiff alleges that Defendants knew or had reason to know that he was working at their premises

outside his scheduled hours, and that Defendants suffered and permitted that work (¶ 166C). Plaintiff further alleges that Defendants assigned him the goals described at ¶¶ 91C–91C-6 while allocating his scheduled hours to the work described at ¶¶ 39 and 44A–44C.

40. Defendants withheld from Plaintiff the systems access required to perform his duties. On October 25, 2022 — four weeks after Plaintiff commenced work — Sinel wrote that "[a]ccording to IT you have had access since you started," and directed Plaintiff to "double check." Plaintiff replied the same day: "Today is the first time I've seen boutique and couture assistant and it is filled with files!" A colleague in production separately described Defendants' information systems to Plaintiff as "[v]ery segmented" and stated that "[n]o OnE has access to everything." Plaintiff worked "with no idea what the prices are" and without "access to look book or price sheets."

38A. Among Plaintiff's assigned duties was tracking Defendants' couture inventory. When a couture garment left the 501 Fifth Avenue premises for a press pull, Defendants furnished Plaintiff with the invoice or transfer document covering the garment. When a garment was returned, Plaintiff physically checked it in and recorded the return in a tracker he maintained for Defendants. Plaintiff came into possession of Defendants' invoices, including the invoice described at ¶ 19R, in the performance of that duty and in the ordinary course of his employment. Plaintiff alleges that couture garments are made as single articles, that a couture garment absent from the premises was not available for Plaintiff to sell while absent, and that garments so released were not routinely returned. Defendants' own personnel confirmed this practice contemporaneously in writing. On November 14, 2022 Defendants' shipping and press coordinator wrote that she had "slid the CM for all the samples that came back from the TS and the invoice for lady liberty under the door." On November 16, 2022, after identifying a garment

by style number that she was collecting, she wrote, "Left invoice on desk." On December 19, 2022, after Plaintiff located a garment that was to be shipped abroad, she wrote, "Left the invoice on ur desk." On December 1, December 6, December 7, 2022, January 4 and January 27, 2023 the same employee wrote to Plaintiff requesting that he admit her to the couture closet, stating on December 6, 2022, "I have to get into couture closet," and on December 7, 2022, "I need to get into the couture closet at some point." On February 17, 2023 Plaintiff wrote to her, as to a garment she could not identify, "583-826 is the only cape on my tracker."

38B. On November 29, 2022 a member of Defendants' staff wrote to Plaintiff, "Hollin mentioned you asked her for access to the RTW tracker? Jen oversees the RTW tracker. Access is only approved by Jillian & RA. FYI.." Plaintiff replied the same day that he had asked "if she had access/seen the one of a kind bridal tracker, not rtw," and that "Jillian said she emailed a copy to me but searching through email I cannot find it for the life of me. Was more a question of have you seen this file to confirm existence versus can I have access." Plaintiff alleges that Defendants maintained a tracker of one-of-a-kind bridal merchandise separate from the ready-to-wear tracker; that access to Defendants' inventory trackers was controlled personally by Defendant Sinel and by Defendant Reem Acra; and that Plaintiff, whose assigned duties included tracking couture inventory (¶ 38A), was not given access to it. The record Plaintiff maintained (¶¶ 38A, 38C) is not the tracker described in this paragraph. Defendants' one-of-a-kind bridal tracker is a separate record that Plaintiff never received. The trackers, the transfer and return records, the access permissions and access logs, and the underlying inventory system are within Defendants' possession and control.

38C. On November 3, 2022 at 9:57 a.m. Defendants' shipping and press coordinator wrote to Plaintiff: "is there any way you could send me a list of all the style numbers that are

Couture?? I have to pull a report for Jillian excluding couture and I don't know what's couture and what's not!" On November 4, 2022 at 17:19:17 Coordinated Universal Time — 12:19 p.m. Eastern Daylight Time — Defendant Sinel created an electronic workbook titled "FINAL COUTURE INVENTORY TRACKER 11-04-2022." The workbook's embedded document properties identify "Jillian Sinel" as its author, record its creation on November 4, 2022 and its last modification on November 5, 2022 at 21:12:04 Coordinated Universal Time, and identify the authoring application as Microsoft Excel for Macintosh. The workbook contains a single sheet captioned "COUTURE." At 3:40 p.m. that same afternoon Plaintiff asked Defendants' coordinator whether she had placed "the hard copy" on his desk. She replied that she had given it to another employee, offered to print another, and asked whether she should instead send it by electronic mail. Plaintiff replied, "Only because Jillian made the emphasis on you bringing a physical copy can you please do that."

38D. The workbook Sinel created lists 172 couture styles by style number, item type, description, size and color, and states for each style an "INVENTORY" count of one unit. Its remaining columns record, for each style, whether the garment is "In Couture room," "Design," "Atelier," "RA," "Sold," "Blanca," "Showroom," "Alta Moda," "Production," "Sho&Co," "DONATED," or "OUT," together with a "Total" and a "Diff." Plaintiff alleges that Defendants' own contemporaneous inventory record therefore states that each couture style existed as a single unit, and that Defendants tracked the dispersal of individual couture garments away from the sales floor to design, to the atelier, to production, to Defendant Reem Acra, and to outside recipients. Plaintiff alleges that this record corroborates the allegations at ¶ 38A that couture garments are made as single articles and that a couture garment absent from the premises was not available for Plaintiff to sell while absent.

38E. Plaintiff alleges that Sinel assigned him the function of maintaining Defendants' couture inventory record, and that Plaintiff performed that function at the direction of Defendants' President and in the ordinary course of his employment, and not on his own initiative. Plaintiff alleges that Defendants thus assigned him responsibility for the record of their couture inventory while withholding from him access to the one-of-a-kind bridal tracker, access to which Defendants' staff stated was "only approved by Jillian & RA" (¶ 38B). Plaintiff further alleges that Defendants' own personnel responsible for shipping Defendants' merchandise could not determine which of that merchandise was couture and applied to Plaintiff to make that determination. Plaintiff discloses that he thereafter maintained expanded working versions of the record bearing columns and entries not present in the workbook Sinel created, and does not plead those versions as Defendants' record. Plaintiff does not allege that Defendants approved the form of those expanded versions. The workbook as Defendants maintained it after November 5, 2022, its revision history, the physical inventory report Defendants furnished on or about November 4, 2022, and the report Defendants' coordinator prepared for Sinel "excluding couture" are within Defendants' possession and control.

41. On September 30, 2022 — Plaintiff's first week — Arbogast transmitted to Plaintiff, across multiple emails, the couture line sheets with pricing.

**E. Diversion of Sales and Appointments**

42. On October 19, 2022, Arbogast wrote to Plaintiff concerning two prospective sales of the same style: "I want both sales," and then "Both silver lining sales." At 3:48 p.m. she wrote: "Okay. I am using the dress. Your client will not be able to purchase. Sorry." Plaintiff alleges that the dress in question was one his client was prepared to buy, that Arbogast used it for a sale

of her own instead, and that Plaintiff earned no commission on the sale his client would have made.

43. In the same exchange Arbogast referred to a client of her own, directed the disposition of the prospective sale, and asked "Should I speak to her before throwing it out?" and "Do I move on or not?" On October 21, 2022 she wrote that "[w]e need to do a physical inventory of couture."

44. Defendants maintained shared calendars designated "Couture," "ShowRoom Calendar," "Reem Acra Boutique," and "Roth Ranbom." Personnel other than Plaintiff had access to the Couture calendar, including Reem Acra and Sinel, and, Plaintiff alleges on information and belief, Defendants' designer Alexandre Lahaye and a further employee. The access permissions for each shared calendar are within Defendants' possession and control. Appointment contact sheets were prepared by Plaintiff's comparator.

44A. Defendants sold made-to-order bridal merchandise, and the manner in which Defendants conducted those sales bears on the allocation of appointments alleged at ¶¶ 45–49. A client did not take delivery at the time of sale. She selected from sample garments kept at the showroom, which were of a single sample size, were fitted to her at the appointment by temporary means, and had been worn and tried on by other clients. She placed the order and paid a deposit of at least 60% of the price before any garment was made (¶ 19A). Defendants then produced the garment, on a lead time Defendants' own order confirmations state in months (¶¶ 19S, 58B). The client's first fitting was therefore the first occasion on which she saw and wore the garment she had bought and largely paid for. Defendants' own client-facing terms provide for "up to 3 fittings and a final try-on," cap alteration charges at 15% of the merchandise value, and provide that Defendants ship "once all production is complete or after your final fitting" (¶ 58C).

44B. Plaintiff alleges that fitting and alteration appointments were accordingly the point in Defendants' sales process at which a client's satisfaction with a completed purchase was determined, and at which the consultant handling the appointment bore responsibility for a garment ordered months earlier against a non-refundable deposit. Plaintiff further alleges that a fitting appointment occupied the same appointment slot, and the same hours of a consultant's scheduled day, as a sales consultation, but generated no order and therefore no commission for the consultant who conducted it, and that where the underlying order had been credited to another consultant, the consultant conducting the fitting performed the work of preserving a sale for which another had been paid.

44C. Plaintiff alleges that Defendants scheduled fitting and alteration appointments on his assigned sales-floor days and did not schedule them, or scheduled them only rarely, on the days assigned to his comparator. Plaintiff alleges that this allocation placed on him the non-commission service labor of Defendants' sales process while the commission-generating consultations were concentrated on his comparator's days (¶¶ 91, 91A, 91C). The shared calendars identified at ¶ 44, the appointment-type designations Defendants applied within them, and the records of which consultant conducted each fitting are within Defendants' possession and control.

45. In December 2022 an outside bridal stylist wrote to Defendants seeking to schedule and confirm client appointments for January 2023. On December 6, 2022 at 5:26 p.m., Defendants' Sales and Alterations Specialist Jennifer Schelich replied to her from retailoperations@reemacra.com: "No, you can address those with me. Can you please remind of the clients WD and names? Remember that we are open Tuesdays, Wednesdays, and Fridays." The stylist replied on December 7, 2022 at 11:40 a.m. proposing appointments on a Tuesday and

a Wednesday and asking, "So on Thursday, January 12th, you will not be open?" Plaintiff alleges that Defendants thereby directed an outside stylist's client appointment requests to Schelich rather than to Plaintiff, and represented to her that Defendants' showroom operated on three days of the week. Plaintiff was required to be present five days each week (¶ 91A).

47. On January 26, 2023, Reem Acra wrote in an internal message concerning client handling: "As usual anyone I bring I would like a small recap." Plaintiff alleges that Reem Acra thereby directed that she receive follow-up reporting on clients she referred, and that the phrase "[a]s usual" reflects an established practice of such reporting.

48. In one transaction a client had paid in full before shipment, yet Plaintiff was required to arrange shipment of the unaltered garment solely to satisfy Defendants' asserted shipment condition so that the commission would be paid.

49. In another instance a client was prepared to purchase and the sale did not close after an alterations quotation rose from approximately $6,700 to over $10,000. Plaintiff reported this to Sinel by text message at 7:41 p.m. on Monday, October 17, 2022. Sinel replied at 7:57 p.m., "No way! That's very uncool - who did you ask for assistance?" and at 8:09 p.m. directed: "Call the client back and tell her maximum cost of alterations will be $1100 - not sure why in turned into this."

**F. The Wage Notice**

50. On September 28, 2022, Plaintiff's first day of work, Defendants caused Plaintiff to sign a New York State Department of Labor Form LS-59 wage notice entitled "Notice for Exempt Employees," which Plaintiff dated in his own hand "9-28-2022."

51. The notice (a) states Plaintiff's pay only as an annual salary of $75,000; (b) omits the commission rate and the commission basis entirely; (c) omits the employer's telephone number;

(d) bears no employer signature and no preparer name or title; (e) leaves blank the field identifying the exemption claimed; and (f) leaves unchecked both the "at hiring" and "before a change in pay rate" boxes, so that the notice does not document its own occasion for issuance.

51A. Defendants' March 15, 2023 letter states that Plaintiff "w[as] provided with a wage notice at your time of hire clearly detailing your annual salary, your regular pay day and other necessary information which was signed and dated by you on September 27, 2022." The notice Plaintiff signed is dated in his own hand September 28, 2022 (¶ 50). Defendants' letter asserts that the notice detailed Plaintiff's annual salary and regular payday; it does not assert that the notice stated his commission rate or the basis on which commissions would be paid.

52. Vice President of Finance Joy S. Khuu administered Plaintiff's onboarding on September 28, 2022, including the employee handbook, benefits enrollment, and the LS-59. Plaintiff advised Khuu at that time that the wage notice was incomplete. Khuu directed Plaintiff to raise the matter with Sinel, who was unavailable. Defendants never issued a corrected or supplemental notice. Defendants thus had actual notice of the notice's deficiencies, through an officer whose responsibilities included payroll and finance, on the first day of Plaintiff's employment.

52A. Defendants paid Plaintiff a fixed salary of $75,000 per year, paid biweekly, together with commissions. Defendants classified Plaintiff as exempt on the LS-59 while leaving blank the field identifying the exemption claimed (¶ 51). Defendants identified no statutory or regulatory exemption in their letters of March 15, April 12, or May 5, 2023.

52B. Plaintiff alleges that he was not exempt from the overtime requirements of 12 N.Y.C.R.R. § 142-2.2 or of 29 U.S.C. § 207. He supervised no employee and had no authority to hire, fire, discipline, or direct the work of others. His duties also included physically tracking and

checking in Defendants' couture inventory and maintaining Defendants' inventory tracker (¶ 38A). His primary duty was selling merchandise to clients at Defendants' 501 Fifth Avenue showroom, not away from Defendants' place of business. He did not set, revise, or approve the prices Defendants published, did not determine what Defendants charged for anything their materials did not price, and obtained such prices from Sinel, from Arbogast, or from production personnel (¶¶ 38, 41). Defendants' payroll records report gross compensation to Plaintiff of $18,473.10 in 2022, of which $300.00 was carried on an earnings line captioned "Commission" (¶ 58A), and $21,300.35 in 2023, of which $9,761.87 was commission (¶ 86). Total gross compensation across the employment was therefore $39,773.45, of which $10,061.87 — 25.3 percent — was commission. Taking calendar year 2023 standing alone, the period most favorable to Defendants, $9,761.87 of $21,300.35 is 45.8 percent. Commissions did not constitute more than half of Plaintiff's compensation in the employment as a whole or in any representative period within it.

52B-1. Paragraph 2 of Plaintiff's offer letter provides that he "will work five (5) days a week … in our New York Office." The offer letter states no daily start time, no daily end time, and no meal period. Plaintiff's scheduled day began at 9:30 a.m.; on October 19, 2022 he wrote to his supervisor "I'll be back tomorrow see you at 930," and no Defendant corrected him (¶ 66). Defendants' President wrote on January 18, 2023 that Plaintiff "ha[d] been paid for 8 hours per day" (¶ 52C). Defendants' employee handbook, in the provision governing compensatory time, defines a full working day as "the hours of 9:30 - 6 PM." Plaintiff alleges on that basis that his scheduled workweek was five days and forty compensated hours, running from 9:30 a.m. to 6:00 p.m. Each item identified at ¶ 52D occurred after 6:00 p.m., after 9:00 p.m., or on a day outside his five-day schedule, and was therefore performed outside his scheduled hours.

52C. Defendants maintained no complete or reliable record of Plaintiff's actual hours worked (¶¶ 52F–52F-1). Thirty-four minutes after Plaintiff's January 18, 2023 written wage complaint, Sinel wrote to Plaintiff: "However, you have been paid for 8 hours per day even though you don't clock in and out and are clearly not at work during the full 8 hours daily." Plaintiff alleges that the first clause of that sentence is Defendants' own written statement that Plaintiff was paid on a forty-hour, five-day base, and that the second clause is Defendants' own written statement that Plaintiff's hours were not being captured by Defendants' time-clock system. Plaintiff denies that he was absent from work during his scheduled hours. Plaintiff further alleges that any reduction in his presence at the showroom during scheduled hours was produced by Defendants' own conduct in restricting his appointments, diverting client inquiries away from him, and representing to outside parties that the showroom was available on days other than those he worked (¶¶ 42–47).

52C-1. Defendants paid Plaintiff a fixed biweekly salary of $2,884.62, which is $75,000 divided by twenty-six. Every pay statement Defendants issued to Plaintiff for a full pay period reflects that figure as salary. The sole exception is the statement for the pay period September 19 through October 2, 2022, which reflects salary of $865.38 — three-tenths of the biweekly figure, corresponding to the three working days remaining in that period after Plaintiff's September 28, 2022 start date. No pay statement reflects any deduction, reduction, docking, or adjustment on account of absence, lateness, partial-day attendance, or failure to record time. The pay statement for the pay period February 6 through February 19, 2023 reflects salary of $2,884.62 in full, notwithstanding that Plaintiff left work partway through February 15, 2023 and was absent on February 16 and February 17, 2023 (¶¶ 66A, 157).

52C-2. Plaintiff alleges that Defendants' payment of a full eight-hour day for every scheduled day of his employment, without a single attendance-based deduction (¶ 52C-1), is Defendants' own conduct confirming the forty-hour, five-day base stated in their January 18, 2023 correspondence (¶ 52C). Defendants issued Plaintiff no written attendance criticism at any time before January 18, 2023, and first reduced any such criticism to writing thirty-four minutes after receiving his written wage complaint (¶¶ 59–60).

52C-3. Defendants' employee handbook states: "Exempt employees are required to record their time in and out of the office daily. Hours worked are used only for time off accrual purposes (vacation, personal/sick)." Defendants therefore required daily time recording from employees they classified as exempt and used recorded hours to compute leave accruals. Because Defendants' system did not completely or reliably capture Plaintiff's hours (¶¶ 52C, 52F–52F-1), the leave accruals Defendants computed for him were derived from incomplete data, on which Defendants nonetheless relied in asserting that he had no sick leave remaining (¶¶ 88, 161).

52C-4. Defendants' handbook further provides that late arrival without notice "may result in payroll deductions or PTO usage." Defendants thus had a written remedy for the attendance conduct they later attributed to Plaintiff. Defendants never applied it to him (¶ 52C-1).

52D. Because Defendants restricted Plaintiff's ability to perform sales and client-service work during scheduled showroom hours, Plaintiff performed that work outside those hours. It was performed in Defendants' own communication threads, at the direction of Defendants' personnel, and with Defendants' knowledge, and included the following, each documented by contemporaneous timestamped communications:

(a) In the workweek of October 23–29, 2022, Plaintiff wrote to Sinel at 7:57:25 p.m. on Monday, October 24, 2022, "Hi Jillian. Is now too late?" Sinel replied at 8:00:16 p.m., "Give me

a call," and wrote again at 8:46:24 p.m.: "There are two stylist appointments son Thursday 1:30 and 2 - please plan on attending with Lil. Any issues on this please let me know." Earlier that evening, at 5:31 p.m. and again at 6:07 p.m., Plaintiff made photographic records of Defendants' Microsoft Outlook calendar as displayed on Defendants' computer, each after the close of his scheduled day. On the evening of Thursday, October 27, 2022 Plaintiff made three further such records, at 7:01:14 p.m., 7:01:27 p.m., and 7:01:40 p.m. Each of the three retains embedded capture metadata recording those times, a local offset from Coordinated Universal Time of −04:00, and the same capturing device identified at ¶ 52D-1 — an Apple iPhone 12 running iOS 16.0.2, the mobile telephone Defendants issued to Plaintiff (¶ 52G). The October 27 records show an open appointment entry held in the shared "ShowRoom Calendar" and last modified by another of Defendants' employees.

(b) In the workweek of November 13–19, 2022, Plaintiff performed selling work on the evening of Friday, November 18, 2022. At 9:48:50 a.m. on Saturday, November 19, 2022 — a sixth day beyond Plaintiff's five-day schedule — Defendants' employee Jennifer Schelich wrote to Plaintiff by text message, "Morning. Did capuchin buy last night?" Plaintiff alleges that Schelich thereby acknowledged that selling work had been performed the previous evening.

(c) In the workweek of December 4–10, 2022, Hollin Pritchett, an intern working on Defendants' seventh floor, messaged Plaintiff at 5:55 p.m. on Monday, December 5, 2022 concerning gowns to be unpacked, placed on wooden hangers, and sorted by color, and at 5:43 p.m. on Wednesday, December 7, 2022 concerning dresses to be brought down to the showroom. Plaintiff alleges that those messages reached him at or near the close of his scheduled day and that he performed the work after it, as the record described at ¶ 52D(h) reflects. Plaintiff does not allege that Pritchett had authority to direct his work.

(d) In the workweek of January 29–February 4, 2023, Plaintiff transmitted a client's specifications to Sinel and Sinel responded with pricing at 6:38 p.m. on Thursday, February 2, 2023 (¶ 38).

(e) In the workweek of October 30–November 5, 2022, Plaintiff worked with Defendants' merchandise and records after the close of his scheduled day on the evening of Thursday, November 3, 2022 at 6:30:45 p.m., and again on the evening of Friday, November 4, 2022 at 6:39:08 p.m. Each of those times is recorded in the embedded capture metadata of a photograph Plaintiff made on the device identified at ¶ 52D-1, and the November 4 record additionally carries satellite-positioning coordinates.

(f) In the workweek of November 6–12, 2022, Plaintiff was present at Defendants' 501 Fifth Avenue premises at 6:12 p.m. and again at 7:52 p.m. on Wednesday, November 9, 2022, and performed work on the evenings of November 7 and November 8, 2022.

(g) In the workweek of November 13–19, 2022, in addition to the Friday-evening and Saturday work described at ¶ 52D(b), Plaintiff was present at Defendants' 501 Fifth Avenue premises at 7:01 p.m. on Monday, November 14; at 6:41 p.m. and again at 8:09 p.m. on Wednesday, November 16; and at 6:58 p.m. and 7:11 p.m. on Friday, November 18, 2022. He performed further work on the evening of November 14, 2022 at 9:44 p.m., 9:48 p.m., and 10:11 p.m., and on the evening of November 15, 2022. Defendants' own order schedule records a couture order attributed to Plaintiff dated November 14, 2022 in the gross amount of $24,224.69 and net amount of $22,250 — the largest single order attributed to Plaintiff in that schedule. Plaintiff alleges that he secured that order in the course of the evening work of November 14, 2022, including an extended telephone call with the client conducted after the close of his scheduled hours.

(h) In the workweek of December 4–10, 2022, at 7:00 p.m. on Monday, December 5, 2022 — approximately one hour after the 5:55 p.m. message described at ¶ 52D(c) — Plaintiff was present at Defendants' 501 Fifth Avenue premises and made a photographic record of Defendants' gowns hanging on rolling racks, the work the message concerned.

(i) In the workweek of October 23–29, 2022, Defendants scheduled at least two bridal client appointments for Saturday, October 29, 2022 on their shared Microsoft Outlook calendar designated "ShowRoom Calendar," maintained in a shared folder (¶ 44). The October 27, 2022 record described at ¶ 52D(a) displays the Saturday, October 29 column of that calendar and shows no fewer than seven bridal appointments scheduled for that day, two of which bear the prefix "R-" in their titles. On Friday, October 28, 2022, at Defendants' 501 Fifth Avenue premises and after the close of his scheduled day, Plaintiff made photographic records of two of those entries, one scheduled from 10:00 a.m. to 11:30 a.m. with the location stated as "Bridal," and one from 3:00 p.m. to 4:30 p.m. with the location stated as "Bridal confirmed," the second titled with the prefix "R-" followed by a client's name and the parenthetical "(Bride)." Plaintiff alleges that the prefix "R-" denoted Plaintiff, and that the entry therefore records an appointment Defendants assigned to him for that Saturday. Plaintiff worked at Defendants' showroom on Saturday, October 29, 2022 — a sixth day beyond his five-day schedule — and the appointments Defendants scheduled that day bracket the period from 10:00 a.m. to 4:30 p.m.

52D-1. The times and places stated in ¶ 52D(e)–(h) are established by contemporaneous digital photographs Plaintiff made in the course of his work. Ten of those photographs, spanning November 4 through December 5, 2022, retain complete embedded capture metadata recording the local date and time of capture, the capturing device, and satellite-positioning coordinates. Each of the ten was made on the same device — an Apple iPhone 12 running iOS 16.0.2 —

which was the mobile telephone Defendants issued to Plaintiff and which he returned to Defendants on March 10, 2023 (¶ 52G). That is the same device recorded in the October 27, 2022 captures described at ¶ 52D(a). Nine of the ten resolve to a location within approximately fifteen meters of Defendants' premises at 501 Fifth Avenue. Plaintiff alleges on that basis that he was physically present at Defendants' premises at each of those nine recorded times. The tenth, captured at 7:58 p.m. on November 8, 2022, resolves to a location approximately 1.3 kilometers from those premises; Plaintiff does not rely on it to establish presence at the premises and alleges as to that evening only that he performed work (¶ 52D(f)). Certain further images identified at ¶ 52D(e)–(h) retain a recorded capture date and time but no location data; Plaintiff pleads those times as recorded and does not allege that they are corroborated by location data. The subjects of these photographs are Defendants' merchandise, Defendants' price lists and line sheets, and Defendants' client and order documents. Plaintiff alleges that making a photographic record of that material, on Defendants' equipment and in furtherance of Defendants' business, was itself work performed for Defendants, and that each capture time is therefore the time of a discrete act of work. On the evening of November 14, 2022 captures were made at 9:44 p.m., 9:48 p.m. and 10:11 p.m., and Defendants' own order schedule records the largest single order attributed to Plaintiff on that date (¶ 52D(g)).

52D-2. On Monday, February 13, 2023 at 6:10:23 p.m., Plaintiff made a photographic record of Defendants' Microsoft Outlook calendar as displayed on Defendants' computer, showing Defendants' appointment schedule for Friday, February 17, 2023. The image carries embedded capture metadata recording the local date and time and satellite-positioning coordinates resolving to a location approximately twenty-six meters from Defendants' premises at 501 Fifth Avenue. Plaintiff alleges this record as evidence that he performed work for

Defendants after the close of his scheduled day and at Defendants' premises in February 2023. Plaintiff does not allege that he worked in excess of forty hours in the workweek of February 13 through 19, 2023; he was absent by reason of illness from midday on February 15, 2023 through the end of that week (¶¶ 66A, 157), and this paragraph is not included among the workweeks identified at ¶ 52E.

52D-3. The records identified at ¶¶ 52D(a)–(i) are part of a larger set. Plaintiff has reviewed the photographic and screen records he made during his employment and preserved them. Excluding every record made after February 15, 2023 — the last day on which Plaintiff performed work before the illness and separation alleged at ¶¶ 66A and 157 — those records comprise 138 files bearing an embedded capture timestamp. Of those 138, 130 bear a capture time outside the scheduled workday alleged at ¶ 52B-1: 108 after 6:00 p.m. on a scheduled day, 15 before 9:30 a.m. on a scheduled day, and 7 on a Saturday or Sunday. They fall on 23 distinct days across 10 distinct workweeks. Sixty-nine were made on the Apple iPhone 12 Defendants issued to Plaintiff (¶ 52G), twenty-eight on Plaintiff's own device, and the remainder are screen captures bearing a capture time but no device identifier. On three of those days the last such record was made at or after 9:00 p.m. — 9:21 p.m. on November 8, 2022, 10:11 p.m. on November 14, 2022 (¶ 52D(g)), and 10:06 p.m. on January 12, 2023 — and on the weekend of November 5 and 6, 2022 records were made at 1:43 a.m. and again at 2:12 a.m. Plaintiff alleges that the subjects of these records are Defendants' merchandise, price lists and line sheets, order and shipping documents, and expense records, and that making them was work performed for Defendants (¶ 52D-1).

52D-4. Two categories of that work were performed away from Defendants' premises and outside Plaintiff's scheduled hours. First, Plaintiff monitored the status of couture shipments

overnight because Defendants directed him to report to Reem Acra as soon as shipment information became available; the records at 1:43 a.m. and 2:12 a.m. on November 5 and 6, 2022 are of that kind. Second, Plaintiff prepared figures for Sinel before the start of his scheduled day; the fifteen records bearing capture times before 9:30 a.m. are of that kind, including eleven made between 8:46 a.m. and 8:50 a.m. on Friday, January 13, 2023. Plaintiff alleges that Defendants knew or had reason to know that this work was being performed, because Defendants directed the shipment reporting and received the figures Plaintiff prepared. Plaintiff does not allege that Defendants expressly instructed him to perform either category at the particular hours recorded.

52E. Plaintiff's scheduled workweek was five days and forty hours. In the workweek of November 13–19, 2022 Plaintiff worked his five scheduled days and in addition performed work on the evening of Friday, November 18 and on Saturday, November 19, 2022; the hours so worked were hours in excess of forty in that workweek. Plaintiff likewise worked his five scheduled days in the workweek of October 30–November 5, 2022 and in addition performed work after the close of his scheduled day on the evenings of Thursday, November 3 and Friday, November 4, 2022 (¶ 52D(e)); the hours so worked were hours in excess of forty in that workweek. Plaintiff likewise worked his five scheduled days in the workweek of October 23–29, 2022 and in addition worked at Defendants' showroom on Saturday, October 29, 2022 (¶ 52D(i)); the hours so worked were hours in excess of forty in that workweek. Plaintiff further alleges that the records described at ¶¶ 52D-3 and 52D-4 identify ten workweeks during his employment in which he performed work outside his scheduled hours, and that the three workweeks pleaded above are those for which he presently identifies by name both his five scheduled days and the additional work.

52E-1. Plaintiff alleges that he worked in excess of forty hours in each of the ten workweeks identified at ¶ 52D-3, and not only in the three pleaded at ¶ 52E. Plaintiff identifies nine of those workweeks as the workweeks of October 16–22, 2022; October 23–29, 2022; October 30–November 5, 2022; November 6–12, 2022; November 13–19, 2022; December 4–10, 2022; January 8–14, 2023; January 15–21, 2023; and January 29–February 4, 2023. The records establishing each are among those described at ¶¶ 52D-1 through 52D-4 and include, without limitation, captures at 9:11 p.m. and 11:39 p.m. on Friday, October 21, 2022; at 7:01 p.m. on Thursday, October 27, 2022; at 1:43 a.m. on Saturday, November 5 and 12:03 a.m. on Sunday, November 6, 2022; at 9:21 p.m. on Tuesday, November 8, 2022; at 10:11 p.m. on Monday, November 14, 2022; at 7:00 p.m. on Monday, December 5, 2022; at 10:06 p.m. on Thursday, January 12 and between 8:46 a.m. and 8:50 a.m. on Friday, January 13, 2023; and at 6:04 p.m. on Thursday, January 19, 2023. Plaintiff's scheduled workweek was five days and forty hours (¶¶ 52B-1, 52E). Defendants paid Plaintiff a fixed biweekly salary and no pay statement Defendants issued reflects any deduction, reduction, docking, or adjustment on account of absence, lateness, or partial-day attendance in any pay period of his employment (¶ 52C-1). Plaintiff alleges on that basis that he worked his five scheduled days in each of those ten workweeks. The records described at ¶ 52D-3 place work outside his scheduled hours on twenty-three distinct days within those ten workweeks, including one hundred eight records after 6:00 p.m. on a scheduled day, fifteen before 9:30 a.m. on a scheduled day, and seven on a Saturday or Sunday. Plaintiff alleges that the hours so worked were hours in excess of forty in each such workweek, and that Defendants paid no premium for any of them. If Defendants' records show that Plaintiff did not work his full scheduled week in any of the ten, Plaintiff does not press this allegation as to that week; those records are within Defendants' possession and control and

Defendants kept no record of his actual hours (¶¶ 52C, 52F–52F-1, 166E). Defendants paid Plaintiff no premium for any hour worked in excess of forty in any workweek. Plaintiff's pay statements reflect salary and commission only; none reflects any overtime compensation. Because Defendants kept no complete or reliable record of Plaintiff's actual hours (¶¶ 52C, 52F–52F-1), the number of hours Plaintiff worked in excess of forty in each workweek is ascertainable from Defendants' own communications and scheduling systems (¶ 166E).

52F. Defendants' timekeeping and workforce-management platform was operated by the vendor Payroll Dynamics. Plaintiff's user account on that platform bore the username "rranbom." Plaintiff alleges that the system functioned intermittently as to him: it recorded some entries and did not record others, and on October 21, 2022 at 11:39 p.m. it returned the message "Error Message: Account Locked" in response to his attempt to log in. Defendants' time clock authenticated employees by facial recognition. On October 20, 2022 Plaintiff composed a message addressed to Vice President of Finance Joy S. Khuu and transmitted it to his own Company electronic-mail address, rothr@reemacra.com. It reads in part: "Lil brought it to my attention that the machine has not been logging my hours accurately and if it continues to malfunction, I am at risk of disciplinary action; specifically, a portion of my salary being deducted. I assure you I am working the hours expected of my position." It continues that "the machine does not recognize my facial features with ease, I am spending upwards of five minutes trying to get it to register my face sometimes," and asks to "find a time to meet and get my image reset at the machine." The message breaks off mid-sentence. Plaintiff transmitted it to his Company address in order to send it to Khuu from that address, and does not recall whether he then sent it to her or raised the matter with her in conversation; he does not allege that Khuu received the message, and the transmission records for his Company mailbox are within

Defendants' possession and control. Plaintiff alleges that he did raise the malfunction with Khuu, and that Khuu thereafter attempted to reset his enrollment in the facial-recognition system. The system continued to fail to recognize him after that attempt. Defendants sited the time clock in an unlit alcove. On repeated occasions the device failed to recognize Plaintiff across approximately five successive attempts while other employees waited behind him to clock in, and Plaintiff abandoned the attempt and went to his desk to begin work. Plaintiff alleges that this is a mechanism by which Defendants' punch records came to omit time he worked, that the omission followed from the conditions and operation of Defendants' own device, and that Defendants knew of the malfunction because Plaintiff reported it and Defendants acted on the report. Plaintiff alleges the message as a contemporaneous record, made approximately three months before the correspondence at ¶ 52C, that Defendants' timekeeping system was not capturing his hours and that Arbogast — one of the two supervisors to whom Plaintiff's offer letter directed him to report (¶ 29) — had so informed him. Defendants' own writings reflect that the subject reached them: on January 26, 2023 Sinel listed among the accommodations she said Defendants had extended to Plaintiff "not following corporate policy with respect to clocking in and out" (¶ 61D(d)), and in the same reply wrote that "upon being informed that there were issues with your computer and phone contributing to the lack of communication we immediately focused on ensuring that any computer issues were corrected promptly" (¶ 61D(e)). Plaintiff does not allege that any particular gap in Defendants' punch records is attributable to the system rather than to him; on February 15, 2023 he himself reported in writing that he had forgotten to clock in that morning (¶ 66A).

52F-1. Plaintiff alleges that whatever the cause of any individual gap, the consequence is that Defendants' punch records for Plaintiff are incomplete and unreliable, and that Defendants

know it — their President wrote on January 18, 2023 that Plaintiff "[did not] clock in and out" at all (¶ 52C). NYLL § 195(4) placed the obligation to establish and maintain contemporaneous records of hours worked on Defendants, not on Plaintiff. Defendants nonetheless treated the absence of those records as a ground of criticism (¶¶ 52C, 61D(d)) and of discipline (¶ 75), while maintaining no other record of Plaintiff's actual hours. The platform's authentication and punch records — including every login, failed login, password reset, lockout, unlock, recorded entry, and administrator action affecting Plaintiff's account, and the corresponding records for other employees — are within Defendants' possession, custody, or control, or that of their vendor.

52G-1. Paragraph 6 of the offer letter directs that the company mobile telephone "should be used for all company correspondence." Defendants issued Plaintiff that telephone on or about September 27, 2022. The device was obsolete, its screen was cracked, and it was incompatible with the cellular network then in use. Defendants' own information-technology personnel confirmed that the device would not function on that network. Defendants did not furnish a working replacement for a period exceeding one month. On October 7, 2022 at 11:35 a.m. — the ninth day of Plaintiff's employment — Sinel herself wrote to Plaintiff, "Is your phone working?", and Plaintiff replied at 2:50 p.m. that he had "just checked and no service still" (¶ 61F). Plaintiff alleges that Defendants designated a single channel for all company correspondence, furnished equipment that could not carry it, knew that it could not, and thereafter advanced "a general lack of communication and response to inquiries" as a ground of criticism against him (¶¶ 61D(a), 61D(e), 61E) and as a ground stated in their letters of February 23, March 15 and April 12, 2023 (¶¶ 73, 74, 79A). The device Defendants issued, its make and model, the records of Defendants' information-technology personnel concerning it, and the date any replacement was issued are within Defendants' possession and control.

52G-2. Defendants cannot rely on Paragraph 6 against Plaintiff on either reading of that clause. If Paragraph 6 obliged Defendants to furnish a company mobile telephone in good working order, Defendants did not furnish one. If instead Paragraph 6 obliged Plaintiff to keep the telephone in good working order, that obligation presupposed a device that was in working order when delivered, and the device Defendants delivered was not: Defendants' own information-technology personnel determined that it would not function on the cellular network then in use (¶ 52G-1). Plaintiff alleges that he had no means of curing that condition. The device was Defendants' property, Defendants selected it, Defendants alone could replace it, Plaintiff asked that it be replaced, and Defendants did not furnish a working replacement for a period exceeding one month. Plaintiff alleges that a party who furnishes an instrumentality that does not work, and who alone can remedy it, may not charge the other party with a failure to maintain it in working order.

52G-3. During Plaintiff's onboarding Defendants asked him to upload his client contacts to Defendants' systems. Plaintiff alleges that the company mobile telephone Defendants had issued could not connect to the cellular network (¶ 52G-1), so that the request could be complied with only from Plaintiff's personal device, and that compliance would therefore have transferred contacts Plaintiff had developed before his employment into Defendants' systems. Plaintiff did not upload his personal client contacts. Plaintiff alleges that Defendants made the request during the same period in which they had furnished him no working company device, and that Defendants thereafter attributed to him a representation that he possessed "a moveable book of business" and asserted that the representation "was false" (¶ 79D). Plaintiff alleges that he made no such representation and that the offer letter contains no term concerning the transfer of clients from any prior employer (¶¶ 28, 79D). The date and terms of Defendants' request, the systems to

which the contacts were to be uploaded, and Defendants' records of what was uploaded by any employee are within Defendants' possession and control.

52G-4. Section 7 of the offer letter provides: "You represent that you are not subject to any restriction or limitation that prevents you from working for the Company in the capacity described above… You further represent that you will not use confidential information of any former employer or other third party in connection with your employment by the Company." Plaintiff alleges that the identities and contact information of clients he had served in the employment of a prior employer are confidential information of that employer, or of those clients as third parties, within the ordinary meaning of Section 7, and that Section 7 by its terms barred him from using such information in connection with his employment by Defendants.

52G-5. Plaintiff alleges that Defendants asked him during onboarding to upload his client contacts to their systems (¶ 52G-3) notwithstanding Section 7; that Defendants thereafter attributed to him a representation that he possessed "a $1,000,000 book of business" and "a moveable book of business," asserted that the representation "was false," and asserted that he "probably did not have one in the first place" (¶ 79D); and that Defendants invoked Section 7 against him in their April 12, 2023 letter. Plaintiff alleges that Defendants thereby faulted him for failing to deliver the very thing their own agreement forbade him to use, and that the offer letter contains no representation, warranty, or performance term concerning a book of business or the transfer of clients from any prior employer (¶¶ 28, 79D).

52G. Paragraph 6 of Plaintiff's offer letter provides that he "will receive a company mobile phone that should be used for all company correspondence and kept in good working order." Defendants issued Plaintiff that telephone, and Plaintiff used it in the course of his work. On March 9, 2023 Plaintiff wrote to Sinel and Gupta under the subject line "Company property

arriving tomorrow, thank you," stating: "The phone, key fob, and key are being delivered tomorrow. You will need to sign for the package." The message states a carrier tracking number and encloses a copy of a letter Plaintiff sent with the package. The device, any forensic image or backup of it, its carrier call and message detail records, and any mobile-device-management record concerning it are within Defendants' possession, custody, or control, or that of their carrier.

53. Apart from the offer letter, Defendants never provided Plaintiff any signed writing describing when commissions are earned, the frequency of reconciliation against any draw, or the treatment of commissions on termination.

54. In the same onboarding session, bundled with the handbook materials, Defendants presented Plaintiff with a five-page Confidentiality Agreement identifying his position as "Business Growth Representative." The document recites that Defendants "would not have agreed to employ you, or continue your employment" absent Plaintiff's signature, although Plaintiff had accepted the offer letter on September 21, 2022 and had commenced work. Its terms purport to bar Plaintiff, without time limit, from "encourag[ing], counsel[ing] or assist[ing] any present or former customer, vendor, employee or consultant of the Company, or any third party, in the initiation or prosecution of any legal action or proceeding" involving Defendants, and impose one-way fee-shifting against Plaintiff. Plaintiff signed the signature page and delivered it to Khuu. Plaintiff retained pages 1 through 4; Defendants furnished him no copy of the executed page, which upon information and belief remains in Defendants' possession.

**G. Sales Performance and Commissions Earned**

55. Between October 2022 and February 2023 Plaintiff generated net orders totaling $325,395.50 across twenty-nine transactions, as reflected in Defendants' own commission report,

which Sinel enclosed with her March 15, 2023 letter and described as "a spreadsheet identifying the orders for which you have sales credit, commission potential due based on a 3% calculation, and amounts already paid to you to date as commissions" (¶ 79A).

56. Defendants' commission report computes Plaintiff's commissions at 3% on every transaction, yielding $9,761.87, and credits payments of $4,725.00 on January 27, 2023, $1,000.00 on February 10, 2023, and $3,461.61 on March 10, 2023, leaving a stated "Balance" of $575.26. Defendants tendered that balance on March 15, 2023 (¶¶ 79–80). The four payments are therefore $4,725.00, $1,000.00, $3,461.61, and $575.26.

56A. The commission report bears, in its lower margin, the notation "ACTIVE\686016802.v1." Plaintiff alleges that this notation is a document-management identifier and version marker of the kind applied by document-management software, and that the report is therefore an electronically managed document bearing a version designation rather than a page of a payroll register or accounting ledger. Sinel transmitted it on March 15, 2023 — after Plaintiff's written wage complaints of January 18 and January 26, 2023 (¶¶ 59, 61B), after his separation on February 23, 2023, and after his written demand. Plaintiff alleges that Defendants have not shown the report to be a record made at or near the time of the transactions it describes or kept in the course of a regularly conducted business activity.

56B. Plaintiff pleads the commission report as Defendants' own statement of the orders they credited to him and of the commissions they computed, and does not withdraw any allegation resting on it (¶¶ 55–58, 104A). Plaintiff alleges in addition that where the report differs from records Defendants created contemporaneously with the transactions — the January 10, 2023 schedule applying rates of 2.5% and 4% (¶¶ 60B, 60B-1), the pay statement recording a $300.00 commission on December 16, 2022 (¶ 58A), and Defendants' own invoices (¶¶ 58B,

58E) — the contemporaneous records are the better evidence of what Defendants did at the time. The version history of the report, each earlier and later version, the identity of the person who prepared each, and the instructions under which each was prepared are within Defendants' possession and control. Plaintiff does not allege that any communication between Defendants and their counsel is discoverable, and seeks no ruling on privilege by this allegation.

57. The four payments identified in ¶ 56 total $9,761.87 — the full amount of the commissions Defendants themselves computed at a flat 3%. Plaintiff does not allege that Defendants withheld that computed sum in its entirety. Plaintiff alleges that Defendants paid it late, in fragments, and only after his written complaints; that Defendants recouped a $1,000 advance from earned commissions without written authorization; and that Defendants never computed or paid commissions on sales that, under Defendants' own asserted shipment condition, accrued after March 15, 2023.

58. The twenty-nine transactions on Defendants' commission report include a sale dated February 9, 2023 to the client identified in Defendants' records as P2550, in the net amount of $2,695.00, on which the report computes a 3% commission of $80.85. That transaction and that commission are within the $325,395.50 and $9,761.87 totals stated at ¶¶ 55–56.

58A. Defendants' pay statement for the pay date December 16, 2022 reports an earnings line captioned "Commission" in the current amount of $300.00 and the year-to-date amount of $300.00, and gross pay for that period of $3,184.62. Defendants' pay statement for the pay date December 30, 2022 reports year-to-date commission of $300.00 and year-to-date gross pay of $18,473.10. Defendants thus paid Plaintiff, on December 16, 2022, an amount their own payroll system recorded as commission. That payment preceded by thirty-three days Sinel's written statement of January 18, 2023 that "[t]he offer letter does not state clearly whether the

commission is paid based on when order is taken or when it is shipped so we have set a policy" (¶ 60). The commission report Defendants enclosed with the March 15, 2023 letter credits four payments (¶ 56) and reflects no payment of $300.00. That report identifies a single transaction on which it computes a commission of exactly $300.00: purchase order P0534, dated October 25, 2022, in the net order amount of $10,000.00, at a stated rate of 3%. Plaintiff alleges on that basis that the payment Defendants made on December 16, 2022 was commission on an order taken in October 2022 and computed at 3%. Plaintiff does not allege that Defendants identified the payment as commission on that order at the time it was made.

58B. Defendants' own point-of-sale records for the P0534 transaction show an order created October 21, 2022 at 11:58 a.m. from draft order #D1241 in the amount of $10,225.00, paid in full the same day by American Express, with $9,825.92 credited to Defendants' October 25, 2022 payout. On November 17, 2022 the client transmitted to Plaintiff an image of a replacement payment card. On November 21, 2022 Defendants refunded the October order and archived it, and the same day created a second order in the identical amount of $10,225.00 from draft order #D1286, paid in full that day by a different American Express account, with $9,825.92 credited to Defendants' November 23, 2022 payout. Defendants' own invoice for that transaction, headed "Reem Acra Couture" at 501 Fifth Avenue, 2nd Floor, states one merchandise line — "Couture RTW 579-806," color seafoam, size 4 — in the amount of $10,000.00, together with freight of $225.00, for a total of $10,225.00, and bears the notation "Paid Shopify 2136 - $10,225 10/25/22" against a balance due of $0.00. The $10,000.00 merchandise figure on that invoice is the net order figure Defendants' commission report states for purchase order P0534 (¶ 58A). Plaintiff alleges that the client paid Defendants in full for this order on October 21, 2022 and again on November 21, 2022, and that the refund and re-entry

reflect a change of payment card rather than a cancellation. Plaintiff does not allege that the refund and re-entry were improper.

58C. Plaintiff alleges, from his own knowledge, that before Defendants paid the December 16, 2022 commission Sinel told him that the garment on this order had to ship before any commission on it would be paid; that Plaintiff caused the garment to be shipped for that reason; and that alterations on the garment were then still in progress. Plaintiff alleges that this was the first occasion on which Defendants asserted that commission was conditioned on shipment. Defendants' own client-facing terms for this transaction provide that Defendants will ship merchandise "once all production is complete or after your final fitting, provided all outstanding merchandise balances and shipping charge … are paid in full."

58D. Defendants did not reduce the shipment condition to writing until January 18, 2023, when Sinel wrote that the offer letter "does not state clearly whether the commission is paid based on when order is taken or when it is shipped so we have set a policy," and stated as the reason that "[i]t does not make business sense to pay out a commission before the client has fully paid for the dress" (¶ 60). The client on the P0534 transaction had paid Defendants in full on October 21, 2022, more than a month before Defendants paid Plaintiff any commission on it, and had paid in full a second time on November 21, 2022 (¶ 58B). Plaintiff alleges that the rationale Sinel stated on January 18, 2023 does not describe the single transaction on which Defendants in fact paid him a commission; that Defendants applied the shipment condition before they stated it; and that Paragraph 4 of the offer letter contains no shipment condition and Paragraph 8 permits no amendment absent a writing agreed to by both parties (¶¶ 27, 28). The shipping records, the order-event history, the draft-order history, and the alteration records for this transaction are within Defendants' possession and control.

58E. Defendants' pro forma invoice number P0553, dated January 25, 2023, is headed "Reem Acra Couture" beneath the masthead "Reem Acra NEW YORK," identifies the sales representative as "RR," and states a single merchandise line item — "COUTURE / CUSTOM EMBROIDERY FABRIC, AS DISCUSSED WITH RA / SHAPE OF HEAVEN" — in the amount of $30,000.00, together with freight of $225.00, for a stated total of $30,225.00. Defendants' commission report states the net order on purchase order P0553, dated January 25, 2023, as $28,000.00 (¶¶ 55–56). Plaintiff alleges that the $2,000.00 difference between those two figures is a discount Defendant Reem Acra personally granted to the client, and that Defendants computed Plaintiff's commission on the discounted amount rather than on the amount stated on their own pro forma invoice. Paragraph 4 of the offer letter provides for commission on "all your sales" and states no rule reducing the base on which commission is computed by a discount Defendants grant after an order is taken (¶ 27); no writing agreed to by Plaintiff established such a rule (¶ 28). Plaintiff alleges that Defendants applied that rule to his compensation without his agreement, and that this is a further instance of Defendants computing his commission by a term not contained in the offer letter (¶¶ 60B, 60C, 61C). Plaintiff further alleges that Defendant Reem Acra thereby exercised pricing authority over a transaction Plaintiff originated; that the pro forma invoice records the merchandise as custom work "AS DISCUSSED WITH RA"; and that she was copied on Defendants' internal recap of the client meeting concerning that order (¶ 61A). The order records, the pro forma invoice file and its revision history, the record of the discount and of its authorization, and the basis on which Defendants computed the net order for this transaction are within Defendants' possession and control.

58F. Defendants' own billing practice is inconsistent with the shipment condition they asserted. Defendants issued an invoice — not a pro forma — under the designation "Reem Acra

Couture" to a client who was a personal client of Defendant Reem Acra. Plaintiff alleges that Defendants generated that invoice while the garment remained in the atelier's physical possession undergoing alterations and while a balance remained outstanding on the account. Plaintiff alleges that Defendants therefore invoiced a client before shipment and before payment in full, and that the condition Defendants asserted as the reason for deferring his commissions (¶¶ 58C, 58D, 60) was not applied uniformly to Defendants' own billing.

58G. Plaintiff performed fitting, alteration-facilitation, shipment, and client-relationship labor on transactions for which Defendants credited the commission to another employee or to no one. On the transaction described at ¶ 58F, Plaintiff performed the alteration labor and executed the final shipment, and received no commission credit. Plaintiff alleges that under the shipment condition Defendants themselves asserted, his execution of the shipment was the event on which commission would vest. Plaintiff further alleges that he performed labor of the same kind on other transactions for clients of Defendant Reem Acra personally, and on the client pipeline he inherited from the predecessor employee who departed at or about the time of his hire, and received no commission credit on any of them.

58H. On occasions during his employment Plaintiff remained at Defendants' premises past the end of his scheduled shift, at times until approximately 8:00 p.m., awaiting completion of couture production on orders for which he held sales credit. On some of those occasions Defendants' atelier personnel completed the shipment or handoff after Plaintiff had waited, and without his participation. Plaintiff alleges that to the extent Defendants condition the vesting of a commission on shipment, Defendants may not rely on the non-occurrence of that event where their own conduct excluded Plaintiff from it. The identities of the transactions described at ¶¶

58F–58H, the invoices and shipping records for each, and the person to whom Defendants credited each commission are within Defendants' possession and control.

**H. The Wage Complaints and the January 2023 Compensation Change**

59. On January 18, 2023 at 2:32:52 p.m., from his personal electronic-mail account, Plaintiff sent Sinel a written complaint under the subject line "Unpaid earned wages causing financial crisis; for responsen [sic]." He wrote that he was "in a financial crisis due to the nonpayment of earned wages … specifically commission"; that "I need to be paid according the law and our agreement"; and that "I'm sure this a big misunderstanding but i need you to follow through with your end of the agreement." He copied his Company email address.

60. Thirty-four minutes later, at 3:07:25 p.m., Sinel replied. She conceded that "[t]he offer letter does not state clearly whether the commission is paid based on when order is taken or when it is shipped so we have set a policy," and that the policy was "to be consistent with what retail stores are paying out which has always been when the client picks the dress or the dress is shipped to the client." She wrote that "[i]t does not make business sense to pay out a commission before the client has fully paid for the dress." She admitted that Plaintiff was "currently owed $6,395 in commission for approximately $200,000 in orders that have been taken." She proposed a draw. In the same message she wrote: "Client appointments need to be handled by others."

60A. Sinel's January 18, 2023 reply transmitted an attached spreadsheet titled "Copy of 1.17.23 RETAIL AND COUTURE ORDERS AND SHIPMENTS OCT- DEC 2022-ROTH.xlsx." She wrote: "You are currently owed $6,395 in commission for approximately $200,000 in orders that have been taken and quite a few of those orders are shipping this month — see attached schedule and confirm which orders are shipping this month."

60B. That spreadsheet contains a column headed "Rate." For every October 2022 transaction and every November 2022 transaction attributed to Plaintiff, the Rate column states 0.025. For every December 2022 transaction attributed to Plaintiff, the Rate column states 0.04. The Commission column is the product of the Net Sales column and the Rate column for each row, and the three monthly subtotals — $594.375, $2,270.6375, and $3,530.40 — sum to $6,395.41, the figure Sinel stated in her covering message. Plaintiff alleges that Defendants therefore computed the sum they represented to him as owed at rates of 2.5% and 4%, and not at either of the rates provided by Paragraph 4 of the offer letter (¶ 27).

60B-1. Plaintiff is in possession of a second Microsoft Excel workbook, titled "RETAIL AND COUTURE ORDERS AND SHIPMENTS OCT- DEC 2022- GABY AND ROTH.xlsx." Its embedded document properties identify the same author and the same creation timestamp as the schedule Sinel transmitted on January 18, 2023 (¶ 60D). Plaintiff alleges on information and belief that the two files are versions of the same underlying schedule maintained by Defendants' accounting personnel. Plaintiff discloses that the properties of the copy in his possession identify him as the last person to save the file and record two saves, on February 14 and February 17, 2023; Plaintiff does not allege that the values in that file were altered, and the cell values in the two saves are identical. The native file and its revision history are within Defendants' possession and control.

60B-2. The "GABY AND ROTH" workbook contains a sheet captioned "ALL" listing each order for October, November and December 2022, and, beside the "Rate" column described at ¶ 60B, a column headed "Sales Person" identifying the consultant credited with each order. For October 2022 and for November 2022, every row identifying the comparator states a Rate of 0.03 and every row identifying Plaintiff states a Rate of 0.025. For December 2022 both

consultants' rows state 0.04. In November 2022 both consultants sold in the couture division: four rows coded "Ctr" identify the comparator, each at a Rate of 0.03, and three rows coded "Ctr" identify Plaintiff, each at a Rate of 0.025. Plaintiff alleges that Defendants applied a commission rate to the comparator that exceeded the rate they applied to Plaintiff, in the same months, on the same divisions of merchandise, at the same establishment. Plaintiff further alleges that this differential is the opposite of what Sinel represented at hire, when she declined to alter Plaintiff's proposed rate on the stated ground that she was "unable to change the commission structure for one sales person and not the rest of the team" and would "actually need to raise the current salesperson to 3%" to match it (¶ 32).

60C. Defendants' commission report, enclosed with their March 15, 2023 letter (¶ 79A), computes the same transactions at 3% on every row (¶ 56). Defendants thus produced two internally inconsistent computations of Plaintiff's commissions on the same orders. For the December 2022 transactions, the contemporaneous schedule computes $3,530.40 and the commission report computes $2,647.80, a difference of $882.60. For October through December 2022 taken together, the schedule computes $6,395.41 — the sum Sinel represented to Plaintiff as owed (¶ 60A) — and the report computes $6,085.82, a difference of $309.59. Paragraph 4 of the offer letter provides a commission of 3% on all sales and "an additional 1% commission on all of your monthly sales if you meet your monthly sales goal" (¶ 27). The rate Defendants' contemporaneous schedule applied to every December 2022 transaction — 0.04 — is the sum of those two components. The December 2022 net sales to which the two computations were applied are $88,260.00, and one percent of that sum is $882.60 — the whole of the difference between them. Defendants' contemporaneous schedule applied a rate of 0.04 — the sum of the two components of Paragraph 4 — to every December 2022 transaction attributed to him.

60C-1. Defendants' contemporaneous schedule does not state a single monthly goal. On its "ALL" sheet it states, for each consultant and for each month, a separate boutique goal and a separate couture goal, together with a row captioned "(Under/(Over)" recording attainment against each. For December 2022 that sheet states a boutique goal for Plaintiff of $25,000.00 and a couture goal for Plaintiff of $65,000.00. Against the boutique goal it records $88,260.00 and enters $63,260.00 in the "(Under/(Over)" row — that is, $63,260.00 over goal. Against the couture goal it records no December 2022 couture sales and enters $65,000.00 under. Those two components net to $1,740.00 under, which is the December difference Defendants' commission report states against a stated goal of $90,000.00. For the year the same sheet states a boutique goal for Plaintiff of $90,000.00 and records him $46,120.50 over it.

60C-2. Plaintiff alleges that Defendants applied the 4% rate to every December 2022 transaction in the schedule they created on January 10, 2023, at a time when their own attainment row recorded him $63,260.00 over his December boutique goal; that Paragraph 4 of the offer letter provides no rate above 3% other than the additional one percent payable on meeting the monthly sales goal (¶ 27); and that Defendants have stated no other basis for the rate they applied. Defendants' March 15, 2023 letter states: "Your commission rate is 3% and you never exceeded your monthly sales goal to warrant an additional 1% payment" (¶ 79A). Plaintiff alleges that Defendants applied the higher rate in the schedule they created on January 10, 2023 and disclaimed it in the letter they wrote on March 15, 2023. Plaintiff does not allege that he met the combined December 2022 goal. The basis on which Defendants applied the 4% rate, the goals assigned to each consultant, and the records of attainment against them are within Defendants' possession and control.

60D. The spreadsheet's embedded document properties identify its author as an individual other than Sinel, record its creation on January 10, 2023, identify Sinel as the last person to modify it, and record the time of last modification as 2:57:05 p.m. on January 18, 2023. Plaintiff's complaint was sent at 2:32:52 p.m. that day and Sinel's reply at 3:07:25 p.m. Plaintiff alleges that Defendants modified the schedule after receiving his complaint and before transmitting it to him.

61. On January 23, 2023 — five days after Plaintiff's complaint — Defendants transmitted new written terms altering the basis on which Plaintiff's commissions would be paid and imposing a monthly draw. No writing signed by both parties amended the offer letter.

61A. On January 26, 2023 at 1:07 p.m., Defendants' designer Alexandre Lahaye circulated an internal "PRIVATE CLIENT RECAP" email to Plaintiff, Sonia Traikia, and Julien Nguyen, copying Jean Claude A., Andrea Seemeyer, Sinel, and Reem Acra at reem@reemacra.com. The email recapped a client meeting held that morning concerning a couture order and directed that design expectations and cost be documented.

61B. On January 26, 2023 at 5:59 p.m., from his Company email address to Sinel's Company email address, Plaintiff sent a written complaint forwarding that thread. He wrote: "Today, I am reaching out with grave concerns that I ask to remain confidential and noted within my personnel file. After observing the below e-mail thread, I can only conclude that my clients are now being handled by other employees. As this is a recent change, I would like an explanation as to why this new workflow is being implemented? I'm sure this must be a mistake or an error in communication. As I see it, the treatment I have received from my management team has shifted since I began inquiring about the backpay I am owed. Aside from the discrimination I have endured around receiving client appointments and my missing paychecks, I

am extremely disheartened to now be retaliated against for asking that my employment agreement be upheld."

61C. Sinel replied at 7:22:57 p.m. Eastern Standard Time the same evening, one hour and twenty-four minutes later. She quoted Plaintiff's complaint back to him verbatim, including the sentence beginning "As I see it, the treatment I have received from my management team has shifted," and demanded that he "elaborate." Defendants therefore had actual knowledge, on January 26, 2023, of a written complaint by Plaintiff expressly asserting discrimination in the allocation of client appointments, unpaid wages, and retaliation for asserting his compensation rights.

61D. In that reply Sinel made the following written statements:

(a) As to the diversion alleged at ¶¶ 42–47: "as you have not been able to manage the timing of client appointments we have provided additional staff members to help facilitate," and "there is an absolute need for other employees to be involved."

(b) As to the offer letter: "The timing of commission payment on orders, as you are claiming, is not indicated in the offer letter," transmitting a copy of Plaintiff's executed offer letter as an attachment.

(c) As to the January 23, 2023 change: "I have sent you an email, which to date I have not received a response, clarifying the agreement we have made verbally in my office last week including the financial accommodation on the part of the company for a commission draw."

(d) As to timekeeping: she listed among her asserted accommodations "not following corporate policy with respect to clocking in and out."

(e) As to Plaintiff's reports of equipment failure: "upon being informed that there were issues with your computer and phone contributing to the lack of communication we immediately

focused on ensuring that any computer issues were corrected promptly even though we were not previously informed that you were having such issues nor were any such issues identified/duplicated by our IT specialists."

61E. Plaintiff alleges that the statement quoted at ¶ 61D(d) is a second written acknowledgment by Defendants that no punch record existed for Plaintiff (¶ 52C), and that the attendance and timekeeping criticisms set out in Sinel's January 26, 2023 reply were first reduced to writing in that reply — in direct response to, and on the same day as, Plaintiff's written complaint of discrimination and retaliation.

61F. The statement quoted at ¶ 61D(e) is contradicted by Sinel's own contemporaneous writing. On October 7, 2022 at 11:35 a.m., Sinel wrote to Plaintiff by text message: "Is your phone working?" At 2:50 p.m. the same day Plaintiff replied: "Hello Jillian! I hope you're well. I jusT [sic] checked and no service still." Plaintiff alleges that Defendants' President thereby had actual knowledge, in her own writing and on the ninth day of Plaintiff's employment, that the mobile telephone Defendants furnished under Section 6 of the offer letter was without service; that she herself initiated the inquiry; and that her written statement of January 26, 2023 that Defendants "were not previously informed that you were having such issues" cannot be reconciled with that exchange. Plaintiff further alleges that Defendants advanced the asserted "lack of communication" as a ground of criticism in the same message (¶¶ 61D(a), 61D(e)) and in their subsequent statements of the grounds for his separation (¶¶ 73, 74, 79A).

62. Defendants' employee handbook states: "The Company does not give advances or loans to employees."

63. On February 6, 2023 Plaintiff contacted the New York State Department of Labor concerning unpaid commissions. The agency's record reflects that Plaintiff was calling, and

states that the Department "does not take claims for unpaid commissioned sales" and that Plaintiff "must file a civil action." Plaintiff does not allege that a formal administrative claim was docketed.

63A. Plaintiff placed that call during business hours from the office he shared with two colleagues at Defendants' 501 Fifth Avenue premises. Jennifer Schelich and Gabrielle Kauper were present in that office at the time. They are the two colleagues referred to in Plaintiff's February 22, 2023 written complaint (¶ 72). Plaintiff alleges no fact concerning any communication between either employee and any Defendant. Whether either reported the call, and whether and when any Defendant learned of it, are matters within Defendants' knowledge and control and are the subject of proof.

64. Defendants' letter of March 15, 2023 states that "the Company was unaware of your alleged complaint to the Department of Labor until you addressed it in your March Letter." Plaintiff alleges that the retaliation pleaded below was caused by his January 18, January 26, and February 22, 2023 written complaints to Sinel, each of which Defendants indisputably received and the second of which Sinel answered the same evening by quoting it back to Plaintiff (¶ 61C). The retaliation counts therefore do not depend on Defendants' knowledge of the February 6 agency contact. Plaintiff does not concede the accuracy of the quoted statement.

**I. Attendance, Notification, and Termination**

65. Defendants established the applicable absence-notification protocol in writing. On October 19, 2022 at 12:19:56 p.m., Sinel wrote to Plaintiff: "Hi - I understand you are not feeling well - hope you feel better - please text me next time when you are going to be late or be out sick."

66. Plaintiff complied with that protocol on each occasion. On October 4, 2022 at 9:21 a.m. he wrote to Arbogast that he was "running about 10 minutes late," and Arbogast replied "Okay. I'm late as well." On October 6, 2022 at 9:45 a.m. he wrote "I'm sorry I slept through the alarm I'll be there around 10," and Arbogast replied "Kk." On October 19, 2022 at 3:59 p.m. he wrote "I'll be back tomorrow see you at 930," and Arbogast replied "Okay!! Be well." On November 22, 2022 at 9:28 a.m. he wrote to Sinel that "there's been an incident at my apartment I'm going to be late maybe by one hr." No Defendant objected to the form or timeliness of any of these notices.

66A. On February 15, 2023 at 12:59 p.m., from his personal electronic-mail account, Plaintiff wrote to Gupta and Sinel under the subject line "2/15/2023-clockin": "I forgot to clock in this morning but was present for the shift. Sorry for the inconvenience. I need to excuse myself for the rest of the day I do not feel well enough to work." That message is the first written notice of the illness alleged at ¶ 157, it was addressed to both individual Defendants with authority over Plaintiff's employment, and it reported a missed time-clock entry to Defendants on the day it occurred. No Defendant objected to the form or timeliness of that notice.

66B. On February 16, 2023 at 9:13 a.m., from the same personal account, Plaintiff wrote to Sinel and Gupta under the subject line "2/16/2023 - will be absent" that he had "thought that I would be available to return to work this morning, but I am not feeling up to it." At 2:54:27 p.m. that day Sinel replied to Plaintiff, copying Gupta: "You do not have any accrued but unused sick time left. Therefore, this absence is unexcused. We can apply one of your three remaining PTO days to cover the absence; however, consider this a written warning as this unexcused absence violates the Company time and attendance policy. Further, please communicate through your Company issued email address regarding Company matters." Plaintiff alleges that Defendants

thereby stated on February 16, 2023 that three days of paid time off remained available to him, and applied one of those days to the absence. The same message continued: "[I]t has come to my attention that you brought various books of couture designs home with you without requesting permission, which also violates Company policy. Please return the books to the office tomorrow when you come in for work."

66C. Plaintiff did not remove any book of couture designs from Defendants' premises. Defendants' February 16, 2023 message did not identify the source of the report, the books said to be missing, or the date of any removal (¶ 66B). Defendants pressed the subject during the week Plaintiff was absent and ill. On February 17, 2023 at 1:55:48 p.m. Sinel wrote: "please do not forget to bring back the couture books you brought home without authorization (also in violation of the Company policy) on your next scheduled work day, Monday February 20th." On February 22, 2023 at 10:07 a.m. Plaintiff denied the accusation in writing to Sinel and Gupta, stating that "the couture binder is at my desk and not with me" (¶ 72). At 5:18:55 p.m. that day Sinel replied: "The couture binders are not at your desk. If you placed them somewhere specifically in the showroom or office, please advise as we have not been able to find them." Plaintiff alleges that Defendants thereby stated, six days after accusing him of removing the books, that they had not been able to find them. Defendants identified no witness, no inventory record, and no investigation, and imposed no discipline on the subject. The accusation appears in none of the documents in which Defendants stated the grounds for their action. It does not appear in Defendants' February 23, 2023 separation letter, which states the grounds for separation as Plaintiff's absences, the requested doctor's note, and "the Company's Attendance and Tardiness policy, Workplace Conduct policy, complaints from clients and overall deficiencies in the performance of your job duties" (¶ 73). It does not appear in Defendants' March 15, 2023 letter

or their April 12, 2023 letter, each of which sets out an enumerated list of Plaintiff's alleged performance failures (¶¶ 74, 79A). Plaintiff did not attend Defendants' premises after February 15, 2023, and had no telephone conversation with any of Defendants' personnel thereafter; every communication between Plaintiff and Defendants after that date was in writing. Plaintiff alleges that the accusation was first made twenty-nine days after his first written wage complaint (¶ 59), in the same message that issued the first written warning of his employment (¶¶ 66B, 75); that Defendants pressed it while Plaintiff was absent and ill and while simultaneously demanding medical documentation from him (¶ 69); and that Defendants thereafter omitted it from every document in which they stated the reasons for the separation.

66D. Plaintiff alleges on information and belief that Sinel previously directed a comparable accusation at another male employee of Defendants. That employee worked in the shipping and receiving department on the seventh floor of 501 Fifth Avenue. During Plaintiff's employment, Kauper identified that employee to Plaintiff as having been accused of theft and terminated. Plaintiff does not allege that the employee performed work substantially similar to his own and does not offer him as a comparator for the purposes of Counts VIII or IX. Plaintiff alleges the episode as evidence bearing on the reason for the accusation Defendants directed at him (¶¶ 66B–66C) and on Defendants' treatment of male employees. Plaintiff raised that episode with Defendants in his letter of March 8, 2023. Defendants' March 15, 2023 letter responded: "Your discussion of a past employee is also irrelevant to your employment with the Company and amounts to nothing more than gossip." Defendants did not deny that the employee had been accused or that he had been separated. The identity of that employee, the circumstances of his separation, and any investigation Defendants conducted are within Defendants' possession and control and are identifiable from Defendants' payroll and personnel records.

67. On February 1, 2023 Defendants' President inquired in writing into Plaintiff's attendance.

68. Between February 15 and February 22, 2023 Plaintiff was ill and remained in written communication with Defendants concerning his absence, his medical status, and his expected return.

69. During that period Defendants solicited medical information from Plaintiff, including whether he had tested for COVID-19 and the results of that test, and sought a provider letter. On February 20, 2023 at 1:58 p.m. Sinel wrote: "Please provide positive Covid test results as is the company policy with respect to all employees that have contracted Covid." On February 21, 2023 at 5:55 p.m. Sinel wrote: "Please confirm you have gotten tested for COVID and advise what the results of the test were." On February 22, 2023 at 5:18 p.m. Sinel wrote that if Plaintiff did not "advise of a positive COVID test or provide a doctor's note attesting to your need for your absence by tomorrow, the Company will assume that you have voluntarily resigned from you position."

69A. On February 17, 2023 at 1:55 p.m. Sinel wrote to Plaintiff: "you do not have any more sick time to apply to this absence, so we can apply one of your remaining two PTO days." On February 20, 2023 at 10:13 a.m. Plaintiff captured the display of Defendants' timekeeping and leave-accrual system, shown under the account heading "MM229 - Reem Bridals LLC." Under the heading "My Accrual Balances," that display reflected "PTO — 32.00 hours available — Jan 1, 2023 - Jan 1, 2024" and "Sick/Safe Leave — 3.86 hours available — Jan 1, 2023 - Jan 1, 2024." On February 22, 2023 at 5:18 p.m. Sinel wrote: "You do have [sic] any available sick time or PTO for your absences Monday, yesterday or today, and thus, they are unexcused." Plaintiff alleges that Sinel stated on February 16, 2023 that three days of paid time off remained

and applied one of them (¶ 66B), stated on February 17 that two remained, and stated on February 22 that none remained; that Defendants' own system reflected available sick leave on February 20, 2023, three days after Sinel represented that no sick time remained; reflected 32.00 hours of available paid time off, twice the "two PTO days" Sinel represented remained on February 17; and reflected both balances two days before Sinel asserted that neither existed. Plaintiff further alleges that no deduction, adjustment, or entry reducing either balance between February 17 and February 22, 2023 has been identified, and that the underlying accrual records and audit history are within Defendants' possession and control. Defendants' employee handbook separates sick leave from paid time off "[a]s of January 1, 2021" in order "to comply with New York City law." Defendants' February 23, 2023 letter states a fourth time that Plaintiff "did not have any available sick time or paid time off to cover your absences on Monday, February 20, 2023; Tuesday, February 21, 2023; Wednesday, February 22, 2023, or today, Thursday, February 23, 2023."

69B. Defendants' employee handbook addresses documentation for sick absences in two places. Under the heading "Safe and Sick Time Protocol," it provides that "[f]or an absence of more than three consecutive work days, employees may be required to provide documentation from a health care provider, confirming the need for the amount of sick time taken." Under the attendance policy at page 26, it provides that the Company "reserves the right to require proof of the need for absence, if allowed by law," and that where an employee is absent three consecutive days "and has not provided proper notification in the form of a doctor's note, the Company will assume that the employee has voluntarily resigned their position and will proceed with the termination process" (¶ 79A). Plaintiff alleges that Sinel demanded medical documentation on February 20, 2023, the first day of the absence (¶ 69); that his absence did not exceed three

consecutive work days on that date; that Defendants' own sick-time protocol permits a documentation demand only for an absence exceeding three consecutive work days, and then only permissively; and that Defendants declared the absences unexcused (¶ 69A) on the asserted ground of a missing doctor's note. Defendants' handbook makes an absence unexcused for failure to notify: "Failure to properly notify Reem Bridals using these procedures will result in an unexcused absence." Defendants' own correspondence records that Plaintiff gave notice. On February 17, 2023 Sinel wrote that Plaintiff's "call out was 20 mins before the start of the work day (9:30 a.m.) and 17 mins before the start of the work day yesterday." Plaintiff wrote to Sinel and Gupta at 9:13 a.m. on February 16, 2023 (¶ 66B), at 9:11 a.m. on February 17, 2023, at 9:54:05 a.m. on February 20, 2023, and at 10:07 a.m. on February 22, 2023 (¶ 72). Defendants' February 23, 2023 letter charges Plaintiff with having "completely failed to advise of your need to be absent on Tuesday, February 21, 2023, and today, February 23, 2023" — and charges no failure to advise as to February 16, 17, 20, or 22 (¶ 73). Plaintiff alleges that Defendants nonetheless declared every absence of that week unexcused, and did so on the stated ground that no sick time or paid time off remained and no doctor's note had been produced, not on any failure to notify. Defendants' March 15, 2023 letter states the standard as "[t]he Company's request that you provide a doctor's note after being absent for more than three consecutive days," and asserts that the Company "was entitled to request such an attestation after you had been out for seven days (7)." Plaintiff alleges that Sinel in fact demanded the documentation on February 20, 2023, the first day of the absences Defendants declared unexcused, and repeated the demand on February 21 and February 22, before the period Defendants' own letter identifies had elapsed (¶ 69).

70. Defendants' personnel knew of Plaintiff's illness and expected his return throughout February 20–22, 2023. On February 20, 2023 at 10:50 a.m., Jennifer Schelich wrote to Plaintiff: "Are you okay?" On February 21, 2023 at 3:11 p.m., Gabrielle Kauper wrote: "Hi Roth! Oh my goodness… how are you feeling? Let me know if you need anything:))" On February 22, 2023 at 7:54 a.m., Hollin Pritchett wrote: "Are you not coming back:("

71. Plaintiff replied to Pritchett on February 22, 2023 at 10:38 a.m.: "It is my full intention to return."

72. On February 22, 2023 at 10:07 a.m. Plaintiff wrote to Sinel and Gupta: "I do not like being accused of taking things I am not supposed to; the couture binder is at my desk and not with me. I also am now concerned with privacy as the two colleagues with whom I share an office have messaged me and know I am sick. How do they know I am sick? … Where was this level of vigilance with the colleague I came in contact with who had a positive PCR and allowed to work? This scrutiny is another example of retaliation against me for bringing up the fact that I have not been paid in accordance with our agreement."

72A. Sinel replied at 5:18 p.m. the same day, copying Gupta. In that reply Sinel stated that Defendants had "paid you commissions owed to date in accordance with our agreement and the commission structure extended to you on January 23, 2023"; stated that upon ending Plaintiff's employment Defendants would pay "outstanding commission on orders that have not yet shipped — even though payment of those amounts is not yet required under our agreement because the garments have not yet shipped"; stated that "no one has disclosed to employees the reason for your absence (your claimed illness)—so your concerns regarding privacy are unfounded"; and stated that "no one reported to work last week and disclosed they tested positive for COVID" and that "nor has anyone advised they tested positive for COVID." Sinel further

stated: "Enforcing Company policies is in no way retaliatory as the Company enforces its policies equally as to all Company employees." Plaintiff alleges that Defendants thereby acknowledged in writing, on February 22, 2023, that Plaintiff had charged them with retaliation, one day before they transmitted the separation letter (¶ 73).

73. On February 23, 2023 — one day after Plaintiff confirmed in writing that he intended to return, and one day after his written complaint — Defendants terminated Plaintiff's employment by letter transmitted at 8:20:23 p.m. from Sinel to Plaintiff, copying Gupta, under the subject line "Confirmation and acceptance of resignation." The transmittal carried two attachments. The attached New York State Form IA 12.3 Record of Employment bears an embedded modification timestamp of 6:00:01 p.m.; the attached letter bears an embedded creation timestamp of 8:19:50 p.m., thirty-three seconds before transmission. On the attached Form IA 12.3, the field "Payroll Records are kept at" is completed "Reem Bridals LLC," "501 5th Avenue," "NY, NY 10017"; the New York State Employer Registration Number is stated as 0820781 and the Federal Employer Identification Number as 27-0509328; and the fields for the employee's name and Social Security number are blank. The attached letter bears the subject reference line "Confirmation of Resignation from Employment and Termination." Its operative sentence states that "the Company confirms your voluntary resignation from your position with the Company and this letter confirms the Company's acceptance of that resignation, effective immediately, and termination of your employment based on your failure to comply with, and violation of, the Company's Attendance and Tardiness policy, Workplace Conduct policy, complaints from clients and overall deficiencies in the performance of your job duties." That sentence characterizes the separation both as a resignation Defendants accepted and as a termination Defendants effected.

74. Defendants have since characterized the separation as a voluntary resignation and have asserted a failure to notify. Defendants' March 15, 2023 letter identifies two specific dates of alleged failure to notify. Defendants' April 12, 2023 letter expands the assertion to "all of the days you were absent" and to "at least four" unexcused absences, and adds performance criticisms not stated in the March letter.

75. Defendants' April 12, 2023 letter further asserts that Plaintiff's performance failures were documented "prior to you raising any conversation about commissions." Plaintiff alleges that the February 16, 2023 written warning was the first formal written discipline in his employment record.

**J. Post-Employment Conduct**

76. On February 6, 2024 Plaintiff wrote to Sinel proposing a referral arrangement for a client interested in a couture-archive style, offering "a 10% commission for me to seal the deal." On February 7, 2024 Gupta promised Plaintiff in writing "10% of the sale" for the referral. Plaintiff made the referral and an appointment was scheduled and confirmed.

77. Defendants paid Plaintiff nothing on the referral.

78. Between March 8 and May 5, 2023 Plaintiff and Defendants exchanged correspondence. Sinel wrote to Plaintiff on March 15, April 12, and May 5, 2023. No counsel appears on any of the three letters.

79. The March 15, 2023 letter tendered $575.26, described as "the remaining balance," "in full and final satisfaction of commissions." That figure is the exact arithmetic remainder of Defendants' own computation.

79A. Defendants' March 15, 2023 letter states: "Your commission rate is 3%." The same letter states that "[b]etween October 2022 and February 2023, you had net orders of $325,395.50,

for which $9,761.87 may be payable as commission upon shipment," and encloses "a spreadsheet identifying the orders for which you have sales credit, commission potential due based on a 3% calculation." That enclosure is the commission report referred to at ¶¶ 55–58. The letter further quotes Defendants' handbook at page 26: "if an employee is absent for three consecutive days and has not provided proper notification in the form of a doctor's note, the Company will assume that the employee has voluntarily resigned their position and will proceed with the termination process."

79B. In the same letter, responding to Plaintiff's written claim of unequal pay, Sinel stated: "Additionally, your eligible commission percentage was not different from Gaby's and your claim that she received more of a draw does not support a claim of discrimination under NYLL § 194." Plaintiff alleges that the statement was false when made, and that Defendants' own personnel had created the schedule contradicting it approximately two months earlier (¶¶ 60B-1, 60B-2, 60D).

79C. In the same letter Sinel described the comparator as "Gaby, a part-time employee," who "handles walk-ins and primarily ready-to-wear clients," and stated that Plaintiff "w[as] hired to handle couture appointments" and that "[w]alk-ins or ready-wear appointments have always been Gaby's job." The letter also states that Plaintiff is "not entitled to $144.23 for a half day of PTO based on work performed on a Saturday in November," and that "[t]his amount was accounted for and attributed to your absences." Plaintiff alleges that Defendants thereby acknowledged in writing that the comparator was employed part time, that Plaintiff performed work on a Saturday in November 2022 (¶¶ 52D, 52E), and that Defendants applied accrued paid time off against his absences — while asserting in the same letter that he "had no available sick time or PTO as of Monday, February 20, 2023" (¶¶ 69A, 88, 161).

79D. Defendants' March 15, 2023 letter attributes to Plaintiff a representation that he possessed "a $1,000,000 book of business" that "never materialized." Defendants' April 12, 2023 letter repeats the attribution, stating that "your representation that you had a moveable book of business was false" and that Plaintiff "probably did not have one in the first place." Plaintiff made no such representation, orally or in writing, and no writing exchanged between the parties records one. The offer letter contains no representation, warranty, condition, or performance term concerning a book of business or the transfer of clients from any prior employer, and by its own terms supersedes "any prior verbal or written agreements between you and the Company" (¶ 28). The recruiting correspondence of September 20 and 21, 2022 contains no such representation (¶¶ 30–33). Defendants first asserted the attributed representation on March 15, 2023, after Plaintiff's written wage complaints and after the separation (¶ 73).

79E. Defendants' April 12, 2023 letter states that "Section 7 [of the offer letter] confirms that you will not use the confidential information of any former employer or other third party in connection with your employment with the Company," and that "[i]f the clients were truly yours, they would not be potentially confidential information of any former employer or third-party."

79F. Defendants' March 15, 2023 letter states that Plaintiff "w[as] not hired to handle walk-in appointments," that "[w]alk-ins or ready-wear appointments have always been Gaby's job," and that Plaintiff and the comparator "do not perform the same job." Defendants' showroom operated by appointment only, its doors were kept locked, and persons arriving without an appointment were directed away by Defendants' reception personnel rather than served by either consultant. The comparator was Defendants' sole sales consultant before Plaintiff's hire; Sinel wrote on September 21, 2022 that "there are only two people selling" and that Plaintiff was "the only one dedicated to couture" (¶ 32).

79G. Defendants' own schedule records both consultants selling in both divisions in the same months. Of the orders it attributes to Plaintiff between October and December 2022, $136,120.50 in net sales are coded to the boutique division "Btq" and $66,740 to the couture division "Ctr." Of the orders it attributes to the comparator in the same period, $284,010 are coded "Btq" and $83,900 "Ctr" (¶¶ 60B-1, 60B-2). Plaintiff pleads ¶¶ 79D–79G in response to characterizations Defendants have advanced in their own correspondence, and not as separate causes of action.

80. Defendants processed that payment through payroll and withheld statutory taxes, remitting a net instrument of $504.10.

81. Defendants' April 12, 2023 letter states that the $575.26 was remitted "in full and final satisfaction of commission potentially payable to you, as of March 15, 2023," and that Defendants were "not obligated to pay any remaining commission … as various garments had not yet shipped."

81A. Defendants' April 12, 2023 letter states: "between October 2022, and February 2023, you had net orders of $325,395.50 for which $9,761.87 may be payable as commission upon shipment of said orders based on your 3% commission rate." The letter further states that "[a]s of March 15, 2023, the Company had paid you $9,186.61 in commission and remitted the final $575.26." Plaintiff alleges that Defendants' President thereby stated in writing, after the fact, that Plaintiff's commission rate was 3%, and that Defendants' own contemporaneous schedule had applied a different rate (¶¶ 60B, 60B-2).

82. Defendants' April 12, 2023 letter also asserts that Plaintiff "acknowledged receiving" the employee handbook "at your time of hire." Plaintiff alleges Defendants possess no acknowledgment signed by him. On February 22, 2023, in the message quoted at ¶ 72, Plaintiff

wrote to Sinel and Gupta that his handbook was "missing the page covering the Covid policy, as I never signed off on what you are saying." Sinel's reply of that date (¶ 72A) did not assert that Plaintiff had signed an acknowledgment.

83. Defendants' March 15, 2023 letter states that Plaintiff was "provided with a wage notice at your time of hire clearly detailing your annual salary, your regular pay day and other necessary information which was signed and dated by you on September 27, 2022." That letter does not state that the notice set forth any commission rate or commission basis (¶ 119). Defendants' May 5, 2023 letter states that "you are not entitled to any damages or penalties under NYLL § 195," that Plaintiff "w[as] provided with a compliant wage notice as a salaried employee," and refers to "the wage notice which you signed on September 27, 2022." The notice Plaintiff signed is dated September 28, 2022 in his own hand (¶ 50), and Defendants' payroll records reflect that Plaintiff's employment began September 28, 2022. Defendants thus twice stated a date for the notice one day earlier than the date the notice bears.

84. Check no. 14946 for $227.01, dated May 8, 2023, was transmitted with the May 5, 2023 letter. By that letter's terms the payment was tendered "in full and final satisfaction of your claimed outstanding business expenses" — a reimbursement, not wages.

85. Defendants classified Plaintiff as exempt on the LS-59 without identifying the exemption claimed, and did not identify any statutory or regulatory exemption in their letters of March 15, April 12, or May 5, 2023. Plaintiff pleads the exempt designation, for purposes of Count IV, as context bearing on the completeness of the wage notice and on Defendants' good faith, and not as an independent violation of NYLL § 195(1). Plaintiff pleads the misclassification itself, and its consequences, at ¶¶ 52A–52G and in Count XII.

86. Defendants' 2023 Form W-2 for Plaintiff reports at Box 1 wages, tips and other compensation of $20,490.87, and reports the identical figure at Box 3 (Social Security wages), Box 5 (Medicare wages and tips), Box 16 (State wages) and Box 18 (Local wages). At Box 14 the form reports "Medical 742.04" and "Dental 67.44." Plaintiff's base salary was $75,000 annually (¶ 29), paid biweekly at a gross of $2,884.62 per period (¶ 104C). Plaintiff alleges that Defendants paid him salary on four pay dates in 2023 — January 13, January 27, February 10 and February 24 — totaling $11,538.48, and commissions of $9,761.87 (¶ 56), for gross compensation of $21,300.35; and that $21,300.35, reduced by the $742.04 and $67.44 reported at Box 14, together $809.48, equals the $20,490.87 reported at Box 1. The Form W-2 therefore accounts for the whole of Plaintiff's 2023 compensation. It reflects no salary payment on or after the March 10, 2023 pay date, and no payment of any kind after March 15, 2023.

87. Plaintiff's pay statements reflect no itemized commission calculation, no identification of a draw, no shipment-vesting condition, and no reconciliation. The February 10, 2023 payment of $1,000 — the draw — was recorded as "commission."

88. Defendants' employee handbook provides that "PTO is accrued monthly from January through December at the rate of one day" credited on "the last day of each month," and that unused paid time off carries over into the next calendar year "to a maximum of 3 days." Plaintiff's offer letter provides that his "eligibility for PTO (Paid Time Off) is based on a Five (5)-day work week," and that he "may accrue up to 12 days next year" — twelve days being the product of the handbook's one-day monthly rate over a full calendar year. Defendants' pay statement of January 27, 2023 displayed 3 days of paid time off available to Plaintiff and 0.48 days of sick/safe leave available. Defendants' timekeeping system on February 20, 2023 displayed 32.00 hours — four days — of paid time off available, and 3.86 hours of sick/safe

leave available (¶ 69A). The paid-time-off figures differ by exactly one day, the increment Defendants' own handbook provides accrues on the last day of each month, here January 31, 2023. Plaintiff alleges that Defendants' payroll system and Defendants' timekeeping system therefore reported his accruals consistently with each other and with Defendants' written policy, and that both reported a sick-leave balance greater than zero. Plaintiff's pay statements of February 10 and February 24, 2023 contain no accruals section at all. The accruals section that had appeared on every prior statement is absent from both. Defendants' handbook further provides that "[c]arry over time not used by March 31 is forfeited," so the paid time off carried from 2022 into 2023 remained available to Plaintiff throughout February 2023. Under the heading "Information & Announcements," the February 10, 2023 statement reads: "We apologize your time off is not appearing on your checks this pay period. We have identified an issue that needs correction. We expect that your corrected accruals will appear on the next pay stub." The next statement, for the pay date February 24, 2023, contains no accruals section and no further statement on the subject. Plaintiff alleges that Defendants acknowledged in writing, twelve days before Sinel asserted that no paid time off remained (¶ 69A), that their own reporting of his accrued time was in error and required correction, and that Defendants did not correct it.

88A. Defendants' employee handbook provides: "If an employee resigns all unused PTO time will be forfeited," and separately, "[i]n the event of termination by the Company accrued PTO will be paid out at the time of termination." It further provides that "[s]ick days will not be paid out if your employment with the company should end." Under Defendants' own written policy, whether a separation was characterized as a resignation or as a termination by the Company determined whether accrued paid time off was forfeited or paid. The same handbook

provides at page 26 that where an employee is absent three consecutive days without a doctor's note, "the Company will assume that the employee has voluntarily resigned their position and will proceed with the termination process" (¶ 79A). Plaintiff alleges that a separation effected by Defendants under that provision is a termination by the Company within the meaning of the payout clause. Defendants transmitted the separation letter under the subject line "Confirmation and acceptance of resignation" (¶ 73), stated in the same sentence both that they confirmed a resignation and that they effected a termination (¶ 73), stated in it that Plaintiff had "no accrued but unused vacation time for payout," and paid him nothing on account of accrued paid time off (¶ 86). Plaintiff alleges that the characterization of the separation as a resignation operated, under Defendants' own policy, to extinguish an obligation Defendants would otherwise have owed him, and that Defendants derived a financial benefit from that characterization.

89. The offer letter contains two paragraphs numbered 6. The second of them entitles Plaintiff to "up to Five (5) sick and safe days as earned through the year." Defendants' employee handbook contains a section captioned "NEW YORK CITY EARNED SICK TIME" providing that an employee will "accrue 1 hour sick time for every 30 hours worked up to a maximum of 40 hours sick time per year"; that "[s]ick time off must be reported separately from PTO"; and that "[i]n the event that your sick days exceed your sick time accrued, you must use PTO accrued time in order to get paid for those days." On February 16, 2023 Sinel asserted in writing that Plaintiff had no accrued but unused sick time remaining.

**K. The Comparator**

90. Gabrielle Kauper was employed by Defendants as a sales consultant at the same establishment, the 501 Fifth Avenue showroom, during the same period, and was compensated in part by commission on her sales, as Defendants' own schedule reflects (¶ 60B-2). Plaintiff does

not allege the form or amount of her base compensation, which is within Defendants' possession and control. Kauper represented to Plaintiff that she held the title Director of the Atelier; Defendants' President replied in writing the same evening that the designation was "news to me" and that she would "certainly investigate" (¶ 36). Plaintiff does not allege that Defendants conferred that title on her.

91. Plaintiff and Kauper both sold Defendants' bridal and couture merchandise to clients at that showroom, from the same inventory, from the same price lists and line sheets, under the same supervisors.

91A. Plaintiff's offer letter required him to work five days a week in Defendants' New York office (¶ 29). Kauper was normally scheduled approximately three days per week and on occasion worked more. Plaintiff was required to be present five days each week, but Defendants scheduled him on the sales floor on approximately two of those days — the days Kauper was not scheduled. Kauper was therefore scheduled on the sales floor on substantially every day she worked, while Plaintiff was scheduled there on approximately two days of the five he was required to work. In December 2022 Defendants' retail operations personnel told an outside stylist that the showroom operated three days per week (¶ 45). Plaintiff does not allege that Defendants reduced his sales-floor days at any point during his employment; he alleges that this was the arrangement throughout it. Plaintiff further alleges that the non-sales tasks he was directed to perform (¶ 39) were performed on days he was not scheduled on the floor, that client appointments and inquiries were separately allocated away from him (¶¶ 42–47), and that the selling and client-service work he performed outside scheduled hours (¶¶ 52D–52E) followed from the same arrangement. The records establishing each employee's scheduled and actual days worked are within Defendants' possession and control.

91B. Defendants did not offer Plaintiff a draw at hire and did not inform him that a draw was available. Plaintiff learned that draws existed only after overhearing a discussion of one in the office he shared with two colleagues (¶ 63A). Kauper stated to Plaintiff that her draw was $2,000. Defendants thereafter extended Plaintiff a draw of $1,000 and recouped it in full against his earned commissions (¶ 93). Plaintiff alleges on information and belief, the amount and terms of Kauper's draw being within Defendants' exclusive control (¶ 94), that Kauper was afforded a draw greater than his while working a reduced schedule (¶ 91A), and alleges that the availability of a draw was disclosed to Kauper and not to Plaintiff. Confronted in writing with Plaintiff's claim that Kauper "received more of a draw," Defendants did not deny it and justified it instead (¶ 94). The draw authorizations, amounts, dates, and recoupment terms for each employee are within Defendants' possession and control.

91C. The "GABY AND ROTH" workbook (¶ 60B-1) contains a sheet captioned "COUTURE" stating each consultant's assigned sales goals. For 2022 it states a couture goal of $205,000 for Plaintiff and $75,000 for the comparator, and a retail goal of $90,000 for Plaintiff and $360,000 for the comparator. For 2023 it states a couture goal of $1,425,000 for Plaintiff and $205,000 for the comparator, and a retail goal of $433,750 for Plaintiff and $1,301,250 for the comparator. Plaintiff alleges that the workbook therefore records a couture goal for him several times the comparator's and a retail goal a fraction of hers, consistent with Sinel's statement at hire that he was "the only one dedicated to couture" (¶ 32). Plaintiff does not allege that Defendants communicated these figures to him during his employment. On the "ALL" sheet the monthly attainment columns headed with each consultant's name credit only orders coded "Btq"; Plaintiff's couture orders — $10,000 in October 2022 and $56,740 in November 2022 — are excluded from the column against which his monthly goal is measured, while appearing in the

monthly totals. Plaintiff alleges that the goal-attainment figures Defendants maintained during his employment therefore understated his production. The assignment of goals, the allocation of appointments, and the records of each consultant's attainment are within Defendants' possession and control.

91C-1. The same sheet permits the couture goals to be measured against what Defendants' couture business in fact produced. It assigns Plaintiff a couture goal of $205,000.00 for October through December 2022 — stated month by month as $65,000.00, $75,000.00 and $65,000.00 — and assigns the comparator a couture goal of $75,000.00 for the same three months, stated as $25,000.00 in each. Its attainment rows record Plaintiff at $138,260.00 under his couture goal and the comparator at $8,900.00 over hers, which yields couture sales of $66,740.00 by Plaintiff and $83,900.00 by the comparator. The sheet states a combined couture goal of $280,000.00 and records the two consultants together $129,360.00 under it, which yields $150,640.00 in couture sales by Defendants' couture operation as a whole for those three months.

91C-2. Plaintiff is separately in possession of a document Defendants furnished to him captioned "REEM ACRA / RETAIL PROJECTIONS / 2023." It states Defendants' retail orders by month for the years 2019, 2020, 2021 and 2022 and a 2023 budget, and states beneath them a single line captioned "COUTURE." On that line it states Defendants' couture results as $1,543,025 for 2019, $318,875 for 2020, $315,450 for 2021, and $1,266,380 for 2022, against a 2023 couture budget of $1,830,000. It states total results of $2,862,699 for 2019, $1,129,831 for 2020, $1,327,417 for 2021 and $2,479,044 for 2022.

91C-3. The same document allocates the 2023 budget between the two consultants. It assigns the comparator a 2023 couture goal of $205,000 and assigns Plaintiff a 2023 couture goal of $1,425,000. The "GABY AND ROTH" workbook states the same two figures (¶ 91C).

Plaintiff alleges that the couture goal Defendants assigned to him alone for 2023 was larger than the couture result Defendants' own document records for their entire business in each of 2020, 2021 and 2022: it is 4.52 times the $315,450 recorded for 2021, 4.47 times the $318,875 recorded for 2020, and $158,620 more than the $1,266,380 recorded for 2022. It is within $118,025 of Defendants' best recorded couture year. The couture goal Defendants assigned for the same year to the comparator — $205,000 — is less than the couture result Defendants recorded for either 2020 or 2021. Plaintiff further alleges that the same document assigns him a 2023 total goal of $1,858,750 and assigns the comparator, a consultant Defendants describe as having had "seven (7) years of employment with the Company" (¶ 94), a 2023 total goal of $1,506,250, and that Plaintiff's total goal was therefore $352,500 greater than the comparator's and equal to approximately 75% of Defendants' entire recorded revenue for 2022.

91C-4. A companion sheet captioned "Reem Acra / Couture / 2023 Projections" states the couture allocation in columns headed "Roth" and "Gaby." For October through December 2022 it assigns Plaintiff $65,000, $75,000 and $65,000 — $205,000 in total — and assigns the comparator $25,000 in each of those months, $75,000 in total. Those figures are the same as the "GABY AND ROTH" workbook's (¶ 91C-1), and the workbook's attainment rows are computed against them. For 2023 the same sheet assigns Plaintiff monthly couture goals ranging from $75,000 to $145,000 in every month of the year, totaling $1,425,000, and assigns the comparator $15,000 or $20,000 per month, totaling $205,000. Plaintiff began work on September 28, 2022, and the 2022 period comprised his first three months of employment.

91C-5. The same couture sheet records Defendants' couture orders month by month for each prior year. It records couture orders in three of the twelve months of 2021 and in six of the twelve months of 2020. It records months in which Defendants' couture orders were zero or

negative, including February 2019, May 2022 and July 2022. Plaintiff alleges that Defendants' own record of their couture business shows it to have produced revenue irregularly and in a minority of months in two of the three years preceding his hire, and that Defendants nonetheless assigned him a couture goal for 2023 requiring orders of between $75,000 and $145,000 in every month of that year.

91C-6. Plaintiff alleges that Defendants set the goals against which they measured his performance without reference to the results their own records attribute to their couture business; that the goals so set could not be attained; and that Defendants thereafter relied on his failure to attain them (¶¶ 79A, 60C-2). Plaintiff does not allege that Defendants communicated any of these figures to him during his employment. The basis on which Defendants set each consultant's goals, the results against which they were set, the reason the two documents differ, and the person who prepared each are within Defendants' possession and control.

92. Sinel wrote on September 21, 2022 that she would "need to raise the current salesperson to 3% in order to match" the rate offered to Plaintiff. Plaintiff alleges that Sinel thereby stated that she controlled the commission rate applied to the comparator as well as the rate offered to him. Defendants' contemporaneous sales and commission schedule records Sinel as the last person to modify it (¶ 60D). Whether Sinel set those rates herself or on the direction of Reem Acra is within Defendants' possession and control.

93. Defendants extended Plaintiff a single draw of $1,000 on February 10, 2023. Defendants' pay statement for the pay date February 10, 2023, covering the pay period January 23 through February 5, 2023, reports that sum on the earnings line captioned "Commission," in the current amount of $1,000.00 and a year-to-date amount of $5,725.00. No pay statement Defendants issued to Plaintiff contains any line, caption, or deduction denominated a draw, an

advance, or a recoupment. Defendants' commission report then credits $1,000.00 paid February 10, 2023 against the $9,761.87 it computes as commissions due (¶ 56), so that the sum advanced was applied in reduction of commissions Plaintiff had earned. Plaintiff alleges that Defendants thereby recouped the advance in full against earned commissions; that no writing signed by Plaintiff authorized that application (¶ 28); and that Defendants' pay statement described the payment as commission rather than as an advance or a recoupment (¶¶ 84–85). Whether Defendants recorded the February 10, 2023 payment internally as a draw, as commission, or otherwise, and the terms on which it was extended, are within Defendants' possession and control.

94. Confronted in writing with Plaintiff's claim "that she received more of a draw," Defendants did not deny it. They justified it by reference to the comparator's "proven sales record during the prior seven (7) years of employment with the Company," and in the same letter described her as "a part-time employee" (¶ 79C). Plaintiff alleges on information and belief, the amount and terms of Kauper's draw being within Defendants' exclusive control, that Kauper received a larger draw on terms more favorable than those imposed on Plaintiff.

**L. The State Agency Certification**

95. Following Plaintiff's termination he applied for unemployment insurance benefits.

96. On May 24, 2023 Gupta executed two New York State Department of Labor forms concerning Plaintiff's separation, each bearing Reem Bridals LLC's employer registration number 08-20781. On the Notice of Protest he checked the box captioned "Voluntarily Quit," entered "02/14/23" in the field captioned "Claimant's Last Day Worked," and wrote as the reason: "ROTH STOPPED SHOWING UP TO WORK, claiming that he was sick, but failed to

provide doctors note. See attached copy of letter sent to him." He printed his name, stated his title as "CFO," and signed and dated each form May 24, 2023.

97. Plaintiff alleges that the entries described at ¶ 96 are inconsistent with Defendants' own contemporaneous writings. Plaintiff wrote to Gupta and Sinel at 12:59 p.m. on February 15, 2023 that he "was present for the shift" that morning (¶ 66A). On February 16, 2023 Sinel wrote that Defendants would "apply one of your three remaining PTO days to cover the absence" and issued a written warning (¶ 66B). Sinel wrote further to Plaintiff concerning his absences on February 17, February 20, February 21, and February 22, 2023 (¶¶ 69, 69A). On February 22, 2023 Plaintiff wrote that it was his "full intention to return" (¶ 71). Defendants' February 23, 2023 letter states that Plaintiff had no available time "to cover your absences on Monday, February 20, 2023; Tuesday, February 21, 2023; Wednesday, February 22, 2023, or today, Thursday, February 23, 2023" (¶ 69A), and Defendants paid Plaintiff full salary for the pay period February 6 through February 19, 2023 (¶ 52C-1). Plaintiff further alleges that Defendants had in their possession his February 22, 2023 written statement of intent to return when the forms were executed three months later.

98. Plaintiff was thereafter assessed an overpayment liability by the Department of Labor. The proceeding concerning that assessment remains adjourned and has not been finally determined. Plaintiff pleads the assessment as an item of consequential damage and will establish its amount and its final disposition by documentary proof.

**M. The Amsale Opportunity and Its Withdrawal**

98A. On May 16, 2024 Plaintiff corresponded with Marina Santo, Managing Director of Fourth Floor, a staffing and placement agency serving the fashion industry, concerning a position with Amsale, a bridal house. The position was the Evening and Cocktail Stylist role. Plaintiff

spoke with Santo by telephone on May 21, 2024. On May 30, 2024 Santo wrote that the Amsale team "did express interest in meeting with you." Fourth Floor thereafter arranged and confirmed in writing four in-person meetings between Plaintiff and Amsale personnel: (a) June 6, 2024 at 10:00 a.m. at Amsale's flagship boutique, 150 Wooster Street, New York, which Fourth Floor's written confirmation identified as a meeting with Apri Brown, Flagship Salon Manager, and which Plaintiff alleges Neil Brown, Chief Executive Officer, also attended; (b) June 11, 2024 at 12:30 p.m. at the same address with Sarah Swann, Chief Creative Officer, whom Fourth Floor had not scheduled for the first meeting; (c) June 27, 2024 at 12:00 p.m. at the same address with Swann and Neil Brown, Chief Executive Officer, which Plaintiff and Fourth Floor referred to contemporaneously as "Amsale Interview No. 3"; and (d) July 29, 2024 at 9:00 a.m. (¶ 98E).

98B. On June 3, 2024 at 12:31 p.m., before the first meeting, Fourth Floor's Senior Recruiting Associate wrote to Plaintiff by text message: "Also- they asked specifically what you have been doing since Reem! What have you been up to since?" Plaintiff answered in writing at 1:02 p.m. that day, describing e-commerce work in vintage resale, freelance work for private clients, and travel. Amsale thereafter conducted the four meetings identified at ¶ 98A. Plaintiff completed the first two interviews without raising Sinel, Reem Bridals, Reem Acra, or any dispute concerning his prior employment. Fourth Floor's written interview instructions directed Plaintiff: "Do NOT talk negatively about former employers."

98C. Neil Brown was present at the first meeting (¶ 98A) and at the third. At the beginning of the third, Brown asked Plaintiff without prompting: "So what do you think of Jillian?" Plaintiff understood Brown to refer to Defendant Jillian Hirsch-Sinel. Plaintiff answered that he did not have a favorable view of Sinel, that Defendants had not paid commissions in accordance with his employment agreement, and that he was considering legal remedies.

98D. The third interview continued for approximately one hour. At its conclusion Amsale personnel showed Plaintiff the atelier and introduced him to atelier staff. Plaintiff thereafter submitted professional references to Fourth Floor in writing. That written submission identifies no person affiliated with Defendants. Plaintiff did not identify Sinel, Reem Bridals, Reem Acra, Gupta, or any other Reem-affiliated person as a reference, and the reference submission is within the possession of Plaintiff and of Fourth Floor.

98E. On July 2, 2024 at 7:14 p.m. Fourth Floor's Managing Director wrote to Plaintiff: "Neil called and said he was traveling all of this week but you are the final candidate and we should have next steps for you by beginning of next week," and "rest assured, they absolutely love you." On Sunday, July 21, 2024 at 12:02 p.m., under the subject line "Amsale FINAL STEP!", she wrote: "I spoke with Neil today and they are prepared to move forward with making you a temp to perm offer at the number that we discussed. As a final step, Neil and Sarah would love to meet with you for coffee on Tuesday afternoon to discuss details." Plaintiff was traveling and asked that the meeting be moved later in the week. On July 27, 2024 at 8:50 p.m. Fourth Floor confirmed the meeting in writing: "you are confirmed for an in-person interview with Amsale on Monday, July 29th at 9:00am! You will be meeting for breakfast at the below address: Parker and Quinn, 64 West 39th St in the Refinery Hotel, New York, New York 10018. You will be meeting with Neil Brown, Chief Executive Officer." That confirmation identifies no other Amsale participant. The meeting took place on July 29, 2024. At its conclusion Brown orally offered Plaintiff the position and Plaintiff and Brown shook hands. Compensation and administrative terms of the initial placement remained to be documented.

98F. On August 1, 2024 at 4:29 p.m. Plaintiff wrote to Fourth Floor asking that his thank-you note be forwarded to Neil Brown "regarding the recent job offer from Amsale," and asking

to discuss "the offer terms and benefits package," stating that "[d]uring the interview, I wasn't able to fully comprehend all the details." That afternoon Fourth Floor's Managing Director replied: "Yes we passed the note along. We are waiting to hear back from Neil regarding official offer details. I followed up with him today and hope to hear very soon." On August 8, 2024 at 1:30 p.m. a Fourth Floor recruiter wrote to Plaintiff by text message: "Hi Roth! This is Danielle from fourth floor fashion. Are you available to chat live today regarding the amsale offer?" Under the structure Fourth Floor described in writing as a "temp to perm offer" (¶ 98E), Fourth Floor would have been Plaintiff's employer of record during an initial period, with anticipated conversion to direct employment by Amsale.

98G. On August 20, 2024 at 10:58 a.m. Fourth Floor's Managing Director wrote to Plaintiff: "Do you have any times that work best for you to speak today or tomorrow?" Plaintiff spoke with her by telephone on Wednesday, August 21, 2024. On that call Fourth Floor informed Plaintiff that Amsale would not proceed, and that a person from Reem Acra had provided negative information concerning Plaintiff's time there, while also stating that it might be a person from a different company. On the evening of August 22, 2024 Plaintiff memorialized the call in writing to Fourth Floor under a subject line he supplied: "Clarification Needed Regarding Feedback from Reem Acra." He wrote: "I wanted to reach out regarding the recent news about the rescinded offer from Amsale. I understand that someone from Reem Acra provided negative feedback about my time there, and I appreciate you letting me know. You also mentioned it might be someone from a different company." He asked Fourth Floor to "clarify what concerns were raised and who provided this information."

98H. On August 23, 2024 at 11:30 a.m. Fourth Floor's Managing Director replied under Plaintiff's subject line, "RE: Clarification Needed Regarding Feedback from Reem Acra." She

wrote: "You and I actually spoke on Wednesday, sorry for the confusion." She wrote: "When I connected with Neil, he did not mention names and only mentioned concerns with attendance, tardiness, reliability, etc." She wrote: "He was sure to mention that he thinks you are a great candidate with a lot of potential but because the Amsale team is so small, he was unwilling to take the risk due to the information that was presented to him." She wrote: "This is all the information that we have unfortunately." Fourth Floor did not deny that the information had come from Reem Acra and identified no alternative source.

98I. Those stated concerns correspond to the attendance and reliability assertions Defendants advanced in their February 23, 2023 termination letter and in their subsequent correspondence.

98J. Plaintiff alleges on information and belief that Defendants, or a person acting for or affiliated with Defendants, communicated negative information concerning Plaintiff's attendance, tardiness, or reliability to Brown, to Amsale, or to a person participating in the Amsale hiring process. That allegation rests on: (a) Brown's unsolicited inquiry concerning Sinel at the third interview; (b) Plaintiff's omission of any Reem-affiliated person from his references; (c) the advanced and affirmative posture of Plaintiff's candidacy immediately before the withdrawal, including an oral offer from the decisionmaker; (d) the correspondence between the reported concerns and Defendants' prior assertions; (e) Fourth Floor's statement that Brown did not identify the source; and (f) Fourth Floor's reply under a subject line naming Reem Acra as the source, without correction or denial of that attribution (¶¶ 98G, 98H); and (g) Amsale's knowledge, before the first meeting, of Plaintiff's departure from Reem Acra and of his subsequent work history (¶ 98B), and its decision to conduct four meetings and to extend an

offer notwithstanding that knowledge. The communications among Defendants, Amsale, and Fourth Floor concerning Plaintiff are within those parties' possession and control.

98K. Before the withdrawal, Fourth Floor had recruited Plaintiff, coordinated four interviews, requested references, transmitted onboarding materials, and communicated that Amsale was prepared to proceed. On August 23, 2024 at 1:55 p.m., after receiving Fourth Floor's reply (¶ 98H), Plaintiff wrote to Fourth Floor: "Given the concerns raised by the feedback from Reem Acra, I'm considering how to best frame my experience to highlight my strengths and avoid any potential issues," and asked whether "it would be wise to remove Reem Acra from my resume entirely, as I don't want to negatively impact my job prospects." Following the withdrawal, Fourth Floor ceased meaningful placement communications and made no further submissions or interview arrangements for Plaintiff.

98L. Plaintiff does not allege that he became an Amsale employee or that a written employment contract was executed. Plaintiff alleges the loss of the temporary placement earnings that would have been paid through Fourth Floor, the loss of the opportunity for conversion to direct Amsale employment, and the loss of associated benefits. Fourth Floor's July 21, 2024 message states that Amsale was prepared to proceed "at the number that we discussed" (¶ 98E). The pay rate so discussed, the anticipated hours, the duration, the conversion terms, and the benefits were not reduced to a signed writing and are within the possession and control of Fourth Floor and Amsale.

## CAUSES OF ACTION

### COUNT I — Unpaid Earned Commissions and Untimely Payment of Wages

**NYLL §§ 190(1), 191(1)(c), 193, 193(5), 198**

*(Against Reem Bridals, Sinel, and Reem Acra; against the Entity Defendants as joint or single integrated employers)*

99. Plaintiff repeats each preceding paragraph.

100. Plaintiff was a commission salesperson within NYLL § 190(6): his principal activity was sales, his earnings were based in part on commission, and his duties were not supervisory, managerial, executive, or administrative (¶¶ 38–39).

101. Commissions are wages under NYLL § 190(1). Defendants are employers under NYLL § 190(3).

101A. Defendant Reem Acra is an employer within the meaning of NYLL § 190(3). Plaintiff adopts and realleges ¶¶ 16, 19H, 19K, 19O and 20: she is the owner and chief executive of the entity that carried Plaintiff on its payroll; she certified under penalties of perjury that she was the Manager of two other Entity Defendants; centralized control of labor relations rested with her and Sinel; Sinel reported operational decisions concerning Plaintiff to her and stated in writing that she was required to review an operational request concerning Plaintiff with "Ms Acra" before acting on it; and on January 26, 2023 she directed that she receive follow-up reporting on clients she referred and was a copied recipient of the thread that prompted Plaintiff's written wage complaint that evening (¶¶ 47, 61A, 61B). Plaintiff alleges on the foregoing that Reem Acra possessed and exercised operational control over the enterprise that employed him. The facts bearing on her membership or ownership interest in each Entity Defendant, on her authority to hire, fire, and set rates and methods of pay, and on her participation in the compensation decisions at issue in this Count are within Defendants' possession and control.

102. Under the offer letter, Plaintiff earned 3% on all sales. No writing signed by both parties conditioned earning or payment on shipment, established a draw, or provided for reconciliation (¶¶ 27–28, 53).

103. Defendants nevertheless conditioned payment on shipment and imposed a draw by unilateral transmission on January 23, 2023, five days after Plaintiff's written wage complaint (¶ 61). That purported modification is ineffective under offer letter ¶ 8 and N.Y. Gen. Oblig. Law § 15-301(1).

104. NYLL § 191(1)(c) requires payment of commissions in accordance with the agreed terms and not later than the last day of the month following the month in which they are earned. Plaintiff earned commissions on sales made between October 2022 and February 2023. Defendants paid nothing until January 27, 2023, and paid the balance on February 10, March 10, and March 15, 2023. Each payment fell outside the statutory deadline for the months in which the underlying commissions were earned. Defendants' President admitted on January 18, 2023 that $6,395 was then owed (¶ 60).

104A. Commissions remain unpaid. On February 22, 2023 Sinel wrote that upon ending Plaintiff's employment Defendants would pay "outstanding commission on orders that have not yet shipped — even though payment of those amounts is not yet required under our agreement because the garments have not yet shipped." Defendants' February 23, 2023 letter states that the Company "will also pay you commission on orders taken and recorded by you in February 2023, on the next regularly scheduled pay date following the end of the month of February 2023." Defendants' payroll records reflect total commissions paid of $9,761.87 — the identical figure stated on Defendants' commission report — and no separate computation or payment of commission on orders taken in February 2023 appears in any record produced or transmitted to Plaintiff. The release language in the February 23, 2023 letter is by its own terms confined to "any and all commissions owed to you for orders taken by you through January 31, 2023." Defendants' April 12, 2023 letter then states that Defendants were "not obligated to pay any

remaining commission … as various garments had not yet shipped," and confines the March 15, 2023 tender to commission "potentially payable to you, as of March 15, 2023." Under Defendants' own asserted condition, commissions on garments shipping after March 15, 2023 accrued after that date. Defendants never computed, stated, or paid any such commission. The shipment dates for the twenty-nine transactions on Defendants' report are within Defendants' possession and control.

104A-1. Defendants' commission report identifies eleven orders taken by Plaintiff between January 5 and February 9, 2023, bearing Defendants' own purchase-order numbers P2531, P0545, P0546, P2539, P0550, P2538, P0553, P2545, P0554, P0555 and P2550, in net order amounts totaling $122,535.00. Under the shipment condition Defendants themselves assert (¶¶ 81, 104A), commission on any of those orders that shipped after March 15, 2023 accrued after the date of Defendants' final tender. Defendants never computed, stated, or paid commission on any such accrual. The shipment date of each order is within Defendants' possession and control.

104B. The $1,000 paid on February 10, 2023 was an advance against future commissions rather than earned compensation. Defendants recouped it in full from commissions Plaintiff had earned, and Plaintiff never authorized that recoupment in writing (¶¶ 91B, 93). Defendants' employee handbook states that "[t]he Company does not give advances or loans to employees" (¶ 62).

104C. Defendants' February 23, 2023 letter states that the Company would pay Plaintiff $3,461.61 in commissions "on the next regularly scheduled pay date." Defendants' payroll records reflect a biweekly pay cycle falling on Fridays, and the next regularly scheduled pay date after February 23, 2023 was February 24, 2023. Defendants generated a wage statement for that

date. It reflects gross pay of $2,884.62 consisting of salary alone, no commission for the period, and a commission year-to-date figure of $5,725.00. Defendants did not disburse the $3,461.61 until March 9, 2023, by manual check drawn on Defendants' operating account rather than through Defendants' payroll direct-deposit cycle, and recorded that sum as taxable wages on the March 10, 2023 payroll.

104D. The 32.00 hours of accrued paid time off displayed on Defendants' own system on February 20, 2023 (¶¶ 69A, 88) were payable to Plaintiff. Defendants' handbook provides that "PTO is paid at the employee's current base pay rate for the number of hours requested." Thirty-two hours at Plaintiff's base pay rate — $75,000 annually, $2,884.62 biweekly, $36.06 hourly — is $1,153.85. Defendants' written policy provides that accrued paid time off "will be paid out at the time of termination" where the Company terminates the employment (¶ 88A). Defendants terminated Plaintiff's employment (¶¶ 73, 135) and paid him nothing on account of that accrued time. Plaintiff pleads that sum as a wage supplement payable under NYLL § 198-c and, in the alternative, as wages within NYLL § 190(1) and as an item of contract damages under Count II. NYLL § 198-c(3) excepts only a person employed in a bona fide executive, administrative, or professional capacity whose earnings exceed nine hundred dollars per week; Plaintiff was not employed in any such capacity (¶¶ 52A–52B-1, 166B).

104E. Independently of Counts VIII and IX, Defendants applied a 2.5% rate to Plaintiff's October and November 2022 orders (¶ 60B). Both months were complete before Defendants created that schedule on January 10, 2023 (¶¶ 60B-1, 60D). The agreed rate was 3% (¶¶ 27, 102), which Defendants themselves stated in writing on March 15 and April 12, 2023 (¶¶ 79A, 81A), and no writing signed by both parties amended it (¶¶ 28, 102). Plaintiff alleges the difference between the agreed rate and the rate applied as a reduction of commissions he had already

earned. This allegation does not depend on the comparator, on sex, or on the January 23, 2023 change (¶ 61).

105. Defendants' withholding of earned commissions constitutes an unlawful deduction under NYLL § 193. NYLL § 193(5), added by L. 2021, ch. 397 effective before the conduct at issue, provides: "There is no exception to liability under this section for the unauthorized failure to pay wages, benefits or wage supplements."

106. Plaintiff disputes that any "full and final" notation created an accord and satisfaction.

(a) **No consideration.** The $575.26 tendered March 15, 2023 was the exact arithmetic remainder of Defendants' own computation, which their letter called "the remaining balance." Payment of an amount the payor has computed as owing furnishes no consideration for release of the balance.

(b) **Characterization.** Defendants processed the payment through payroll, withheld statutory taxes, and remitted a net instrument of $504.10, treating it as compensation for work performed.

(c) **Temporal limitation.** Defendants' April 12, 2023 letter confines the stated satisfaction to "commission potentially payable to you, as of March 15, 2023," and states that Defendants were "not obligated to pay any remaining commission … as various garments had not yet shipped." Under Defendants' own asserted shipment condition, commissions on garments shipping after March 15, 2023 had not then accrued and were not within the stated satisfaction.

(d) **Subject-matter limitation.** The May 5, 2023 tender was confined by its terms to "claimed outstanding business expenses."

(e) No writing signed by Plaintiff released any statutory or contractual claim.

107. Defendants' violations were willful. Defendants had actual notice of the wage-notice deficiencies on Plaintiff's first day (¶ 52); their President admitted the sum owed and simultaneously acknowledged that no writing addressed timing (¶ 60); and they altered the compensation basis five days after the complaint (¶ 61).

108. Plaintiff seeks the commissions that remain unpaid, the statutory remedies available for untimely payment of wages and for unlawful deduction, liquidated damages, prejudgment interest, costs, and such attorneys' fees as are recoverable, under NYLL § 198(1-a). Plaintiff pleads the untimely-payment theory subject to the unresolved question whether a private right of action lies for full-but-untimely payment of wages.

**COUNT II — Breach of Contract**

*(Against Reem Bridals)*

109. Plaintiff repeats each preceding paragraph.

110. The September 15, 2022 offer letter, executed by both parties on September 21, 2022, is a valid and enforceable contract.

111. Plaintiff performed. He generated $325,395.50 in net orders across twenty-nine transactions, as Defendants' own records reflect (¶ 55).

112. Defendants breached by failing to pay 3% on all sales when due, by conditioning payment on a term absent from the agreement, and by imposing a draw and reconciliation not agreed in writing (¶¶ 102–104).

112A. To the extent Defendants contend that commissions did not become payable because the garments on particular orders had not shipped, Defendants may not rely on the non-occurrence of a condition their own conduct prevented. Defendants controlled the shipment function. Defendants' atelier personnel completed shipments on orders for which Plaintiff held

sales credit, after Plaintiff had waited past his scheduled hours for production to be completed, and without his participation (¶ 58H). On the one transaction on which Defendants did pay a commission in 2022, Sinel directed that the garment ship before the commission would be paid, and Plaintiff caused it to ship (¶ 58C). Defendants ended Plaintiff's employment on February 23, 2023 and thereafter controlled whether and when every remaining order shipped (¶¶ 73, 104A). Plaintiff alleges that a party may not defeat another's right to payment by preventing the occurrence of the condition on which payment is said to depend, and that Defendants did so here.

112B. Defendants' own writings are to the same effect. On February 22, 2023 Sinel wrote that upon ending Plaintiff's employment Defendants would pay "outstanding commission on orders that have not yet shipped — even though payment of those amounts is not yet required under our agreement because the garments have not yet shipped" (¶ 104A). Defendants' February 23, 2023 letter states that the Company "will also pay you commission on orders taken and recorded by you in February 2023" (¶ 104A). Plaintiff alleges that Defendants thereby undertook to pay commissions without regard to shipment, and that Defendants' later position — that they were "not obligated to pay any remaining commission … as various garments had not yet shipped" (¶ 104A) — is inconsistent with that undertaking and with their own billing practice (¶ 58F).

113. Plaintiff was damaged in the amount of the unpaid commissions, with interest.

114. Separately, on February 7, 2024 Gupta promised Plaintiff in writing "10% of the sale" for a client referral. Plaintiff performed by making the referral. Plaintiff alleges the referred transaction proceeded and that no commission was paid; the fact and amount of the resulting sale are within Defendants' exclusive control.

**COUNT III — Quantum Meruit and Unjust Enrichment (Pled in the Alternative)**
*(Against Reem Bridals and the Entity Defendants)*

115. Plaintiff repeats each preceding paragraph.

116. In the alternative, and only if the offer letter is found not to govern the compensation at issue: Plaintiff performed sales and client services in good faith for the benefit of Reem Bridals and each Entity Defendant — selling merchandise branded with marks used across the enterprise, servicing clients invoiced under the Couture and Boutique designations, and generating revenue for the enterprise (¶¶ 19–23, 55). Defendants accepted those services. Plaintiff expected compensation. The reasonable value of the services exceeds what Defendants paid.

**COUNT IV — Wage Notice Violations**

**NYLL § 195(1), § 198(1-b)**

*(Against Reem Bridals; against the Entity Defendants as joint or single integrated employers)*

117. Plaintiff repeats each preceding paragraph.

118. NYLL § 195(1)(a) requires that an employer provide, at the time of hiring, written notice stating the rate or rates of pay and the basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other, together with the employer's name, address, and telephone number.

119. The notice Defendants issued omits the commission rate and the commission basis entirely, and omits the employer's telephone number (¶ 51). Both are express statutory requirements.

120. Plaintiff suffered concrete downstream injury. The statutory notice stated no commission rate and no commission basis. Plaintiff's offer letter states the 3% rate (¶ 27) but

states no earning event, no shipment condition, no draw, and no reconciliation method (¶¶ 27–28). Because the notice omitted the rate, and because neither the notice nor any writing signed by both parties supplied the basis on which commissions were earned and became payable, Plaintiff could not verify his commission entitlements while approximately $200,000 in orders accrued — as Defendants' own January 18, 2023 admission confirms (¶ 60). The omitted commission basis is the precise term Defendants later claimed unilateral authority to define, and their definition of it is how payment was deferred and withheld (¶¶ 60–61). Had the notice stated the commission rate and basis, Plaintiff would have identified the discrepancy earlier, would have demanded correction at that time, and would plausibly have avoided the delay and partial non-payment described in Count I. See *Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300 (2d Cir. 2024).

121. Plaintiff further alleges Defendants had actual notice of the deficiency on his first day of employment and never cured it (¶ 52), foreclosing any defense of complete and timely good-faith compliance under NYLL § 198(1-b).

122. Plaintiff is entitled to statutory damages of $50 per workday, to the $5,000 maximum, plus costs and such attorneys' fees as are recoverable.

**COUNT V — Wage Statement Violations**

**NYLL § 195(3), § 198(1-d)**

*(Against Reem Bridals; against the Entity Defendants as joint or single integrated employers)*

123. Plaintiff repeats each preceding paragraph.

124. NYLL § 195(3) requires that each payment of wages be accompanied by a statement listing, among other items, the dates of work covered, the rate or rates of pay and the basis thereof, gross wages, deductions, and net wages. For an employee who is not exempt from

overtime, the statement must also list the regular hourly rate, the overtime rate of pay, the number of regular hours worked, and the number of overtime hours worked.

124A. Plaintiff was not exempt from overtime (¶¶ 52A–52B-1; Count XII). None of Defendants' wage statements to Plaintiff states a regular hourly rate, an overtime rate of pay, a number of regular hours worked, or a number of overtime hours worked. The earnings section of each statement lists only "Salary" and, in some periods, "Commission," and contains no hours field of any kind. Plaintiff alleges that each statement therefore omitted four items NYLL § 195(3) required it to contain, and that the omission follows directly from Defendants' classification of Plaintiff as exempt without identifying any exemption (¶¶ 51, 85).

125. Defendants' statements never itemized a commission calculation, never identified a draw, never stated a shipment-vesting condition, and never reflected any reconciliation. The $1,000 draw of February 10, 2023 was affirmatively mislabeled as "commission." (¶ 87.)

126. Plaintiff suffered concrete downstream injury. The mislabeling of the draw as commission, and the omission of any reconciliation line, prevented Plaintiff from determining what he had been paid and on what basis, and prevented him from detecting that the draw was being recouped against earned commissions rather than paid in addition to them. Accurate statements would have disclosed the recoupment at the time it occurred and permitted timely objection.

127. Defendants' wage statements recorded Plaintiff's use of sick and safe leave. The statements of October 21, November 4, November 18, December 2, and December 16, 2022 report sick/safe leave taken by Plaintiff in cumulative figures rising from 0.46 to 1, then 2, then 5 days. Plaintiff alleges that Defendants therefore maintained a contemporaneous record of his use of leave protected under the New York City Earned Safe and Sick Time Act, that Defendants

knew he was using such leave as he used it, and that Defendants raised no objection to any such use at the time. Plaintiff further alleges that the accruals section reporting that information is present on every statement from October 2022 through January 27, 2023 and absent from the statements of February 10 and February 24, 2023 (¶ 88).

128. Plaintiff is entitled to statutory damages of $250 per workday, to the $5,000 maximum, plus costs and such attorneys' fees as are recoverable.

**COUNT VI — Retaliation**

**NYLL § 215**

*(Against Reem Bridals, Sinel, and Gupta)*

129. Plaintiff repeats each preceding paragraph.

130. NYLL § 215(1)(a) prohibits an employer from discharging, threatening, penalizing, or discriminating against an employee because the employee "has made a complaint to his or her employer … that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter." The statute requires a reasonable, good-faith belief, not an actual violation.

130A. NYLL § 215(2)(a) provides that an action under that section may be commenced "within two years after such violation." Plaintiff pleads the August 2024 communication described at ¶ 135A as the primary timely act under this Count. Plaintiff pleads the February 2023 conduct in the alternative, and alleges that it is timely if the six-year period of NYLL § 198(3) applies to this section. Plaintiff does not rely on a continuing-violation theory and does not allege that the August 2024 act revives any earlier act.

131. Plaintiff engaged in protected activity on three occasions. First, on January 18, 2023, when he complained in writing to Defendants' President that he had not been paid earned wages

and that he "need[ed] to be paid according the law and our agreement." Second, on January 26, 2023, when he wrote to Sinel that "the treatment I have received from my management team has shifted since I began inquiring about the backpay I am owed," and objected to "the discrimination I have endured around receiving client appointments and my missing paychecks" and to being "retaliated against for asking that my employment agreement be upheld" (¶¶ 61B–61C). Third, on February 22, 2023, when he wrote to Sinel and Gupta that Defendants' conduct was "another example of retaliation against me for bringing up the fact that I have not been paid in accordance with our agreement."

132. Defendants had knowledge of each complaint. Sinel replied to the first within thirty-four minutes and to the second within three hours and twenty-four minutes, quoting it back to Plaintiff verbatim (¶ 61C). Defendants' knowledge of the January 26, 2023 complaint does not depend on any allegation concerning Plaintiff's February 6, 2023 contact with the New York State Department of Labor (¶¶ 63–64).

133. Defendants took adverse action: on January 23, 2023 they altered the basis on which Plaintiff's commissions would be paid and imposed a draw (¶ 61); beginning with Sinel's January 26, 2023 reply and continuing into February 2023 they escalated scrutiny of his attendance (¶¶ 61D–61E, 67); on February 16, 2023 they issued the first formal written warning of his employment (¶ 75); and on February 23, 2023 they terminated him (¶ 73).

134. Causation is established by close temporal proximity — five days from the January 18 complaint to the compensation change, and one day from the February 22 complaint to termination — and by the sequence's departure from Defendants' own prior practice (¶¶ 65–66).

135. Defendants' stated reason is pretextual. Defendants themselves established the notification protocol in writing and Plaintiff complied with it on every prior occasion without

objection (¶¶ 65–66); three Company personnel communicated with Plaintiff about his illness and expected return on February 20, 21, and 22, 2023 (¶ 70); Plaintiff confirmed in writing on February 22 that it was his "full intention to return" (¶ 71); and Defendants' account of the reason for separation expanded and shifted between their March 15 and April 12, 2023 letters (¶ 74).

135A. Defendants further retaliated against Plaintiff after his employment ended. NYLL § 215(1)(a) prohibits an employer from discharging, threatening, penalizing, or in any other manner discriminating or retaliating against an employee because the employee made a complaint that the employee reasonably and in good faith believes constitutes a violation of the Labor Law. Plaintiff alleges that in or about August 2024 Defendants, or a person acting for or affiliated with Defendants, communicated negative information concerning Plaintiff to a prospective employer, causing an advanced offer of employment to be withdrawn and impairing Plaintiff's prospective employment opportunities (¶¶ 98A–98L). Plaintiff alleges that communication was a retaliatory adverse act taken because of his protected complaints. It was a discrete act occurring in August 2024 and accrued at that time. Plaintiff seeks relief under this Count independently for the August 2024 conduct, irrespective of any limitations defense Defendants may direct at the February 2023 conduct.

136. Plaintiff is entitled under NYLL § 215(2) to liquidated damages of up to $20,000, lost compensation, front pay, reinstatement or comparable equitable relief, injunctive relief, prejudgment interest, costs, and such attorneys' fees as are recoverable.

## COUNT VII — Retaliation

### FLSA, 29 U.S.C. § 215(a)(3)

*(Against Reem Bridals, Sinel, and Gupta; against the Entity Defendants as joint employers)*

137. Plaintiff repeats each preceding paragraph.

138. Plaintiff's January 18, 2023 complaint asserted, in writing, that he had not been paid earned wages and stated: "I need to be paid according the law and our agreement." The complaint was sufficiently clear and detailed for a reasonable employer to understand it as an assertion of statutory rights and a call for their protection. *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105 (2d Cir. 2015). Plaintiff further alleges that his complaint concerned wages subject to the Fair Labor Standards Act: Plaintiff was a non-exempt employee paid on a salary basis whose actual hours Defendants did not record (¶¶ 52A–52C), and the commissions he demanded were remuneration for employment includable in his regular rate under 29 U.S.C. § 207(e). A complaint that the employer has not paid earned wages "according the law" is therefore an assertion of rights protected by the Act and not solely a contractual grievance.

139. Defendants had knowledge and took the adverse actions described at ¶ 133.

139A. Section 215(a)(3) makes it unlawful to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint." Plaintiff alleges that the "in any other manner" language reaches post-employment adverse acts, including conduct alleged to have caused a prospective employer to withdraw an offer, where that conduct was motivated by the employee's assertion of wage rights. In the analogous Title VII context the Supreme Court held that former employees are protected and that a retaliatory negative job reference is actionable. *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997). Plaintiff alleges the August 2024 conduct described at ¶¶ 98A–98L as a further adverse action that accrued in August 2024 and is timely under 29 U.S.C. § 255(a), independent of any limitations defense Defendants may direct at the February 2023 conduct.

140. Defendants' violations were willful (¶ 107). Plaintiff is entitled to all legal and equitable relief under 29 U.S.C. § 216(b), including lost wages, liquidated damages, reinstatement or front pay, costs, and such attorneys' fees as are recoverable.

**COUNT VIII — Equal Pay Act**

**29 U.S.C. § 206(d)**

*(Against Reem Bridals and Sinel; against the Entity Defendants as joint employers)*

141. Plaintiff repeats each preceding paragraph.

142. Plaintiff is male. Defendants employed Gabrielle Kauper, a female employee, in a commissioned sales position at the same establishment during the same period (¶ 90).

143. Plaintiff and Kauper performed work requiring substantially equal skill, effort, and responsibility under similar working conditions: both sold Defendants' bridal and couture merchandise to clients at the 501 Fifth Avenue showroom, from inventory Defendants stocked, at prices Defendants set, under the same supervisors (¶ 91). Defendants' own schedule records both selling in both the boutique and couture divisions in the same months (¶ 79G). Defendants' assertion that the two "do not perform the same job" rests on a walk-in appointment category that Defendants' appointment-only showroom did not maintain (¶ 79F).

144. Defendants provided Kauper compensation on more favorable terms, including a draw alleged on information and belief to have been greater than the $1,000 extended to Plaintiff, the availability of which was disclosed to her and not to him, and which was not recouped in full against his earned commissions as Plaintiff's was against his (¶¶ 91B, 93–94). The draw is a component of compensation, and its provision, amount, timing, and reconciliation terms are terms of pay.

145. Defendants referred to the comparator's prior tenure and sales record. Defendants did not identify a defined seniority system, a merit system, a system measuring earnings by quantity or quality of production, or the amount, eligibility criteria, recoupment terms, or comparative application of the draw. Those facts are within Defendants' possession and control.

145A. Plaintiff's Equal Pay Act claim is subject to 29 U.S.C. § 255(a), which provides two years and three years for a willful violation. This action was commenced on February 24, 2026. A cause of action under the Equal Pay Act accrues on each occasion that unequal compensation is paid. Defendants paid Plaintiff compensation on February 24, 2023 (¶ 52C-1), on March 10, 2023, and on March 15, 2023 (¶¶ 56, 79, 104C). Each of those payments falls within three years of commencement. Plaintiff alleges that each was made under the compensation terms alleged at ¶¶ 143–145 and that the violation as to each was willful (¶ 146).

145B. Defendants' stated justification for the comparator's more favorable draw terms is her "proven sales record during the prior seven (7) years of employment with the Company" (¶ 94). Defendants have identified no difference in job content. Defendants never conferred on the comparator the title she represented to Plaintiff that she held, and Sinel replied in writing that the designation was "news to me" (¶¶ 36, 90); Defendants cannot rely on that title to distinguish the two positions. Plaintiff alleges that client appointments and inquiries were diverted away from him during his employment (¶¶ 42–47), that Defendants scheduled the comparator on the sales floor on substantially every day she worked while scheduling Plaintiff there on approximately two of the five days he was required to be present (¶ 91A), and that a sales record produced on a schedule Defendants protected and through the allocation of client appointments is not a factor other than sex independent of the compensation arrangement Plaintiff challenges. Plaintiff further relies on the commission-rate differential and the quota allocation pleaded at ¶¶ 60B-1,

60B-2 and 91C, on the draw terms pleaded at ¶¶ 91B and 93, and on Defendants' written statements of March 15, 2023 (¶¶ 79B, 79C). Plaintiff does not allege that the comparator was the beneficiary of each diverted appointment (¶ 164).

145A-2. Defendants' commission report credits the $1,000 draw as a reduction in arriving at the $575.26 balance it states as owed (¶¶ 56, 93). Defendants tendered that balance on March 15, 2023 and made a further commission payment on March 10, 2023 (¶¶ 56, 79–80). The recoupment of Plaintiff's draw was given effect in each of those payments, both of which fall within three years of commencement. Plaintiff alleges on information and belief, the terms of the comparator's draw being within Defendants' exclusive control, that hers was not recouped in full against her earned commissions; Defendants described hers as "an advance of anticipated commissions" (¶ 94). Each payment Defendants made to Plaintiff on and after February 24, 2023 was made under compensation terms that differed from those applied to the comparator, and each such payment was a discrete act of unequal payment.

146. Defendants' violation was willful. Sinel stated in writing that she controlled the commission rate applied to each employee (¶ 92) and administered the draw terms applied to each. Defendants' own schedule, created January 10, 2023, applied a higher commission rate to the comparator than to Plaintiff in the same months and on the same divisions of merchandise (¶¶ 60B-1, 60B-2), and Sinel nonetheless stated in writing on March 15, 2023, in response to Plaintiff's written claim of unequal pay, that his "eligible commission percentage was not different from Gaby's" (¶ 79B). Plaintiff seeks the differential and the remedies available under 29 U.S.C. § 216(b), without duplicative recovery.

## <u>COUNT IX — Sex-Based Pay Disparity</u>

## NYLL § 194

*(Against Reem Bridals and Sinel; against the Entity Defendants as joint employers)*

147. Plaintiff repeats each preceding paragraph.

148. NYLL § 194(1), as amended effective October 8, 2019, prohibits paying an employee less than an employee of a different sex for substantially similar work, viewed as a composite of skill, effort, and responsibility, performed under similar working conditions.

149. For the reasons pleaded at ¶¶ 142–145B, Plaintiff and Kauper performed substantially similar work and Defendants provided Kauper compensation on more favorable terms.

150. Plaintiff seeks the differential, liquidated damages, prejudgment interest, costs, and such attorneys' fees as are recoverable, without duplicative recovery as to Count VIII.

**<u>COUNT X — Disability Discrimination and Retaliation</u>**

**NYSHRL, N.Y. Exec. Law §§ 296(1), 296(6), 296(7)**

*(Against Reem Bridals; against Sinel under §§ 296(6), (7))*

156. Plaintiff repeats each preceding paragraph.

157. Beginning on or about February 15, 2023 Plaintiff was ill. He described the illness to Defendants contemporaneously and in writing as the flu, then as producing "Covid-like symptoms," and then as causing exhaustion severe enough that he had been "sleeping since Monday." The illness rendered Plaintiff unable to perform the duties of his position. It caused him to leave work partway through February 15, 2023 (¶ 66A) and kept him out of work on February 16, 17, 20, 21, 22, and 23, 2023. N.Y. Exec. Law § 292(21) defines disability to include a physical or medical impairment that prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic technique. Unlike federal law, it does not require that the impairment substantially limit a major life activity.

157A. Independently, Plaintiff was regarded by Defendants as having such an impairment, which N.Y. Exec. Law § 292(21) likewise includes within the definition of disability. On February 20, 2023 Sinel directed Plaintiff to "provide positive Covid test results as is the company policy with respect to all employees that have contracted Covid." On February 21, 2023 she directed him to "confirm you have gotten tested for COVID and advise what the results of the test were." On February 22, 2023 she conditioned his continued employment on his producing "a positive COVID test or ... a doctor's note attesting to your need for your absence." Defendants' February 23, 2023 termination letter states as a ground for separation that Plaintiff "failed to provide a doctor's note attesting to your need for your absences by February 23, 2023." Defendants thereby treated Plaintiff as having a medical impairment requiring clinical verification, and conditioned his employment on that verification.

158. Plaintiff was qualified for his position: he was hired for it after the pre-hire meetings described at ¶ 25, performed it for five months, and generated $325,395.50 in net orders during that period (¶¶ 24–26, 55). Defendants issued him no written discipline of any kind before February 16, 2023 (¶ 75).

159. Defendants knew of Plaintiff's condition. They solicited medical information from him, including COVID-19 test results and a provider letter (¶ 69), and their personnel communicated with him about his illness on February 20, 21, and 22, 2023 (¶ 70).

160. Defendants subjected Plaintiff to adverse action because of his condition and his need for leave, including the February 16, 2023 written warning, the assertion that no accrued sick time remained notwithstanding Defendants' own timekeeping records (¶¶ 88–89), and termination on February 23, 2023 (¶ 73).

161. Plaintiff's offer letter entitled him to five sick and safe days, and Defendants' handbook provides that where an employee's sick days exceed accrued sick time, "you must use PTO accrued time in order to get paid for those days" (¶ 89). On February 16, 2023 Defendants applied a day of accrued paid time off to an absence under that policy (¶ 66B). Defendants declared Plaintiff's absences of February 20 through February 23, 2023 unexcused rather than applying the accrued paid time off their own written policy directed them to apply, and which they had applied eight days earlier (¶¶ 66B, 69A, 88).

**COUNT XI — Discrimination, Aiding and Abetting, and Retaliation**

**NYCHRL, N.Y.C. Admin. Code § 8-107(1), (6), (7)**

*(Against Reem Bridals; against Sinel and Gupta as employees or agents under § 8-107(1)(a) and under § 8-107(6) and (7))*

162. Plaintiff repeats each preceding paragraph.

163. The NYCHRL is construed independently of and more liberally than its federal and state counterparts. Under § 8-107(1)(a), Plaintiff need allege only that he was treated less well than other employees because of a protected characteristic. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102 (2d Cir. 2013). Under § 8-107(7), conduct is unlawful if it is reasonably likely to deter a person from engaging in protected activity.

164. Plaintiff was treated less well than Gabrielle Kauper, a female employee holding a commissioned sales position at the same establishment during the same period, with respect to the terms on which Defendants extended and recouped a draw against commissions (¶¶ 90–94). Plaintiff separately alleges that he was denied systems access, that client appointments and inquiries were routed away from him, and that sales he worked were attributed elsewhere (¶¶ 40, 42–47); as to those, Plaintiff does not allege that Kauper was the beneficiary of each such act.

Plaintiff further relies on the accusation Defendants previously directed at another male employee (¶ 66D) as evidence bearing on whether Defendants' treatment of Plaintiff was caused at least in part by his sex.

165. Plaintiff engaged in protected activity on January 18, January 26, and February 22, 2023 (¶ 131), and Defendants took the actions described at ¶ 133.

165A. The deterrence standard stated at ¶ 163 is not limited to conduct occurring during employment. Plaintiff's NYCHRL-protected activity includes his February 22, 2023 written complaint to Sinel and Gupta, in which he objected that "the two colleagues with whom I share an office have messaged me and know I am sick," asked "How do they know I am sick?," and objected to Defendants' disparate treatment of a coworker "who had a positive PCR and allowed to work" (¶¶ 69, 69A, 72). Plaintiff alleges the August 2024 conduct described at ¶¶ 98A–98L as a further act of retaliation for that protected activity.

166. Section 8-107(1)(a) makes it unlawful for "an employer or an employee or agent thereof" to discriminate. Where the employer is a business entity, an owner, officer, or employee of that entity is not itself an "employer" within the meaning of the provision. *Doe v. Bloomberg, L.P.*, 36 N.Y.3d 450 (2021). Plaintiff therefore does not plead Sinel or Gupta as an employer under § 8-107(1)(a). Plaintiff pleads each of them as an employee or agent within that subdivision, and under § 8-107(6) and § 8-107(7), and alleges that each personally participated in the conduct alleged: Sinel in the compensation change, the attendance directives, the warning, and the termination; Gupta in the pay and records practices and in the May 24, 2023 certification.

**<u>COUNT XII — Unpaid Overtime; Misclassification</u>**

**NYLL §§ 650 et seq., 663; 12 N.Y.C.R.R. § 142-2.2**

*(Against Reem Bridals and the Entity Defendants as joint employers; against Sinel individually)*

166A. Plaintiff repeats each preceding paragraph.

166B. 12 N.Y.C.R.R. § 142-2.2 requires an employer to pay an employee overtime at one and one-half times the employee's regular rate for hours worked in excess of forty in a workweek, in the manner and methods provided in the Fair Labor Standards Act. Plaintiff was a non-exempt employee within the meaning of that provision and of NYLL article 19 (¶¶ 52A–52B-1).

166C. Plaintiff worked hours in excess of forty in each of the ten workweeks identified at ¶¶ 52D-3 and 52E-1, including the three pleaded by name at ¶ 52E, and in other workweeks during his employment. Defendants paid him no overtime premium for any such hour. Work an employer suffers or permits is hours worked, including work performed away from the employer's premises, where the employer knows or has reason to know it is being performed.

166D. Plaintiff's regular rate derived from his salary alone was approximately $36.06 per hour, and the corresponding overtime rate approximately $54.09 per hour. Plaintiff alleges that his regular rate must also include the commissions Defendants paid him as remuneration for employment, and that Defendants performed no such computation.

166E. Defendants kept no complete or reliable record of Plaintiff's actual hours worked (¶¶ 52C, 52F–52F-1). Their own January 18, 2023 correspondence states that Plaintiff "[did not] clock in and out." NYLL § 195(4) required Defendants to establish and maintain contemporaneous payroll records showing the hours worked by each employee. Where the employer has failed to keep such records, the employee carries his burden by producing sufficient evidence to show the amount and extent of the uncompensated work as a matter of just

and reasonable inference, and the burden shifts to the employer to come forward with evidence of the precise amount of work performed or to negative the reasonableness of the inference. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88 (1946). Plaintiff further alleges that NYLL § 196-a places on Defendants the burden of proving proper payment where they have failed to keep or furnish the required records.

166F. Sinel set Plaintiff's compensation and his exempt classification, controlled his schedule and working conditions, and is an employer within NYLL § 190(3). Plaintiff's claim under this Count is subject to the six-year limitations period provided by NYLL § 663(3). Plaintiff is entitled to unpaid overtime wages in an amount to be determined at trial, liquidated damages under NYLL §§ 198(1-a) and 663(1), prejudgment interest, costs, and such attorneys' fees as are recoverable.

**PRAYER FOR RELIEF**

167. WHEREFORE, Plaintiff respectfully requests that the Court:

(a) award unpaid commissions, unpaid overtime wages, and other wages, with prejudgment interest;

(b) award liquidated damages under NYLL §§ 198(1-a) and 663(1) and under 29 U.S.C. § 216(b), without duplicative recovery as among them;

(c) award statutory damages under NYLL § 198(1-b) and § 198(1-d);

(d) award liquidated damages of up to $20,000 under NYLL § 215(2);

(e) award back pay, front pay, and consequential damages, including the unemployment-insurance assessment;

(f) award compensatory damages under the NYSHRL and NYCHRL;

(g) award punitive damages under the NYCHRL, N.Y.C. Admin. Code § 8-502, and such punitive or other damages under the NYSHRL as may be legally available;

(h) order reinstatement or comparable equitable relief;

(i) declare the January 23, 2023 purported modification ineffective;

(j) award costs and, to the extent Plaintiff incurs counsel fees that are recoverable under applicable law, reasonable attorneys' fees; and

(k) grant such other relief as is just.

## JURY DEMAND

168. Plaintiff demands trial by jury on all issues so triable.

## VERIFICATION

169. I, Roth Ranbom, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that I have read the foregoing Second Amended Verified Complaint; that the factual allegations in it are true and correct to my own knowledge, except those alleged upon information and belief; and that as to those, I believe them to be true.

Dated: August 28, 2026

New York, New York

***[Signature block on following page]***

Respectfully submitted,

**/s/ Roth Ranbom**

______________________________

Roth Ranbom, Plaintiff pro se

1178 Broadway, 3rd Floor, PMB #561

New York, NY 10001

R261291@proton.me

(424) 438-9958

# EXHIBIT EE

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

***Notice to the Bar***

LAURA TAYLOR SWAIN
*Chief Judge*

TAMMI HELLWIG
*Clerk of Court*

---

The Manhattan, White Plains, and Poughkeepsie courthouses will be closed on Monday, February 23, 2026 due to inclement weather. Counsel and parties should check individual court calendars for updated schedules.

Summoned jurors should plan to report to court on Tuesday, February 24, 2026, and call the jury number listed on the summons after 5pm on Monday evening, February 23, for updated reporting instructions.

THE HON. CHARLES L. BRIEANT JR.
FEDERAL BUILDING AND COURTHOUSE
300 QUARROPAS STREET
WHITE PLAINS, NY 10601-4150

THE DANIEL PATRICK MOYNIHAN
UNITED STATES COURTHOUSE
500 PEARL STREET, ROOM 820
NEW YORK, NY 10007-1312

THE THURGOOD MARSHALL
UNITED STATES COURTHOUSE
40 FOLEY SQUARE
NEW YORK, NY 10007

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

***Notice to the Bar***

LAURA TAYLOR SWAIN
*Chief Judge*

TAMMI HELLWIG
*Clerk of Court*

---

On Tuesday, 2/24/26, the court will be open at all locations. The Court's public counters will open for in-person service beginning at 10:00 a.m. Counsel and parties should check individual court calendars for updated schedules.

Summoned jurors (those not already seated in an ongoing trial) should NOT report on Tuesday, February 24, 2026, but should plan to report on Wednesday, February 25, 2026. Jurors should call the number listed on the summons after 5pm on Tuesday evening, February 24, for any updated reported instructions.